```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                                 - - -

 4   IDENIX PHARMACEUTICALS, LLC, and
     UNIVERSITA DEGLI STUDI DI CAGLIARI,        :  CIVIL ACTION
 5                                              :
                    Plaintiff,                  :
 6   v                                          :
                                                :
 7   GILEAD SCIENCES, INC.                      :
                                                :
 8                   Defendant.                 :  NO. 14-846-LPS
                                         - - -

 9
                               Wilmington, Delaware
10                       Thursday, September 7, 2017
                             Oral Argument Hearing
11
                                   - - -
12
     BEFORE:        HONORABLE LEONARD A. STARK, Chief Judge
13
                                   - - -
14
     APPEARANCES:
15

16              ASHBY & GEDDES, P.A.
                BY:  JOHN G. DAY, ESQ.
17
                     and
18
                JONES DAY
19              BY:  CALVIN P. GRIFFITH, ESQ.,
                     RYAN B. McCRUM, ESQ.,
20                   MICHAEL S. WEINSTEIN, ESQ., and
                     BRADLEY W. HARRISON, ESQ.
21                   (Cleveland, Ohio)

22                   and

23

24
     Valerie Gunning                    Brian P. Gaffigan
25   Official Court Reporter            Official Court Reporter
```

1    APPEARANCES:   (Continued)

2

3                        JONES DAY
                         BY:   JENNIFER L. SWIZE, ESQ., and
                               GREGORY A. CASTANIAS, ESQ.
4                              (Washington, District of Columbia)

5                              and

6                        JONES DAY
                         BY:   STEPHANIE E. PARKER, ESQ., and
7                              BRIAN C. LEA, ESQ.
                               (Atlanta, Georgia)

8                              and

9
                         JONES DAY
10                       BY:   JOHN D. KINTON, ESQ., and
                               ANTHONY M. INSOGNA, ESQ.
11                             (San Diego, California)

12                                  Counsel for Plaintiffs

13
                         FISH & RICHARDSON, P.C.
14                       BY:   DOUGLAS E. McCANN, ESQ.,
                               MARTINA TYREUS HUFNAL, ESQ., and
15                             JOSEPH B. WARDEN, ESQ.

16                             and

17                       FISH & RICHARDSON, P.C.
                         BY:   FRANK SCHERKENBACH, ESQ.
18                             (Boston, Massachusetts)

19                             and

20                       FISH & RICHARDSON, P.C.
                         BY:   JONATHAN E. SINGER, ESQ.
21                             (San Diego, California)

22                             and

23                       IRELL & MANELLA, LLP
                         BY:   JASON G. SHEASBY, ESQ.
24                             (Los Angeles, California)

25                                  Counsel for Defendant

```
 1                          - oOo -

 2                    P R O C E E D I N G S

 3                  (REPORTER'S NOTE:   The following oral argument

 4     hearing was held in open court, beginning at 11:09 a.m.)

 5                  THE COURT:   Good morning, everyone.

 6                  (The attorneys respond, "Good morning, Your

 7     Honor.")

 8                  THE COURT:   I'll have you put your appearances

 9     on the record for us, please.

10                  MS. PARKER:   Good morning, Your Honor.

11     Stephanie Parker.

12                  THE COURT:   Good morning.

13                  MR. DAY:   Good morning, Your Honor.

14                  THE COURT:   Good morning.

15                  MR. DAY:   John Day from Ashby & Geddes for

16     plaintiff Idenix.   Stephanie Parker, Calvin Griffith, Ryan

17     McCrum, and Michael Weinstein, all from Jones Day at counsel

18     table.   Jennifer Swize, Brian Lea, that is spelled L-e-a,

19     in the second row.   And then in the gallery, John Kinton,

20     Anthony Insogna, Bradley Harrison.   And behind them, Greg

21     Castanias also from Jones Day.

22                  THE COURT:   Okay.   Thank you.   Welcome again to

23     all of you.

24                  Good morning.

25                  MR. McCANN:   Doug McCann from Fish & Richardson
```

1    on behalf of Gilead.  With me are John Singer, Chad Shear,

2    Frank Scherkenbach, Joseph Warden, Martina Hufnal, all of

3    Fish & Richardson.  Jason Sheasby of Irell & Manella on

4    behalf of Gilead.  And from our client, Brett Pletcher,

5    Lorie Ann Morgan, and Andrea Hutchison.

6              THE COURT:  Okay.  Welcome to all of you as

7    well.  So we're here for argument on multiple motions, let's

8    call them.  Have you all conferred how you might like to

9    present them today?

10             MR. SCHERKENBACH:  We did, Your Honor.

11             THE COURT:  Okay.

12             MR. SCHERKENBACH:  And unless the Court has a

13   different order in mind, the parties agreed that we would

14   start with Gilead's motion on the 112 issues, both written

15   description and enablement.

16             Followed by Gilead's motion on damages.

17             Followed by Idenix's motions on

18   enhancement/fees.

19             THE COURT:  And that is agreeable to the

20   plaintiff; correct?

21             MR. GRIFFITH:  It is, Your Honor.

22             THE COURT:  That's fine.

23             MR. SCHERKENBACH:  Thank you.  Mr. Singer will

24   address the 112 issues for Gilead.

25             THE COURT:  Okay.  Then we will begin with that.

1          MR. SINGER:  Permission to approach, Your Honor.

2   I have some handouts.

3          THE COURT:  Certainly.

4          (Slides passed forward.)

5          MR. SINGER:  Your Honor, before I begin and kind

6   of address the parties' arguments in the papers, I just

7   wanted to say that it's often the case on JMOL we're here

8   on, maybe I shouldn't call it that but I will, somewhat

9   mundane affairs where simply sometimes we want to preserve

10   the appellate record.  I think today we are not.

11          I think before you today on these 112 issues

12   you have a very important issue for the development of the

13   life saving medicines in this country, and that really in a

14   nutshell is whatever the contribution a patentee makes to

15   the field or science at issue, whatever the contribution the

16   patentee made in this case, when claims are so broad that

17   they fail to or they really contract from innovation by

18   charging sort of rent for which they fail actually to teach.

19   And I think in this case the '597 patent falls on the wrong

20   side of that line.  It doesn't disclose or teach the entire

21   class of 2'-methyl up nucleosides to treat HCV.

22          Instead, at best, what it does is it encourages

23   accepting what the characteristics of the invention

24   described.  It encourages others in the field to go find

25   those 2' methyl up compounds that actually treat HCV with

1        their own experimentation and their own effort.  And that,

2        in our view, renders the patent invalid both under

3        enablement and written description.

4                    THE COURT:  Where we are with the record, and

5        I'm sure we'll talk about that a lot but we are on JMOL.

6                    MR. SINGER:  Yes.

7                    THE COURT:  I think that probably means that

8        there is evidence that the 2'-methyl up discovery was

9        important, perhaps key, perhaps crucial.

10                    If we accept that there is evidence to support

11        that, is there some claim that Gilead would allow, could

12        have been legitimately claimed as an invention?

13                    MR. SINGER:  Sure.  Surely, of course.

14                    THE COURT:  Give me an idea of what a claim like

15        that would look like that would be physically enabled and

16        have written description.

17                    MR. SINGER:  Based on the disclosure that is in

18        the claims, the claim to the 2'-methyl up class with hydroxy

19        down would have been absolutely supported by the patent

20        specification and enabled by the patent specification.

21                    And that is the data that was in there, the

22        exemplary compounds that were in there.  And that was, in

23        fact, the discovery described by Dr. Sommadossi.  I think

24        that is fair to say would be perfectly fine.  It would have,

25        if you will, cabined or confined the invention to that,

1    number one, that which was actually invented and, number

2    two, not run afoul of the case law that I think both parties

3    are thinking about in the enablement and description

4    context.

5              THE COURT:  Would not have been too abstract,

6    for instance, to be patented in your view?

7              MR. SINGER:  No.  I mean, Your Honor, it has, it

8    has exemplary compounds, 2'-methyl up, OH down.  Those are

9    the compounds that are actually described in the

10   specification as examples, and it wouldn't have been

11   abstract in any way in the sense of having actually made

12   those compounds and exemplified them in the patent

13   specification to treat, to treat the disease at issue.

14             It's when going beyond that, to then say that

15   the discovery of that, if you will, group, however large or

16   small it might be, to then go from there, that teaching to

17   then say I have and claim any 2'-methyl up compound

18   regardless of its substituent at the 2' down or, frankly, at

19   the other positions in the molecule as well that the patent

20   runs afoul of the enablement and written description laws.

21             THE COURT:  And what we have in the '597

22   specification in Gilead's view is adequate to support both

23   written description and enablement, that more limited claim

24   that you just described?

25             MR. SINGER:  Right.  I think we said that in our

1    papers, Your Honor.

2            Your Honor is familiar with the patent policy

3    behind them.  I'm going to start with enablement, Your

4    Honor.  Most of my discussion beyond that now will go to

5    written description but they do have a lot of overlap.

6            You're familiar with the patent policy.  You

7    asked us to look at the Enzo case and provide you with

8    briefing, and we did.

9            These are the policies here that are at issue,

10   and it really is as I described, when does the patentee go

11   too far -- having discovered something and then go too far

12   to claim that which they don't teach or disclose?

13           I wanted to point out really what I think is

14   what you and I just discussed, and this goes to the

15   exemplary compounds that are in the patent specification.

16   And what we have described in our briefing.

17           And if you look at -- this is I don't think

18   controverted at trial at all.  The sugar, the nucleoside is

19   the sugar on the left side in the bottom.  This is slide 3.

20   And in the right corner, of course, is the base.  And you

21   see that, of course, the sugar in the working examples and

22   as described by Dr. Sommadossi's discovery is identical.

23           So we have, and I think Idenix pointed to one or

24   two examples, but they all have this same sugar.  And it's

25   got the methyl up at the 2', and the OH down at the 2', the

OH down at the 3', and the base is different.

You have got the four different natural bases in this depiction but the sugar is identical, and that's where the rubber hits the road.  Because when it came time for claim construction, Idenix urged, and the Court adopted, this claim construction that then unbounded the sugar, really that is what happened.  We have any purine or pyrimidine base, so anything on the right, and then this 2'-methyl ribofuranosyl nucleoside became any five member sugar ring, as the Court knows.

So this is the Court's construction.  So that extension to this broader, sort of this broader sugar structure or any sugar, almost any sugar with the 2'-methyl up, that is where it is brought in.

So I want to pause on this, Your Honor, because I think it's common to the cases the party talk about, including the *Enzo* case and the *Wyeth* case.  And it is we think an important aspect of these claims, and it is how we presented the argument at trial.

So the claim scope, it kind of has this structure, the claim itself has a structure where it identifies a structure and the structure is really any nucleoside with the attributes listed on the slide, 2'-methyl up, and according to the Court's claim construction, any non-hydrogen substituents at 2' down, 3'

1    down, and any substituents at 3' up, 4' and 5', and any

2    purine and pyrimidine base.

3            This is not to say -- they say a person of skill

4    wouldn't do anything.  And we agree with that, but the claim

5    construction covers anything that anybody comes up with that

6    meets that definition.

7            And then it is circumscribed.  So this group,

8    this broad group of structures is then circumscribed by the

9    function of being effective.

10           The critical aspect that Idenix has focused on,

11   the expert has focused on and said, here is the key.  This

12   is Dr. Meier who was testifying at trial.

13           These were the key teachings according to him.

14   The key invention or the key structures are 2' methyl up,

15   and it should be an inhibitor of the NS5B polymerase.

16   That's the enzyme involved here in the replication of the

17   virus in order to try to block that replication.

18           Well, you know, that inhibition of the NS5B

19   polymerase, that's not a claimed feature.  I don't think the

20   Court really has to resolve that to resolve these motions in

21   Gilead's favor.  But that is what is said is the key, what a

22   person, a skilled person would take from that structure I

23   just described to you as to how the claim works.

24           And so if you go to the patent, and I think this

25   is quite clear, the patent tells the person of skill in the

1    art, you know, in order to find those compounds that have

2    the key structure of the 2' methyl up and that would inhibit

3    the polymerase and therefore be effective to make and screen

4    the compounds.  That's what you do.  You make them and then

5    you screen them, and the experts for Idenix, they agree.

6    That's what they said.

7              Here's Dr. DeFrancesco talking about this very

8    paragraph.  Just for record, Your Honor, this is column 13,

9    lines 42 to 49 of the '597 patent.  This quote is actually

10   in there twice, so if you see it at a different site, it's

11   in there twice as well.  It says the Beta-D and Beta-L

12   nucleosides of this invention may inhibit HCV polymerase.

13   That's that enzyme.  And nucleosides can be screened for

14   their ability to inhibit HCV polymerase activity in vitro

15   according to the screening methods.  And as I said, that's

16   what the experts said, Idenix's experts.  This is not --

17   we're looking at, you know, we have to, of course, for JMOL,

18   look at the evidence most favorably to Idenix.  We have to

19   draw the reasonable inferences one my draw that the jury can

20   draw, and here's Dr. DeFrancesco.  If you remember, Your

21   Honor, he was the virologist that testified for Idenix.  And

22   he said, we used the screens because that is the way you

23   actually cut down the number of compounds, by removing all

24   inactive ones to a few interesting ones.

25             And this is Dr. Meier, both actually referring

1          to this very paragraph.  This was highlighted by Idenix in

2          their examination and this is them talking about this very

3          paragraph in the patent.  Dr. Meier, this is from column 13,

4          the section that I copied here.  Nucleosides can be screened

5          for their ability to inhibit HCV polymerase activity, et

6          cetera.  Make them and screen them.  That's how you find the

7          ones that are active or effective against --

8                    THE COURT:  You're saying make and screen.  It

9          seems like these quotes are talking about screening.  What

10         is the record evidence on whether a person of skill in the

11         art at the appropriate time would also have to take time to

12         make the compounds?

13                   MR. SINGER:  I think that Dr. Meier talked about

14         the, Dr. DeFrancesco didn't talk about making.  Dr. Meier

15         talked about having to make them.  And the question he was

16         talking about, the methodologies in the patent, talking

17         about the manufacturing methods that were in the patent at

18         this very location in the transcript.  I can get you a cite

19         in a moment where he talks about, you have to make them to

20         screen them.  They weren't simply commercially available.

21         You have to make them and screen them.  That's the point.

22                   THE COURT:  And does that contribute to whether

23         or not, to an assessment of how much experimentation is

24         required?

25                   MR. SINGER:  I think it does.  Just the simple

1   fact that one has to make them certainly does and the fact

2   that one has to screen them.  And it isn't the issue, Your

3   Honor, I think Idenix has argued, you know, that the

4   nucleoside chemistry itself was a known field.  People had

5   been making nucleosides for quite a long time, and Dr.

6   Secrist surely acceded to that in his cross-examination.

7   But one still has to go about making these, you still have

8   to do that.  You have to do that process to make them.

9           And in our briefing, Your Honor, the time

10  required, it was uncontested at trial, that Dr. Secrist said

11  the person of skill could make two to four a month, a single

12  person of skill.  And if you remember, if the Court doesn't

13  want to rely on Dr. Secrist on the assumption that the jury

14  rejected anything he said, I don't think it would be a fair

15  and reasonable inference.  Idenix's witness said that she

16  thought screening, which, of course, requires making 37

17  compounds a lot, in a month was a lot.  That I think was Dr.

18  Tausek was her name.  We cited that in our papers as well.

19          So there is this rate limiting feature in the

20  patent of making and then screening.  And while Dr.

21  DeFrancesco did testify that one could in theory screen

22  thousands per month in the abstract, what the testimony was,

23  you have to make them and acquire them.  And as I said, Dr.

24  Tausek said 37 a month was a lot.  Dr. Secrist said the

25  average person of skill could make two to four of these

1  nucleosides per month.

2          And, you know, at times reading, you know,

3  Idenix's papers, I don't mean to make light of this, but it

4  almost sounds like granting JMOL is impossible because

5  enablement is a factual issue and all the facts were

6  resolved again Gilead, and so therefore it's kind of a

7  circular argument.  There are facts involved.  The jury

8  solved them against you, and therefore you lose, and

9  therefore JMOL is impossible.  But, you know, we've cited,

10  and surely the Court has plenty of experience with JMOL,

11  that you don't just ignore the evidence that doesn't support

12  the verdict, particularly where it's uncontradicted and

13  unimpeached, as I believe the testimony I just described

14  from both Dr. Secrist and Dr. Tausek was.

15          THE COURT:  Enablement, I think is a question of

16  law at the end of the day.  Correct?

17          MR. SINGER:  That's right.  That's correct.

18          THE COURT:  Correct me if I'm wrong.  Did you

19  ever move for summary judgment on enablement?

20          MR. SINGER:  We did not move for summary

21  judgment on enablement.

22          THE COURT:  I've never been asked to determine

23  whether there's even a genuine dispute of material fact.

24          MR. SINGER:  That's correct, Your Honor.  We

25  moved on written description, I believe, twice, if memory

1     serves me.  But I think it's important, Your Honor, to look

2     at, here are sort of the key kind of, some of the key points

3     that there's just no dispute about one way or the other at

4     trial, and these are the background facts that are critical

5     to the enablement analysis.  This is Dr. Meier.  Modified

6     nucleoside activity for HCV in its infancy.  That's their

7     own expert.  Dr. Gosselin.  If you recall, he appeared on

8     video, Your Honor, on the Idenix side.  You don't know

9     whether or not a nucleotide will have activity against HCV

10    until you make it and test it, and there's that making and

11    testing again.

12              And we pointed it out in the papers, Your Honor,

13    but it's important to pause on it.  This is a document that

14    was entered into evidence with Dr. Seeger and it records

15    Idenix's activities with the 2' methyl up OH construct.  Not

16    anything else done, but just the 2' methyl up OH construct.

17    Even that I already said would have been enabled, even that

18    more often than not results in inactive compounds.  When you

19    make those, and Dr. Seeger is talking about this log that

20    Idenix made of hundreds of compounds, and this.

21              These are examples of compounds that were not

22    active.  All of them in this Idenix log; right?  Correct.

23    Just what do they have in common?  They have in common that

24    they are 2' methyl up OH down compounds.  That's not to say

25    every compound in this log was inactive.  That's not right.

1    It's just that a lot of them weren't, so we have a very

2    unpredictable field in which people take the time to make

3    compounds and they can't predict the activity.  They have to

4    test them.  And then that's how they find it.  That doesn't

5    satisfy the laws of enablement.

6            And you had a vivid example, uncontested,

7    with -- now we're going to move away from the OH down, which

8    was the thrust of the disclosure.  This is Dr. Otto talking

9    about, okay.  Let's talk about fluorine down.  What happens

10   when you have fluorine down to the 2'?  And Mr. McCann asked

11   Dr. Otto about 6130.  And if Your Honor will remember, that

12   was the key compound that Pharmasset first invented in 2003.

13   And I've got the little picture at the bottom there, Your

14   Honor, right there.  And you see the fluoro down at 2' with

15   the methyl up.  And it says, 61 is sugar ring.  Can you

16   describe to the jury, again, what is at the 2' position?

17   The 2' position has 2' methyl up and fluorine down.  Talks

18   about the base being cytosine and says that it's active.

19   And then Dr. Otto talked about switching the base, even the

20   base.  Just switching the base from cytosine to adenosine,

21   one of the naturally occurring bases in all of our bodies.

22   Did Pharmasset ever try keeping that exact same sugar ring

23   and switching the base to the adenosine base?  Yes.  And

24   what happened?  The compound was inactive.  So what

25   difference does that make there?  And, again, it is not to

| | |
|---|---|
| 1 | say one compound carries the day.  The evidence at trial was |
| 2 | uniform, that predicting the activity of these compounds is |
| 3 | not possible until you make them and test them. |
| 4 | We think under *Wyeth*, under all the case law |
| 5 | we've cited, this is basically an iterative and |
| 6 | trial-and-error process to practice the claimed invention |
| 7 | even with the help of the specification that renders it |
| 8 | invalid. |
| 9 | THE COURT:  Is it Gilead's position that the |
| 10 | full scope of the claims as the Court has construed it could |
| 11 | not possibly be enabled or is there some conceptual |
| 12 | enablement test that could have, some other specification |
| 13 | that could have enabled it? |
| 14 | MR. SINGER:  Sure, Your Honor.  I can imagine a |
| 15 | world -- we're lawyers, so we can always imagine other |
| 16 | hypothetical specifications that had, you know, many more |
| 17 | examples with many more different, for example, substituents |
| 18 | at 2' down and 3' down that showed the world, hey, 2' up |
| 19 | methyl compounds with all of these other things down have |
| 20 | activity or not have activity. |
| 21 | THE COURT:  Even some of them would have |
| 22 | presumably said, no activity.  You know, we tested this. |
| 23 | This one had no activity, but some of these other 2' downs |
| 24 | did have activity? |
| 25 | MR. SINGER:  Sure.  I think the case law, I |

think it was the *UroPep* case kind of talked about the mere

listing of inoperative embodiments, you're kind of -- it's

sort of an unfair thing, right.  You have to list

everything, and if you listed a few that were inoperative,

would that render your claim not enabled?  And the answer is

no.  But I surely -- surely, we can imagine a specification

that had more than one sugar ring to disclose to the world

attached to the four natural bases and a couple modified

bases.  We can imagine other substituents down.  Of course,

we can, could have imagined fluoro down, which, of course,

this patent omits from its description of possible, of

substituents.  So, you know, that's not the case we have

here, Your Honor, but absolutely.  We can imagine something

that would be the standard.

   And, you know, we've cited a variety of cases,

and I'm struck, Your Honor, I think we're all struck by how

similar the *Wyeth* case is, and I put the claim side by side

with *Wyeth* just so we could see.  It has this exact same

claim structure.  You've got the method for treating.

You've got a structure.  In the case of the *Wyeth* case, it

was the Rapamycin structure which has having this

macrocyclic ring.  I will describe it in a moment with a

substitution at the C37 position.  And here we have the 2'

methyl nucleoside, the 2' methyl position and substitutions

at the other points.

Again, the constructions define the classes in
the same way.  There's the *Wyeth*.  The invention is a new
method of use of a known compound, sirolimus and any other
compounds that meet the constructions structural and
functionality requirements.  You've got the new use of what
Dr. Sommadossi described as the known compound and then
extended to anything that was unknown that had that
structure as well, and then circumscribed by the
effectiveness in the claims.

And, again, *Wyeth*, very limited knowledge of the
use of these compounds for the particular disease, the
restenosis in the arteries.  And remember in that case, Your
Honor, Rapamycin was known since the seventies.  That was
not an unknown compound.  In fact, Idenix cited, provided
the Court with a rapamycin patent at issue in the case,
and if you read the patent, you'll see it's a well-known
compound that has been used for a variety of things for many
decades before the *Wyeth* case.

The same thing here.  While some of these
compounds, these nucleosides were known, and as Dr. Meier
described, that people had been doing nucleoside chemistry
for a long time.  The field of actual use here was basically
unknown in its infancy.

Unpredictability, the same thing.  You've got to
test it, you've got to make it and test it to find the

1  activity.

2         And this I've already described, the use of a

3  known compound extended to a class.  And, again, the

4  structure at issue impacted potentially very large numbers

5  of compounds described by the effectiveness limitation.  And

6  whether it's billions or simply a lot or millions, at the

7  end of the day, what you have is an iterative

8  trial-and-error process to find the compounds by making and

9  then testing it.

10         All right.  And it's ironic to even use the

11  exact same language.  The expert said it's significantly

12  smaller than *Wyeth* because of the particular molecular

13  weights that we required to make it permeable, and Dr. Meier

14  said the same thing.  It would be significantly smaller

15  because it would have to inhibit the NS5B polymerase.  That

16  doesn't matter because at the end of the day, it's the

17  person of skill who has to find them.

18         And this I want to pause at.  The data available

19  in the patents is remarkably similar.  And in *Wyeth*, they

20  had in vitro test data about one particular compound.  And

21  then if the Court recalls, they assume that there are four

22  other compounds that shared structural similarities that had

23  that same activities.  Five, five in total.

24         And here it is the same thing.  We have four

25  compounds that are said to be active that share a common

1    structural feature of the 2'-methyl up and are said to have

2    activity, so the exact same number of compounds.  And it is

3    time consuming to do this.

4              And this is Dr. Taucek's testimony I referenced

5    where she said the 37 compounds a month was a lot.

6              So that is the *Wyeth* case.  And I think it well

7    establishes facts looked at in light of, in favor of Idenix.

8              I want to respond a little to Idenix's

9    arguments.  And I'm sure I'll hear more, but just what they

10   said in the papers.  I don't know what is going to be said

11   here today.

12             Idenix responds to this and says, well, there is

13   guidance in the patent specification that it is, it does

14   tell you what to do at these other positions.  And this is

15   from their brief.

16             They say, Dr. Secrist -- excuse me.  The

17   evidence showed using the '597 patent disclosure combined

18   with the knowledge in the art would allow skilled artisans

19   to readily visualize the other compounds expected to have

20   antiviral activity.

21             They talk about -- this is page -- I don't have

22   the page number.  I apologize, Your Honor.  Dr. Meier talks

23   about that key testimony that I highlighted.  The key

24   structure being the 2'-methyl up and NS5B activity.

25             And the brief goes on and says, such compounds

include 2'-methyl prime ribonucleosides having substituents

at the 2' down position that would mimic hydroxy in some

way, shape, or form.  Factors such as steric hindrance and

electronegativity of compounds would inform skilled artisans

of modifications at the 2' position that are likely to work.

This is not Dr. Meier's testimony.  If the Court

will recall, on summary judgment of written description,

Idenix said he would testify to this at trial.  And he did

not.

He did not offer any testimony about mimicry or

steric hindrance.  What they're pointing to is the videotape

deposition testimony of Dr. Storer talking about what he did

at Idenix after the patent filing.  And that simply is not

enough to overcome or -- that is not substantial evidence.

That is not enough to overcome or support denying JMOL.

THE COURT:  Because of the timing with which Dr.

Storer did the work?

MR. SINGER:  Because of the timing.  It is after

the patent.  It is also not from the perspective of a person

of ordinary skill in the art.

And, most importantly, you know, perhaps, it's

not in the patent specification.  If this is the novel

aspects of one of the novel aspects of the invention, it has

to be in there.  And I apologize we don't have a cite there

from *Enzo* I which is just a cite.

1          But it is the specification, not the knowledge

2    of one skilled in the art that must supply the novel aspects

3    of an invention in order to constitute adequate enablement.

4          If the novel aspect is the activity of methyl up

5    with anything at these other positions, if the mimicry and

6    steric hindrance is that novelty, the other aspect of the

7    invention besides being known, OH down, that has got to be

8    in the patent specification.  And this testimony does not

9    put it in.

10         And, critically, it is not from an expert

11   offering that this is what a person of ordinary skill in the

12   art would conclude.  This is we're talking about what Idenix

13   did internally after the patent.

14         So I don't need to go through this again.  I

15   provided to Your Honor just a simple chart of the

16   similarities to *Wyeth*.

17         I did want to pause, Your Honor, assuming I

18   don't take too much time, and also talk a little bit about

19   *Enzo*.  And, again, I look at that case, and it's got the

20   same kind of structural component and then a functional

21   component.  And, again, the structure and the function put

22   together left the person of skill having no choice to make a

23   variety of things to see if they would properly hybridize

24   and be able to be detected in an art with the knowledge with

25   limited examples.  A large class you had to winnow down to

1    find the things that work, that is not enablement.

2             And then also on *Liebel-Flarsheim*.   That is the

3    case Your Honor will remember we were talking about with

4    respect to the impact of the failure of Idenix to be able to

5    make the 2'-methyl fluoro construct themselves.

6             And this is again right back to the policy issue

7    I started with.   It's important to remember the claims as

8    filed didn't allow for the 2'-methyl fluoro down, and they

9    were amended to kind of bring that within the full scope of

10   the claims.

11            As we have already heard, and the Court knows

12   very well, the 2' prime fluoro is not listed in the patent

13   specification, and Idenix failed to make the accused product

14   when they tried and now essentially they want credit for

15   Dr. Griffon unknowingly making it in 2003.

16            Okay.   Let's say that he unknowingly made it in

17   2003 and the jury believed that.   That doesn't change the

18   fact that no one at Idenix actually identified a working

19   synthesis until 2005, after multiple years of failure of

20   either by their experts.

21            So this is right on *Liebel-Flarsheim* where the

22   claims are expanded as they are here.   Their full scope

23   isn't enabled when the patentee itself fails to be able to

24   make the accused product and the accused structures that

25   fall under the claims.

1          This was right back to the teachings or the lack

2    of teachings that I described here.

3          What other response do they have?  They say,

4    well, look, Jeremy Clark himself was guided by the '597

5    patent.  We talk about going to Dr. Otto's office.  Somehow

6    that proves that the patent is enabled because Mr. Clark, he

7    was able to use the '597 patent to do this work.

8          There are inferences, and there are reasonable

9    inferences, Your Honor.  And there is no doubt Mr. Clark did

10   go into Mr. Or Dr. Otto's office with the patent.  And the

11   testimony at trial was they were trying to see whether or

12   not they were infringing or not.

13         Here is what he said.  This was presented to the

14   jury about you can't rely on some portion of Mr. Clark's

15   testimony and ignores others.

16         This is what he said about where he got the idea

17   from:

18         He was asked:  Where did you get the idea of

19   using 2'-methyl up and 2'-methyl down?

20         He said:  Probably from reading the literature.

21         You go back to the old literature.  This was the

22   Merck material that were at trial.

23         The 2'-methylcytidine compounds were made in the

24   late 60s or reported at least in the late 60s.

25         Then they say, well, he did it in 15 minutes.

1    If the Court looks at the testimony that is cited there,

2    Your Honor, he said the reaction took 15 minutes.  So he

3    actually, you know, put the chemicals together.  It took

4    15 minutes for a chemical reaction, as I suppose chemical

5    reactions I suppose sometimes do.

6              What he really said was, let me tell you about

7    the synthesis with the sugar.  This is page 976, line 22:

8              It was the spawn of the devil.  This took me

9    many, many times of going back and doing the same steps over

10   and over.

11             Then when asked where he got a particular part

12   of the reaction:  Do you recall how you arrived at the

13   methyllithium reaction, how you came to use the

14   methyllithium, he didn't say he got it from Idenix.  He said

15   he got it from a work by Matsuda, a Japanese scientist.

16             That does not answer the enablement question.

17             THE COURT:  You say that you can't take part of

18   Mr. Clark and not all of it.  Why wasn't the jury free to

19   say we believe him on some things and we don't believe him

20   on others?

21             MR. SINGER:  They are, but I would just -- the

22   law requires the inferences be reasonable.  And what Mr.

23   Clark said -- so the inference from the testimony, Your

24   Honor, has to be reasonable, it can't just be I'm going to

25   take one part of Mr. Clark's testimony and just ignore and

1    ask for the inference, because Mr. Clark did not directly

2    say -- he didn't, he didn't go to, he didn't offer any

3    testimony that I used Idenix's patent to guide me.  This is

4    an inference that Idenix argued to the jury.

5           So I put up what he actually said and what he

6    actually did and I ask Your Honor, I don't believe that that

7    is a reasonable inference to conclude that the '597 patent

8    was the solution to its properties.

9           And, finally, Your Honor, just on the disclosure

10   point.  The patentee's failure, at the end of the day, not

11   the infringer's success, is what really matters.  And the

12   disclosure in the '597 patent by Dr. Meier's own words was

13   the known routine methods of making nucleoside.  It wasn't

14   anything -- he do not describe it as putting anything new in

15   there.  So persons of skill would turn to these methods and

16   adapt them as they might need to to make these 2'-methyl up

17   and whatever they were going to put down.

18           Okay.  *UroPep* came up, Your Honor.  I would

19   submit that is a very different case.  I believe Idenix is

20   citing it for the proposition both relevant to enablement

21   and written description.  Either way, the field was

22   described by the Court as a mature field in the case.  And

23   there were hundreds of these known inhibitors of selected

24   inhibitors of the particular enzyme in the case at the time

25   of the invention.  So it was a new use of these hundreds

1     of known inhibitors, and literally, I think the Court said

2     thousands, tens of thousands have been developed since the

3     time of the invention.  So this was a very mature field

4     right there.

5             Dr. Bell testified the field was mature.  And

6     that a skilled artisan would not necessarily need to conduct

7     any screening but could use their own PDE5 inhibitor, if

8     they've got one already.  And that is because the field was

9     mature.

10            Okay.  Now, Your Honor, unless you have any

11    questions, I'm going to turn to written description.

12            THE COURT:  I do have some more on enablement.

13            *Storer*, the Federal Circuit decision, that was

14    an enablement decision at least in part, wasn't it?

15            MR. SINGER:  Yes, it was.

16            THE COURT:  And I guess I would like to better

17    understand your position as to its general relevance.  But

18    correct me if I'm wrong, did they talk about Mr. Clark

19    there?

20            MR. SINGER:  They did.  They did, absolutely,

21    Your Honor.  So I think I put it on a slide.  I kind of went

22    over.  I will go back to it.  There it is.

23            I was talking about the failures of Dr. Griffon.

24            So in *Storer*, the Federal Circuit said:  "To

25    establish enablement of a claim whereby new chemical

compounds are provided for use to treat disease, the
application must enable production of the synthesis of the
new compounds."

And the Federal Circuit ruled, as the Court
knows, that the disclosure in that patent did not so enable
the production of the new 2' fluoro down methyl compound in
that patent.

It talked about this evidence about Mr. Clark
and found it not persuasive as overcoming the failure of the
patent specification, which used, again, it's the same
thing.  In that case, Your Honor, what was argued in support
of the enablement was that the method in the patent were
known methods of making nucleosides and then a person using
and could use those known nucleosides methods with their own
knowledge, therefore, come up with the claimed compound.

That is exactly the same thing here.  We have
their expert saying that the methodologies were known and
routine that are in this patent specification and Idenix is
saying a person could use those compounds, those
methodologies, then come up with a new compound covered by
the invention.

So *Storer* is right on point in terms of both
just the general background of the law, Your Honor, but
also, I mean it, you know, I get it is a different case for
a jury and that was an interference, but it talks about the

1   exact same evidence that this jury heard and the Federal

2   Circuit's conclusions about that.  Admittedly a different

3   standard but it is the same evidence.

4            THE COURT:  There was back and forth about

5   closed lists.  Is there a material dispute of fact on

6   whether or not the specification of the '597 talks about

7   closed lists?

8            MR. SINGER:  So with respect to written

9   description, I didn't think there was a dispute that the

10  lists in the patent are closed.

11           THE COURT:  Is that a concept that only goes to

12  written description?

13           MR. SINGER:  That is more about written

14  description, Your Honor.  It is relevant to enablement, Your

15  Honor, in the sense of what is actually listed there and, of

16  course, doesn't list fluoro, so the failure to enable the

17  fluoro moiety, but, of course, none of the things in the

18  list are exemplified in the patent besides -- as we made

19  besides the OH down, but it's more directly relevant to

20  written description.

21           THE COURT:  Okay.  If you would move on to

22  written description.

23           MR. SINGER:  Okay.  Let's see.  All right.  I'll

24  be briefer.

25           We did move for summary judgment here twice,

1   Your Honor.  And I recognize that we are here a third time

2   arguing about written description in the case, and the jury

3   resolved the issue against us.  So I don't want to belabor

4   this.  But I think, again, the points here are, these are

5   not disputed points, or at least disputed evidence wasn't

6   presented about these points to the jury.

7          And I remind the Court once again that in the

8   face of summary judgment what was promised to the Court

9   that would be presented was Dr. Meier's testimony about this

10   aspect of the mimicry and steric hindrance and how that

11   would expand what was disclosed in the patent from the

12   exemplified OH down molecules and the simple lists of

13   possible substituents that are in fact closed to anything.

14   And that a person of skill would be able to do that, and the

15   testimony was not given.

16          And the deficiency, it is real simple.  The

17   patent describes -- and I have here at slide 38 -- specific

18   substituents at the positions at issue.

19          It excludes certain substituents like 2'-fluoro

20   down.

21          And it specifically includes -- and I went

22   over this with Dr. Meier in his cross-examination -- it

23   specifically includes that which the Court excluded.

24          So when you look at the lists, it doesn't

25   include the accused product, the listed fluoro, and it

1   includes the very thing the Court -- the only thing, the

2   only thing that the Court said was excluded.

3           And, Dr. Meier, when he went through his

4   exemplary part of the patent, he relied on formula 11.  And

5   if you read formula 11, it not only includes hydrogen, Your

6   Honor -- and let me just go right here.  It not only

7   includes hydrogen, if you go to the preferred embodiment,

8   the very thing that he relied on, the preferred embodiment

9   is hydrogen.

10          So you have a patent specification, and the case

11  law says that if you are going to claim the genus, you have

12  got to direct the person of skill to that genus.  You don't

13  just kind of get to pick and choose.  The jury instructions

14  in this case was apt, cited in our brief, about blazemarks.

15  You don't just get to pick and choose substituents.  That is

16  number one.

17          And then if you are going to claim something

18  that is broader than what you do, you better have

19  disclosures that shows that that is in fact what is claimed.

20          And you just don't get there from the list in

21  the specification.

22          And you asked me, was there any real material

23  dispute?

24          And here is Dr. Sommadossi:

25          If you look at the '597 patent, there is no

1    disclosure of a 2' up fluoro down methyl nucleoside?

2                Correct.

3                So I don't think there is any real dispute about

4    what is missing from the '597 patent.

5                Your Honor, I have spoken plenty about both of

6    these issues.  I do want to reserve some time to respond to

7    Idenix's argument.  Absent any further questions, I'll sit

8    down at this point.

9                THE COURT:  Not at this time.  I'll give you a

10   chance on rebuttal.

11               MR. SINGER:  Thank you.

12               THE COURT:  I'll hear now from Idenix.

13               Good morning.

14               MR. GRIFFITH:  Good morning.  I have handed a

15   set of slides up to the Court.

16               THE COURT:  I have them.

17               (Slides passed forward.)

18               MR. GRIFFITH:  Let me see if I can get our

19   slides up.

20               All right.  May it please the Court, Idenix

21   respectfully submits that Gilead's JMOL motion should be

22   denied, and I'm going to just be addressing the enablement,

23   written description portions today.  Ms. Parker will address

24   the damages portion that will come later.

25               Your Honor, as your questions earlier today

suggest, the posture of this case matters.

The jury has rendered a verdict in Idenix's favor on the defenses for which Gilead seeks JMOL.  It was a full and rich trial record.  And Gilead bears a heavy burden to have the verdict overturned.

We had a nine day trial, 27 witnesses, four technical experts, 179 exhibits.

Gilead bore the burden on these defenses by clear and convincing evidence, so a high standard, and now is not the time to reargue the evidence.  And I believe that is what is happening here.

This is the standard that Gilead has to show.  They have to show that the record is deficient on the minimum quantum of evidence to sustain the verdict.  The only reasonable conclusion could be in its favor.  All logical inferences have to go Idenix's way and all conflicts in the evidence have to be resolved in Idenix's favor.  And we can't disturb the credibility determinations of the jury or substitute our own resolutions of conflicting evidence for that of the jury.

Here, the record is not critically deficient of the minimum quantum of evidence to sustain the verdict.  And in that regard, Judge Bryson's *UroPep* decision and Judge Robinson's *Amgen* decision -- both denying JMOL after a full jury trial -- are instructive on these intensity factual

1     issues with competing evidence.  That we have in this

2     record.  Judge Bryson, I would note, actually sat on the

3     *Wyeth* panel.

4             Let me start with enablement.

5             THE COURT:  So let's talk about enablement.  Is

6     it correct that I've never been asked to determine any

7     genuine issue of dispute on enablement.

8             MR. GRIFFITH:  Yes.  They did not file a motion

9     for summary judgment on enablement.

10            THE COURT:  So if it turns out there are no

11    genuine disputes of material fact, what is the legal

12    standard that I would apply?

13            MR. GRIFFITH:  It's essentially the same as the

14    summary judgment standard, but the record is different.  We

15    have the trial record here, which is much more substantial

16    than one typically has in a summary judgment motion, but the

17    question is whether, as we discussed in the previous slide,

18    viewing all of the evidence in the light most favorable to

19    the plaintiffs, drawing all inferences in favor of the

20    plaintiffs, can the decision on that only go one way.  Could

21    no reasonable jury reach the conclusion in favor of the

22    plaintiffs?  But the procedural posture does matter because

23    the jury has heard this evidence and has gone in favor of

24    the plaintiffs.  So we have a lot more information here than

25    one typically has on a summary judgment record.

1          THE COURT:  So you have quite a lot of slides

2     here and you're going to have plenty of time to go through

3     them, that's fine, but just as a preview, give me an idea of

4     what you see as some of the genuine disputes of material

5     fact with respect to enablement.

6          MR. GRIFFITH:  Yes.  And the easiest way for me

7     to do that, Your Honor -- for some reason, I'm not getting a

8     reaction here -- would be to go to the *Wands* factors.

9          Well, this is fine.  Could we go to the slide

10    that has the jury instruction?  I'm not sure what's

11    happening with the clicker.

12          These are the fact issues, Your Honor, and this

13    is how the jury was instructed, and both parties jointly

14    submitted this jury instruction.  This was our joint

15    proposal.  And so the jury took these *Wands* factors.  Both

16    sides submitted competing evidence on each and every one,

17    how much experimentation would be necessary to practice the

18    full scope of the claim, to synthesize 2' methyl, how

19    routine was such experimentation, and does the patent

20    disclose working examples, the amount of guidance, the

21    nature and predictability of the field, level of ordinary

22    skill, and the scope of the claimed invention.

23          I think maybe on level of ordinary skill they

24    may have agreed with us, that it was a very high level of

25    ordinary skill, but -- and, indeed, all the witnesses who

1    testified in here, Your Honor, generally speaking, for our

2    scientific witnesses, they have pretty impressive scientific

3    backgrounds.

4            So No. 6 goes Idenix's way and all of the others

5    had conflicting evidence on each and every one.  And let me

6    try this again.  There we go.

7            It wasn't just that there are these fact issues,

8    but the jury was also properly instructed to weigh the

9    fact issues.  No one of the *Wands* factors is dispositive.

10   It's an intensely factual inquiry that was put to the jury

11   and which they resolved, making their credibility

12   determinations and weighing the evidence as they were

13   instructed to do.

14           Now, let's talk a little bit about guidance from

15   the patent, which I think was one where a lot of evidence

16   was submitted.  Again, it was conflicting evidence.

17           Dr. Meier testified that the 2' methyl feature

18   is the key feature of the ribonucleoside in this claim, a

19   very different situation from *Wyeth* and *Enzo*, both which

20   were so heavily relied on by Gilead where the patents did

21   not identify the key technical feature, the key novel

22   feature of the claim.  Those patents did not provide this

23   type of guidance.  The patent informs on the mode of

24   operation, something absent from the *Enzo* patents.  The

25   enzyme that the compound in *Wyeth* acted on was identified in

1    the patent, but in *Enzo*, that was the -- the mode of

2    operation was missing.

3         The jury was entitled to credit this evidence in

4    favor of Idenix.  This was some of the portions of the

5    specification that described that the enzyme acts on the HCV

6    polymerase, the NS5B polymerase.

7         Now, they are rearguing the evidence and saying

8    it just says "may" and we don't know really what it was

9    acting on, skilled artisans wouldn't have understood that it

10   was directed to this, but our expert quite clearly testified

11   that they would understand, and that they precisely

12   understand that it was working on the HCV polymerase.

13        THE COURT:  Now, in the portion and for record,

14   you were showing me the same excerpt that was showed by

15   Gilead.  It immediately goes on to talk about the screening

16   and at least implicitly making.  What's the record on

17   whether you need to make and screen these in order to

18   understand which ones are within the scope of the claim?

19        MR. GRIFFITH:  Well, certainly, to practice the

20   invention, one has to make the compound.  That's a given.

21   But this patent provides guidance to the skilled artisans,

22   that that will certainly work.  We have Gilead's concession

23   today that it is enabling with respect to 2' methyl up, 2'

24   hydroxide down, and the base unspecified, notwithstanding

25   that the skilled artisan may have some strikeouts when they

1    try a base, that it doesn't work.  But that's not undue

2    experimentation.

3              So we have the concession that that sort of

4    modification and that sort of testing and screening is

5    routine.  They said the patent is not enabled because of the

6    fact that if one tries bases besides the four natural bases

7    that are exemplified in the illustrations in the patent and

8    also in the data, that doesn't de-enable, dis-enable the

9    claims.

10             But would one have to do some screening?

11   Certainly.  Sometimes one would have to do screening.  You

12   wouldn't have to do it if you use, for example, the working

13   examples in the specification, the skilled artisans might do

14   it in the last, but you wouldn't have to.  I think there

15   were probably other substitutions, many substitutions that

16   one would not have to do screening on, which are described

17   in the specification.

18             Well, let me go to it.  And this is just another

19   portion of the specification that says for the preferred

20   embodiments, you use the polymerase assay.  So it was,

21   again, emphasizing the importance of HCV polymerase, the

22   NS5B polymerase.

23             Synthetic routes are described.  We may come

24   back to that in a bit, but as well, the patent describes how

25   to make pharmaceutically acceptable salts and prodrugs at

various positions on the sugar.  Columns 39 and 40, I think

maybe 38 to 40 actually get into that in some substantial

detail.  There was -- it's described as being standard

procedures well-known in the art.  The same admission

actually is made in the Clark patent itself, and Dr.

Schinazi testified that these sorts of, this sort of

chemistry on these type of molecules is easy.  He called

prodrugs easy, so that's putting non-hydrogen substituents

at various portions of the molecule.

         Now, the patent has described other options that

one has and these are non-limiting options.  They call it a

closed list, but there's no requirement that a patent list

all of the species that can be used with the invention.  And

in that regard, I saw on the slides that this was described

as specific exclusion.  And I think some of the briefs of

Gilead say that our witnesses testified that, for example,

most notably fluorine at 2' down was specifically excluded.

But it's not specifically excluded.  It's not -- it was

omitted as a specific example of an option at 2' down, but

there's no statements in this patent or anywhere to the

effect of, stay away from fluorine at 2' down.

         THE COURT:  It's undisputed, however, that the

'597 patent nowhere expressly disclosed fluorine as a 2'

down position; correct?

         MR. GRIFFITH:  As a specific example, that's

1    correct, Your Honor.

2              THE COURT:  Is it also undisputed that fluorine

3    is a halogen?

4              MR. GRIFFITH:  It is a halogen.

5              THE COURT:  And is it also undisputed that other

6    halogens are expressly disclosed as candidates for the 2'

7    down position?

8              MR. GRIFFITH:  Yes, they are.

9              THE COURT:  And it's also undisputed that you

10   need more than 2' methyl up to cure HCV.  Correct?

11             MR. GRIFFITH:  You have to have the whole

12   ribonucleoside, but the 2' methyl feature is, as witness

13   after witness testified, the key feature to this invention.

14   It has to be a ribonucleoside.  So that's what the, the

15   importance of identifying the target, the NS5B polymerase,

16   was.  It told the skilled artisan that you want to use a

17   ribonucleoside on this.

18             THE COURT:  But not all 2' methyl up

19   ribonucleosides will be effective to treat HCV.  That's

20   undisputed; correct?

21             MR. GRIFFITH:  That's correct.  It's possible

22   there may be a 2' methyl ribonucleoside that will be

23   inactive.

24             THE COURT:  Is it undisputed that nucleoside

25   chemistry at the pertinent date was highly unpredictable?

1                   MR. GRIFFITH:  It is absolutely disputed.

2                   THE COURT:  Okay.  Tell me where that's

3       disputed.

4                   MR. GRIFFITH:  Let me check just a second, Your

5       Honor.  I will get the slide to work.  26.  This is fine.

6       33.  Then I will move back to 26.

7                   Nucleosides had been used to treat viral

8       diseases before this invention came around.  The chemistry

9       related to the science, exploded in the 1980s, as testified

10      to by Dr. Meier, and the principles were used for various

11      viral diseases.  If I can go back to 26.

12                  There were a lot of synthesis procedures,

13      synthetic routes and methods known at the time.  This is

14      from Dr. Meier.  And you could go to the literature and take

15      it and use it.  There was a lot of information available.

16      He testified it was routine experimentation to make

17      nucleosides.  There's even -- we heard some argument this

18      morning about the most you could do is make two or three a

19      month, I think was the argument, and that was Dr. Secrist's

20      testimony, and that was -- he was talking about what

21      chemists did in his laboratory, whether that was the most

22      they would be capable of doing in a month.  What the precise

23      circumstances were, I don't know.  It's inconceivable to me

24      that you couldn't attach different bases, do different -- by

25      the way, all of those they count as different molecules,

1    this is the way they get to billions of compounds.  You

2    could attach to the bases.  You could do a mono, di,

3    triphosphate.  You could add, you could make salts.  You

4    could make prodrugs.

5            Mr. Clark testified that his reaction for doing

6    2' methyl 2' fluoro was 15 minutes, that reaction.  So could

7    more, could one synthesize many nucleosides and

8    ribonucleosides in a short period of time?  Sure.  And this

9    testimony, the routineness of it totally supports that.

10   More than that though, Your Honor, Your Honor may recall

11   that you didn't always have to synthesize the compound.  So

12   when Dr. Sommadossi and Professor LaColla came up with the

13   invention, so they were doing research on the reductase

14   enzyme, and they found, or they found an article describing

15   the structure of the NS5B polymerase, that the structure was

16   very similar to the reductase enzyme.  And Dr. Sommadossi

17   knew about, or started looking for nucleosides that would be

18   effective against that reductase enzyme, and he called Dr.

19   LaColla and said, do you have such an enzyme or do you have

20   such a ribonucleoside?  He said, let me check.

21           And so he went and he looked at MD1 in his

22   library.  So, and that was the first 2' methyl

23   ribonucleoside that was used for purposes of attacking the

24   HCV.

25           Now, in addition, Merck had an extensive

library.  Dr. Cook, Mr. Cook testified about that.  Dr.

Storer testified about a substantial library that was

present at Pharmasset nucleosides.  There was Professor

LaColla, as I mentioned.  And Dr. Secrist also testified

that it was common, I believe, for large pharmaceutical

companies to have libraries of nucleosides.  That's at

transcript page 1728, and Cook's is at transcript page 1336,

and Dr. Storer's is at page 657.

THE COURT:  So taking all of that evidence and

any other in a light most favorable to you, roughly, how

many compounds did that add up to that a POSA would not have

had to make and synthesize at the pertinent time but could

have pulled off a shelf, at least figuratively?

MR. GRIFFITH:  I don't have a specific number to

give you, but just taking the short period of time that it

took Mr. Clark to synthesize to 2' methyl 2' fluoro, and he

said 15 minutes, but, you know, let's assume for the sake of

discussion, a couple of hours.  You know, one can do many in

a day and many more in a month.

THE COURT:  All right.  I think I'm asking a

slightly different question.  I understand the argument that

maybe it's routine and easy to make more, but I think you're

also arguing, I think you brought this point up, keep in

mind, you don't have to make them all.  You don't always

have to synthesize them; right?

1          MR. GRIFFITH:  Right.

2          THE COURT:  So taking all of that evidence in a

3    light most favorable to you, all of those libraries you just

4    mentioned and any others for which there's a record basis,

5    does that add up to a hundred, a thousand, a hundred

6    thousand?  What could the jury have reasonably concluded on

7    that?

8          MR. GRIFFITH:  I think they could have very

9    reasonably concluded that it was a substantial number for

10   purposes of testing and looking at activity.  And then you

11   have that coupled with the testimony about the ease with

12   which assays can be done and with the high throughput for

13   that.  10,000 a month, maybe more.  It's thousands per

14   month.  They could be done.

15          So we have a situation where on this evidence

16   the jury could reasonably have concluded that making

17   compounds and testing them was not undue burden in this

18   art, which, by the way, was an art that was accustomed to

19   screening.

20          So like in the *Wands* case, where screening

21   was -- it was a monoclonal antibody situation, so screening

22   was very common there, and that was pointed out by the Court

23   as being a factor in terms of the nature of the art and the

24   nature of the invention.  Screening was sort of an expected

25   activity to be engaged in.  So this is not something,

1   screening is not something, making and screening compounds

2   is not something that skilled artisans here viewed as

3   untoward work, undue burden.

4           Now, they argued against that.  They put in

5   evidence arguing that it would have been a lot of work and

6   that the skilled artisan would not have expected to have to

7   confront this activity, but that's, that was a fact issue

8   for the jury to decide.  That is not something to be undone

9   now after they weighed the evidence and weighed their

10   credibility determinations.

11          And further on guidance, Your Honor, there was

12   argument this morning -- let me go back.  There are a couple

13   of points I want to make sure I hit on here.

14          So Gilead's counsel pointed to some testimony

15   from Mr. Clark about how, that he made regarding how he

16   arrived at this.  We had testimony from Dr. Otto, who says

17   that he met with Clark right around the time he was coming

18   up with the idea to use 2' methyl 2' fluoro and we asked

19   him, did he present you with any literature that guided him

20   to 6130, this first 2' methyl 2' fluoro compound.  The

21   answer is, well, he didn't say what necessarily guided him

22   to that idea.  But he did bring with him to my office copies

23   or portions of copies of a Merck application and a Novirio

24   application.

25          So the jury could reasonably infer from this

that Novirio application, the Idenix patent application, and

this was the specification that is the '597 patent, is what

guided Mr. Clark to 2'-methyl, 2' fluoro, and aided him in

his synthesis, which he was able to do with ease during this

time frame with clearly having Idenix's patent application

in hand.

Now, the jury could have credited this

discussion.  And Your Honor pointed out, I think Gilead's

counsel made a point of you have to take the good with the

bad with the testimony, but the jury doesn't have to do

that.  It can credit some testimony from a witness and not

credit other testimony.

And so the fact that there is in some instances

perhaps conflicting testimony about what things happen and

how things unfolded, the jury's job was to sort that out and

we can't, we can't unravel that now.

Now, there is another important piece of

evidence on this point.  And that is that in this time

frame, when the '597 patent published as a PCT application,

the folks at Pharmasset, scientists at Pharmasset got their

hands on it, read it, and they noted that it, it reported on

modified nucleoside analogs with potent inhibition of the

HCV NS5B polymerase.

So they knew what, they knew exactly what enzyme

it was going after.  Again, some of their experts challenged

1    that, but they knew from reading this patent what the target

2    enzyme was.

3            Now, they also identified one of the classes

4    that are potent inhibitors.  And one was 2' modifications,

5    methyl or O methyl.  But the methyl class of compounds was

6    pointed out here, and it pointed to just 2'-C methylcytidine

7    as a representative of that class.

8            So they completely got the importance of

9    2'-methyl, and that it had the ability, that ribonucleoside

10    had the ability to be effective and active in other forms

11    besides 2'-methyl, 2'-OH.

12            THE COURT:  What is in the patent that the jury

13    could have reasonably thought would have directed one of

14    skill in the art to the 2'-methyl up, 2'-fluoro down?

15            MR. GRIFFITH:  I think, Your Honor, it's the

16    teaching that 2'-methyl ribonucleosides are effective for

17    treating HCV.  So this patent taught the genus of those

18    compounds that were effective against HCV.  And the skilled

19    artisan reading the patent understood that modifications

20    could be made, and so the skilled artisan could make

21    modifications at 2' down.  And they could have credited even

22    Mr. Clark's testimony -- or, I'm sorry, Dr. Otto's testimony

23    as supporting that.

24            But the point is the patent doesn't have to

25    list every species.  It doesn't have to lead you to some

1    particular species.  The genus here, the class of compounds

2    has to be supported, and we don't have to call out every

3    possible species that might be used.  And it doesn't have

4    to lead you to one particular one over another.

5              THE COURT:  Okay.  But is there anything that

6    would have led one of skill in the art to this embodiment,

7    the one that is now the accused one?

8              MR. GRIFFITH:  Yes.  I think the, I think the

9    data, for example, in the patent certainly did that.  So

10   that was on the 2'-methyl, 2'-hydroxide.  But I think that

11   that skilled artisan looking at that data would have been

12   and could have been led to try other 2'-methyl to other

13   substituents in the down position, one of which could have

14   been fluorine.  So as I say, it doesn't specifically say go

15   do fluorine, but it doesn't have to do that.  That is not

16   required for enablement.  We don't have to enable the

17   infringing product, if you will.

18             THE COURT:  Do you agree you have to enable the

19   full scope of your claim?

20             MR. GRIFFITH:  I do.

21             THE COURT:  So what does that mean here to

22   enable the full scope of your claim as construed?

23             MR. GRIFFITH:  That means that the skilled

24   artisan has to be able to practice within the claim without

25   undue experimentation.

1          So you can't have -- so in, for example,

2   *Liebel-Flarsheim*, half of the claim was on not having a

3   pressurized jacket and the other half was on having a

4   pressurized jacket.  They didn't enable the not having a

5   pressurized jacket half of the claim.

6          But, broadly speaking, it means that skilled

7   artisans have to be able to practice the invention within

8   the genus.

9          THE COURT:  Do they have to be able to practice

10  without undue experimentation the full scope of the claims?

11         MR. GRIFFITH:  They do, Your Honor.  But just to

12  be clear, that doesn't mean that the project here is for the

13  skilled artisan to go out and make every compound covered by

14  the claim.  So in most cases -- and that is explained, for

15  example, in the *UroPep* case, but it certainly is not unique

16  to that.  In the *UroPep* case, Lilly seemed to be making the

17  argument that enablement requires that every PDE5 inhibitor,

18  a skilled artisan had to be able to make those in a short

19  period of time, go out and make the entire class of

20  compounds.  So no one would do that.

21         So to me, Your Honor, the meaning of being able

22  to practice within -- enable for the full scope of the claim

23  is that a skilled artisan can take this invention, 2'-methyl

24  ribonucleosides, not specific to OH down, and can make

25  those, make such compounds without undue experimentation.

1   It doesn't mean that they can make them all simultaneously

2   this week but if they wanted, if they set out to try to make

3   a compound, they will be able to do that without undue

4   experimentation.

5           The *Wands* case, perhaps, is instructive here,

6   and as well as *UroPep*.

7           So in *Wands*, you had to screen for the monoclonal

8   antibodies.  So the class, the class was unlimited.  I think

9   they were specific to high affinity antibodies for an HBV

10  antigen.  And there is a limitless class of compounds.  But

11  the issue there and the issue here as Gilead has framed it was

12  whether it was a needle-in-the-haystack problem to go out and

13  make anything other than specific embodiments that had been

14  described in the patent or deposited with the government at

15  the time.

16          And what they found there was you had a, I think

17  in *Wands*, a 44 percent success rate.  So you would go out

18  and make your hybridoma and it was a lot of work.  You had

19  to get animals.  You had to inject them and infect them and

20  fuse cells to make the, to screen the hybridomas.  Was this

21  going to be a futile exercise for skilled artisans when they

22  did that or would they be able to come up with these

23  monoclonal antibodies in the patent, the high affinity ones?

24  And the answer was they could.

25          Specifically, in that case it was 44 percent of

1    the time.  The numbers that were involved in that case, it

2    was 44 percent.  So half the time, a little bit more than

3    half the time they would strike out.  That doesn't mean

4    that the claim is not enabled.  You could make various

5    embodiments within the scope of the claim.  You set out to

6    do it and you will be able to do it.  The patent gives you

7    the tools to be able to do that.

8              This patent does that.  And coupled with the

9    tools that skilled artisans have in their toolbox at the

10   time, so assays, running screening assays was something that

11   skilled artisans have here.  They were able to do that.  The

12   synthetic routes were not unduly burdensome.  This was a

13   well developed science at that point in time.

14             THE COURT:  So I understand they don't, we don't

15   need any one person of skill in the art to have taken the

16   time to make every embodiment, every claimed embodiment.

17   That is part of your argument.  I understand that.

18             MR. GRIFFITH:  Right.

19             THE COURT:  Does it have to be, however, that

20   should a skilled artisan have wanted to do that, that with

21   whatever they would know as one of skill in the art plus

22   the patent, that they could make all of those without undue

23   experimentation, all embodiments?

24             MR. GRIFFITH:  I think I agree with that, Your

25   Honor, with the understanding you are not talking about --

1    in other words, could they go out and make any one of them I

2    think is what Your Honor is asking.

3              THE COURT:  Well, that was going to be the next

4    question.  If you want to answer that one.

5              MR. GRIFFITH:  I don't think undue

6    experimentation means you can go out and make every compound

7    covered by a claim without that being a big job, a lot of

8    work, undue work, that sort of thing.  I don't think that is

9    correct.

10             THE COURT:  You don't think you have to have

11   enabled any one to be able do that --

12             MR. GRIFFITH:  Right.

13             THE COURT:  -- in order to have that.

14             MR. GRIFFITH:  That's correct.

15             THE COURT:  But how about your question?  Does

16   one of skill in the art, looking at the patent and knowing

17   whatever one of skill in the art knows, have to be able to

18   visualize the full scope of the embodiments that are claimed

19   and be able to say, without undue experimentation, hey, I

20   want to get this one.  I can do that without undue

21   experimentation.

22             MR. GRIFFITH:  I would say that is roughly the

23   case.  I would not say there are never any exceptions to

24   that, Your Honor.  You can have improvements on things and

25   so forth.

 1              And so when Apple came out with the iPhone, ten

 2     years later, can you come up with some version of it that

 3     they wouldn't have been able to make back then?  I don't

 4     think that sort of thing would defeat the patent, I wouldn't

 5     say.

 6              So with that in mind, I think broadly speaking

 7     what we're talking about is being able to practice the claim

 8     across the claim and not -- so if, you know, the issue would

 9     arise here that if there was only one species in a genus

10     that could be made without undue experimentation, that would

11     implicate the question that Your Honor is asking.  But I

12     don't think that is even remotely close to being the case here.

13              That was the issue, Your Honor, in *Wyeth*.  And

14     if I may go to that?

15              THE COURT:  Sure.

16              MR. GRIFFITH:  Well, first, Gilead's statement

17     of the holding in *Wyeth* is that "required screening of 'a

18     lot of compounds' ... to find the active species fails to

19     enable the full scope of the claims as a matter of law."

20              That is not the holding of *Wyeth*.

21              And in both *Wands* and *UroPep*, there was required

22     screening of a lot of compounds to practice the claim across

23     the full scope.

24              And so each of these cases has to be decided

25     on their own facts and circumstances in the context of the

level of skill in the art, the predictability of the art
or the unpredictability of the art, the level of what is
routine experimentation, what isn't at a given point in
time.  About all of that, and we had much fact dispute
about each and every *Wands* factor, we had fact disputes in
this case.

But, in *Wyeth*, the problem was the patent --
there were a number of issues that the Court looked at
there.  The patent was silent on how to modify compounds.
It didn't give any guidance whatsoever about, hey, you can
make this change, you can make that change.  You can do
this.

We had substantial guidance on changes and
modifications that can be made to the 2'-methyl compound at
issue here.

We have issue of contemporaneous guidance that
the patent provided to scientists at Pharmasset.  This
patent was absolutely crucial to them.  They took this
2-methyl compound and ran with it.

There were assays here.  Assays could be done on
thousands of compounds routinely.  And in *Wyeth*, for one
single compound, it took weeks.  That was just for one.

The rapamycin art was unpredictable and poorly
understood.

We had evidence here of synthesis of nucleosides

1    was certainly predictable and well understood, and use of

2    nucleosides to treat viral diseases was known.

3              Now, Gilead's counsel had testimony from

4    Mr. Meier that he put up saying use of, the use of

5    nucleosides to treat HCV was in its infancy in 2000.

6              But it wasn't that the skilled artisan was

7    without information about using nucleosides for viral

8    diseases and that sort of thing.  And each of the scientists

9    who testified or many of the scientists who testified in

10   this case indeed had experience on just that, on using them

11   to treat HBV or HIV and even had patents in those areas

12   before this.

13             THE COURT:  But is it undisputed that the use of

14   nucleosides to treat HCV was in its infancy at that

15   pertinent date?

16             MR. GRIFFITH:  I believe that it was in an early

17   stage at this time.  Then the 2'-methyl ribonucleoside class

18   gave predictability to that field, and that is what the

19   Pharmasset scientists latched on to.

20             THE COURT:  And I can find Dr. Meier saying

21   that, that the 2'-methyl gave predictability?

22             MR. GRIFFITH:  He testified to that being the

23   key feature of this compound.

24             THE COURT:  But does he testify that, therefore,

25   all of the, whatever you put it, the other substituents,

1   whatever they are, it's predictable, whatever their activity

2   would be?

3                MR. GRIFFITH:  He testified that it would be not

4   undue experimentation to make modifications at the other

5   positions following the guidance in the patent, and that you

6   would be able to do that and have an effective compound.

7   So, yes, in that sense.

8                And I guess I would point further, Your

9   Honor, to the Pharmasset evidence, for example, the grant

10  application saying the 2'-methyl class of compounds is a

11  potent inhibitor of HCV.  That is a clear statement of they

12  believed it predicted effectiveness.

13                Again, as Gilead's counsel noted, you know,

14  could you find a base that wouldn't be active with the

15  compound?  Yes, you could.  That is possible.  But basically

16  this class of compounds honed you in on that which was

17  effective for treating HCV.  And, indeed, 11 out of the 12

18  ribonucleosides -- and there was testimony by I think

19  Dr. McHutchison to this effect.  He noted the compounds that

20  had gone to market, or, I'm sorry, into clinical trial to

21  treat HCV, 11 of the 12 ribonucleosides were 2'-methyl

22  compounds.  11 of the 12.  So this compound became the gold

23  standard for this area of research.

24                Skilled artisans here, as Dr. Secrist testified,

25  were used to working with large classes of compounds.  So

1    this is not a foreign idea to have, you could have different

2    substituents at different positions.  You could have salts

3    that you would use here, prodrugs that you would use here,

4    changes that could be made to this or that.  He and both Dr.

5    Sofia also testified to, yes, we worked with large classes

6    of compounds.

7             THE COURT:  Before you move on from that slide,

8    I want to talk a little bit more about the amount of time.

9    As you know here in *Wyeth*, they found that it would take

10   weeks to test even a single compound.  What is in the record

11   here about how long it would take to test all of the

12   embodiments of the claim here?

13            MR. GRIFFITH:  The record is that you could do,

14   you could test tens of thousands in a month.

15            THE COURT:  And how many embodiments are there

16   within the scope of this claim?

17            MR. GRIFFITH:  I don't have a number to put on

18   that.  Dr. Meier did not put a number on that.

19            What I would note, Your Honor, is that in

20   terms of testing compounds, I mean he characterized it as a

21   relatively small class.

22            Now, that within that, if you are testing, doing

23   assaying, and then in conjunction with Dr. DeFrancesco, you

24   could run a lot of assays in a month.

25            So, again, you don't have to -- it's not a

matter here of being able to find, for the skilled artisan

to go out and find every one.  The question is are they

going to, as they would in *Wyeth*, have a high rate of

futility if they were to do that?

And there is no evidence in this record that the

skilled artisan practicing the '597 patent, making 2'-methyl

compounds, applying, for example, formula 11, would have --

the evidence was not introduced that a substantial portion

of that would be ineffective or would not work.

Now, they bore the burden on this defense.  It

was on Gilead to come forward with evidence to convince the

jury by clear and convincing evidence that this claim was

not enabled, and we don't have the type of evidence that

they had in *Wyeth*, where you had one compound, one compound,

no suggestions or teachings on how to modify that compound.

They have that here, lots of teaching about how to modify it

using different bases, monos, dis, triphosphates, various

substituents suggested, identified as options in the

formulas.  Prodrugs, salts, so forth.  All of that is

included here.  None of that was present in the *Wyeth*

patent.

THE COURT:  If the only conclusion for the

record here is that it would take at least weeks for one of

skill in the art to make and have in hand any particular

embodiment of the claims, would that favor a finding that

1  the experimentation was undue?

2          MR. GRIFFITH:  I would say not, Your Honor.  You

3  know, I mean, we are in the drug development area here, and

4  so I think that -- I mean, nobody put a precise timeline on

5  exactly how long it has to be, but in terms of the volume of

6  experimentation that scientists do in this area, all of that

7  in terms of what, you know, what they did and assays they

8  ran and so on and so forth was indicative of, you could

9  spend time on this.  I mean, there was no -- you know, in

10  the *UroPep* case, they commented on, look, it may take time

11  to make a molecule according to this patent, but that

12  doesn't change that there's not undue experimentation there.

13  There were ways to do it, it could be done.

14          And coming back to, this sort of relates to your

15  Honor's question about enablement versus full scope.  So

16  Gilead has pointed out that in *UroPep*, there were, I think

17  they said a hundred known selective PDE5 inhibitors, so

18  there were some disclosed to the patent.  I don't believe in

19  the patent they were specifically identified as selected

20  PDE5 inhibitors, but the Court said, skilled artisans would

21  know that I think maybe it was four of them would be

22  selected PDE5 inhibitors.

23          Then there were others that could be -- that

24  were known, not mentioned in the patent that were known.

25  But the class was alleged to be billions, and Judge Bryson

1     found that whether it was billions or not, it was a very

2     large class.  But that didn't change that.  You could still

3     do your screening activities and find a compound that -- you

4     know, that would work, not just the ones that were known.

5     All right.

6                    So it's a large class of compounds that you

7     would have to screen to find that which would work, but

8     that -- and to do that across the full scope of the claim

9     there.  So the claim wasn't limited to just the 100 that

10    were known.

11                   So that's the point.  They argued that you

12    didn't have to screen.  You could just use one of the

13    hundreds.  To practice the invention for the full scope, you

14    would have to do some screening.  No prohibition on that and

15    it would take some time.

16                   THE COURT:  All right.  But here are the

17    comparable numbers.  I think the best case for you are the

18    structural limitation is satisfied by billions of compounds,

19    and at best, you disclose four or maybe six that meet the

20    functional limitation.

21                   MR. GRIFFITH:  I don't agree with that.

22                   THE COURT:  Is that a fair understanding of the

23    record?

24                   MR. GRIFFITH:  I don't agree with that, Your

25    Honor.

```
 1              THE COURT:  Tell me where that is wrong.

 2              MR. GRIFFITH:  First, on the billions of

 3   compounds pointed, Dr. Meier -- if we could go to that

 4   slide -- disagreed that it was that broad.  Again, this is a

 5   Wands factor, the scope of the claim.

 6              Dr. Secrist testified that it would be billions

 7   and Dr. Meier said, no.  Reading the patent and looking at

 8   it as a whole in the way a skilled artisan would, it would

 9   be a significantly smaller number than that.

10              THE COURT:  Well, I meant to say first with

11   respect to the structural limitation, just structural

12   limitation, what you could put in each of the different 2',

13   et cetera, positions.

14              MR. GRIFFITH:  Well, I think that's what Dr.

15   Meier was talking about.  In other words --

16              THE COURT:  What did he testify to about how

17   many --

18              MR. GRIFFITH:  Significantly smaller.

19              THE COURT:  Significantly smaller than billions?

20              MR. GRIFFITH:  Yes.

21              THE COURT:  And so what best case could the jury

22   have decided was the number of compounds, the smallest

23   number of compounds that would satisfy the structural

24   limitations of the claim?

25              MR. GRIFFITH:  I think the jury could reasonably
```

1    have concluded that we're talking about some number of

2    thousands.

3           THE COURT:  Because that's significantly smaller

4    than billions?

5           MR. GRIFFITH:  Yes.  But it's not just that,

6    Your Honor.  I mean, Dr. Secrist admitted that you don't

7    check your common sense at the door, and so I think what we

8    see here when Gilead is getting to billions, what they're

9    doing is, they're, for example, they're counting OH at '5,

10   monophosphate of '5, diphosphate of '5, triphosphate at '5,

11   all separate compounds.

12           So that's four compounds there, and then there's

13   four bases, so that's 16 compounds, and they are just doing

14   math here.  That becomes an issue, Your Honor, when the

15   patent describes, for example, various prodrug substituents

16   and salts that could be used at various positions.  That

17   you're not going -- if you do in the course of going out to,

18   if you do some screening, you find, let's say, one active

19   compound and one inactive compound, you are not going to go

20   make a prodrug of the inactive compound, but in Dr.

21   Secrist's world, all of that counts, because mathematically,

22   that's possible.  That's all mathematically possible that

23   could happen with that claim.

24           THE COURT:  But he says that because there's

25   nothing in the patent that excludes that from being put at

1      each of those positions, just in terms of the structural

2      limitations.  Isn't that correct?

3              MR. GRIFFITH:  I think he says that because it

4      drives the number up.  I don't think -- for example, if the

5      patent does teach you can put prodrugs at '5, at 3', at 2',

6      you can put them at different positions.  So in his world,

7      you may put them at all three positions simultaneously, and

8      I don't think Dr. Meier is going to that type of level.

9      He's taking a more practical approach.  So he's recognizing

10     that skilled artisans, when they look at the things that are

11     identified here, yes, you have these options, but you are

12     not necessarily going to try them all at once just because

13     you theoretically can.  You could make a prodrug if you

14     wish, but you are not going to put prodrug moieties on all

15     at the same time.  And you don't have to go out and make

16     multiple prodrugs.  You can if you want to try to optimize

17     and find the best, but that is not required to practice the

18     patent.

19              And this is an intense factual dispute between

20     these two witnesses as to the breadth of the claim and

21     exactly how much.  For skilled artisans in this field, how

22     much work it would take them to, applying the teaching of

23     this patent, make compounds according to the patent.

24              THE COURT:  All right.  Well, then we had -- I

25     think you agree with this.  There's a structural limitation,

1   which we've been talking about.  Then there's the

2   functionality limitation.

3              MR. GRIFFITH:  Right.

4              THE COURT:  It has to be effective to treat HCV.

5   Right?

6              MR. GRIFFITH:  Right.

7              THE COURT:  So in your view, how many

8   embodiments that meet both of those limitations so they have

9   to be effective to treat HCV are disclosed in the patent?  A

10  better question:  What could the jury have reasonably found

11  are the number of embodiments that satisfy both the

12  structural and functional limitation of the claim?

13             MR. GRIFFITH:  Well, they could have concluded

14  that there are many that a skilled artisan could make.

15  Skilled artisans, this is not a large class of compounds,

16  but nonetheless, the numbers are such that it could be a

17  good many.  So, for example, so they've agreed today that 2'

18  methyl 2' OH, anything in the base position is enabled, and

19  there I think there was 260 compounds that Dr. Gosselin had

20  logged.  Dr. Seeger had identified 38 of them that he said

21  were inactive.  So he didn't give us the numbers for, in his

22  opinion, the total active versus inactive, but what he

23  showed to the jury was, 38 bases out of 260 that he said

24  were inactive.  So, I mean, there's -- you know, there's a

25  good number of compounds right there.

1                    Dr. Sofia, when he made his prodrugs, he was

2     working on the prodrugs, he made 140, on that order, of

3     prodrugs, again, trying to optimize and find which is best.

4                    THE COURT:  And there was evidence from which

5     the jury could have reasonably found that all of those were

6     effective to treat HCV?

7                    MR. GRIFFITH:  Yes, Your Honor.  I mean, the

8     compound was certainly active, and he had his -- they

9     introduced his patent into evidence, and it has -- well,

10    that was one that has a billion, million compounds if you

11    count the way Dr. Secrist does.  It has lot of options.  I

12    think it had 80 or so examples of prodrugs that were active.

13    He never testified that any of the 140 were not active, so

14    the jury could have reasonably concluded from that evidence

15    that there are a good number of compounds coming from a

16    variety of ways, there are a number of changes that could be

17    made that are effective and that are active here, and that

18    they did not see evidence that there was a -- the evidence

19    was not introduced to show that there was a substantial

20    portion of the examples and options and so forth illustrated

21    in the patent, that they were not effective.

22                    So this is, as I said, this is not a -- they

23    characterized it their brief a needle-and-haystack

24    situation, but there is insufficient evidence here that that

25    is what this is.  You only get there by doing this

1   theoretical mathematical approach that Dr. Secrist advocated

2   for.  Dr. Meier said that that is not the way skilled

3   artisans would approach this patent, and the jury could have

4   resolved that fact issue in favor of Idenix.

5           Your Honor, may I speak to the 2' methyl, 2'

6   fluorine synthesis issue?

7           THE COURT:  Sure.

8           MR. GRIFFITH:  And if there are any other

9   questions Your Honor would like to ask about this breadth of

10  the claim?

11          THE COURT:  There probably are, but I will ask

12  them.  You move on as to what you want to move onto.

13          MR. GRIFFITH:  The points I want to make here,

14  Your Honor, are that -- so the argument is that it would be

15  undue experimentation for the ordinary skilled artisan to

16  synthesize 2' methyl, 2' fluro-based on this patent.  A

17  detailed recipe for every species does not have to be put

18  forth in the specification.  That's not the law.  General

19  synthetic routes are disclosed.

20          I looked at -- I showed this to Your Honor

21  earlier.  The jury could have reasonably concluded from Dr.

22  Otto's testimony that Mr. Clark was guided by, instructed in

23  his synthesis work by the '597 patent.  It was the PCT

24  version of it, but it was the same specification.

25          He said that he used DAST, a well-known

1        fluorinating agent, so this was something that skilled

2        artisans knew about.  He testified that it was -- it could

3        be done quickly, about 15 minutes.  He thought he succeeded

4        in his first try.  This is not undue experimentation.  This

5        is not needle in the haystack.

6                 And Mr. Clark had below level of ordinary skill

7        in the art experience, so he was just a Master's in

8        chemistry.  The testimony was the PMDs, it could be a lower

9        degree, but it would be some number of years of experience.

10       Mr. Clark was below that ordinary level of skill.

11                Now, so the jury could have reasonably concluded

12       from the Clark evidence that it was not undue

13       experimentation to make 2' methyl, 2' fluoro with the

14       knowledge of the '597 patent in hand.

15                Gilead submitted competing evidence, Griffon

16       evidence, from which it argued that Idenix failed when

17       trying to make this compound, and that that indicated that

18       the skilled artisans would find this difficult to do.

19       And even so, Dr. Griffon did testify that he thought he

20       actually did arrive at an effective route, but that he

21       didn't realize it at the time.  And the reason, the

22       testimony on that was that he didn't look at all of the

23       spots when he ran his TLC, so he looked at, I think it was

24       one spot, and there were other spots on the plane that he

25       should have looked at.

1          And, but this was an intensely -- intensely

2    factual dispute that the jury was entitled to weigh the

3    evidence on and reach its conclusions based on its

4    credibility determinations, and there's no outcome here that

5    is required as a matter of law.

6          *Liebel-Flarsheim* is not on point.  That is the

7    pressure jacket and non-pressure jacket case.  The claim

8    covered both, but the patent criticized non-pressure jacket

9    designs.  Now, they emphasize that in *Liebel*, the inventors,

10   or at least the engineers at the inventor's company

11   struggled to make or failed to make the design without the

12   pressure jacket, but the Court pointed out that it was --

13   it was that evidence coupled with, coupled with the

14   criticism of that design in the patent that led it to

15   conclude that there was a failure of enablement there.

16   And we did not have competing evidence there like we have

17   here in Clark.

18          Now, they point out, well, the infringer there

19   made it, but that's -- it's not the circumstance we have

20   here with Clark walking into Dr. Otto's office with

21   specification in hand back in the relevant time period and

22   so forth.  There was nothing comparable to this.  And as I

23   said, they emphasized the teaching away, which is not

24   present in this patent.

25          And then they rely on the *Storer* decision, but I

1    have not heard argument from them, and I don't think there

2    is one that collateral estoppel or some other legal doctrine

3    mandates that the outcome in *Storer* be applied here.  It's

4    not.  It was a different patent, different proceeding,

5    different burden of proof, and so forth, and so it doesn't

6    mandate the jury have reached the conclusion that the

7    Patent Office reached in connection with that patent in that

8    case, which was not the '597 patent.

9            THE COURT:  Did the Federal Circuit have in

10   front of it the evidence about Mr. Clark that you introduced

11   at this trial?

12           MR. GRIFFITH:  No, Your Honor.  Now, we had the

13   Clark patent and we had some evidence regarding that work,

14   but we did not have the testimony from Mr. Clark that we

15   showed to the jury, and there was a reason for that.  That

16   testimony was procured in part in this case and in part

17   connection with the 1782 petition in a foreign proceeding.

18   And Gilead demanded in connection with that 1782 petition in

19   discovery, that deposition of Mr. Clark, that we agree to a

20   protective order.  A protective order was entered at their

21   insistence, that the Clark deposition could not be used in

22   the interference proceeding.

23           So they were concerned that we would be using

24   1782 discovery to get discovery in the interference.  They

25   said that would be foul play.  The Judge entered a

1    protective order.  We weren't permitted to use the Clark

2    depositions in the interference.  Likewise, the Dr. Schinazi

3    testimony regarding the importance of 2' methyl were not

4    permitted to be used in that proceeding.  Dr. Storer

5    testified and all of this went to the reaction to the '597

6    patent at the time and it also went to synthesizing 2'

7    methyl 2' fluoro.

8            Dr. Griffon's further deposition in this case,

9    or we showed the testimony there, was not available at the

10   time.

11           The Pharmasset grant applications, where they

12   relied on the '597 patent, was not in evidence there.

13           So it was a different evidentiary record and

14   there were various reasons for that, but it was not the same

15   record.  And that in and of itself is a reason why that case

16   cannot be applied here.  Likewise, different burden of

17   proof.  And under *Baxter* -- I'm sorry.  If this is the

18   portion of *Baxter* saying it's a different evidentiary

19   record, the Patent Office can reach a different conclusion

20   from the District Court, and this is what happened in

21   Baxter.

22           They also said the same thing with respect to

23   burden of proof, and they as well, Your Honor, said that

24   even if you had the same evidence, it could come out, same

25   patent, same patents.  This is a different patent, different

 1    evidence, but they said even if you had the same patent,

 2    same evidence, you could come out with a different

 3    conclusion just because of the different burden of proof.

 4          Here, the jury had competing evidence on this

 5    factual issue, whether under the *Wands* factors it would

 6    require undue experimentation to take 2' methyl, 2' fluoro.

 7    All the testimony about synthesizing nucleosides had been

 8    happening for decades.  I think Dr. Secrist said more years

 9    than I can remember.

10          So this is about synthesis.  So synthesis went

11    back a long time.  The jury could weigh that evidence,

12    predictability, could weigh that evidence.  I understand

13    that Gilead made arguments to the contrary, but they did not

14    have to credit those arguments.  They did not have to credit

15    the testimony going Gilead's way.  They could have credited

16    Idenix's testimony, and that is what they did.  And they

17    found in favor of enablement.

18          Now, on written description.

19          I want to, before I get to written description,

20    Your Honor, I wants to go back to, real quickly, the *Wands*

21    factors.  And if I could back to slide, I think it's around

22    13 -- or, you know, let's go back to 13.

23          All right.  We did talk about this one.

24          The patent pointing to what enzyme this is

25    working on.  This was a fact dispute.  They disagreed with

1    it.

2              Synthesis roots are taught in the patent.

3              How to make representative compounds.

4              And the formula 11.

5              And Dr. Meier went through all of this.

6              Dr. Secrist testified that you don't make

7    foolish decisions or foolishly try to make anything just

8    because you can.

9              This is the Clark testimony, the grant

10   application.

11             Now, were there working examples?  So that is

12   one of the *Wands* factors that the Court instructed the jury

13   on.  Yes, there were.  There were here.  There were not in

14   *Enzo*.

15             There was data for the working examples.

16             How routine was any necessary experimentation in

17   the field?

18             This was a lot of synthesis procedures were

19   known.

20             Synthesis was not in its infancy.

21             Screening compounds was routine.

22             The quantum of experimentation necessary.

23   Screening thousands was known.

24             You could synthesize quickly.  You didn't have

25   to be slow.

1              The nature and predictability of the art.

2              This is where it was commented on that this was

3      not the first nucleoside to treat a viral disease that came

4      around.

5              All of these were factual evidence that the jury

6      could have credited and specifically following the *Wands*

7      instructions that they were given by the Court and they

8      could have reached these conclusions on these fact issues in

9      favor of Idenix.

10             It's common to think about large classes of

11     compounds in this field, as testified to by their expert,

12     Dr. Secrist.

13             There was -- and Gilead's counsel mentioned this

14     in his presentation.  This is the Storer testimony about we

15     would look to mimic structures at 2' down, and Gilead's

16     counsel criticized him because he said, well, this wasn't

17     specifically tied to the patent, but this was back in 2001

18     when he started at Idenix and it was exactly in this field,

19     exactly on these sorts of compounds.

20             So it's completely relevant to what persons of

21     ordinary skill in the art do.  The jury was entitled to

22     credit this evidence.

23             THE COURT:  Did anybody ever say what one of

24     skill in the art, though, would have known about that

25     mimicking?

1          MR. GRIFFITH:  Yes.  Dr. Storer said that one of

2    the tools they had was to use, to look for mimics of OH at

3    the 2' down position.

4          And he commented, fluorine is a small

5    electronegative atom, so it doesn't introduce a large steric

6    demand.

7          THE COURT:  I think part of the argument was he

8    is not necessarily one of skill in the art, and he is not

9    necessarily testifying about one of skill in the art, what

10   was skill in the art that the expert would know at the time.

11         MR. GRIFFITH:  They could have made that point

12   to the jury.  They could have tried to attack the

13   credibility of that testimony by that sort of criticism, but

14   at the end of the day, this is for the jury to decide.  This

15   was not irrelevant, and when it came into the case, it was

16   not objected to as being irrelevant.

17         Those are criticisms they were free to point out

18   to the jury, but it doesn't establish as a matter of law

19   that this is something that a person of ordinary skill in

20   the art would not have done.

21         On the contrary, it seems pretty clear that a

22   person of skill in the art would have done this, was doing

23   it.  The level of skill is very high.

24         And then we talked about the scope of the

25   claimed invention and the differing testimony on that.

1    This is, on every single *Wands* factor, we put on

2    evidence, really a mountain of evidence on each one, and

3    established that following this Court's jury instruction,

4    the jury should come out in favor of Idenix on enablement.

5    And having put in certainly far more than a mere

6    quantum of evidence on each and every *Wands* factor, I think

7    this Court needs to actually find on each and every *Wands*

8    factor that they found in Idenix's favor.  This was a

9    judgment as a matter of law.  We're not at the closing

10   argument stage.

11   So having done this, it is really a mountain of

12   evidence, the jury could reasonably have reached a verdict

13   in favor of the plaintiffs on enablement.

14   THE COURT:  Well, before you go back to written

15   description, let me ask you some more questions.

16   I think on the enablement question, as I

17   understand it, it is Idenix's characterization of their

18   invention that the key to it, the critical part is the

19   2'-methyl up; correct?

20   MR. GRIFFITH:  Correct.  The 2'-methyl

21   ribonucleoside structure.

22   THE COURT:  So does that mean that at least all

23   compounds with 2'-methyl up ribonucleosides have to be

24   enabled in order for this patent to be valid?

25   MR. GRIFFITH:  No.  No, it does not.  And so,

for example --

THE COURT:  So why is that?  Why does the one not follow from the other?

MR. GRIFFITH:  Well, because that is what *Wands* tells us.  So you can have some amount of strike outs in this in connection with the patented invention and that does not disenable a claim.  The success rate in *Wands* was 44 percent.

Gilead's counsel agreed that a 2'-methyl OH down ribonucleoside is enabled, and that this claim, if it was limited to OH at 2' down would be enabled even though their own witness found 38 ribonucleosides with that formula that he said were not active.

That amount of failure does not create undue experimentation.  It's very common, Your Honor, to have inoperable embodiments within the scope of the claim that is not fatal to a claim.

THE COURT:  So your view is in order to be enabled, it is not necessary that this patent teach those skilled in the art how to make and use the full scope without undue experimentation of all embodiments that have the 2'-methyl up?  It is the key to the invention but we don't have to tell a person of skill in the art in the patent how to make and use all of those embodiments?

MR. GRIFFITH:  That is not what I'm saying, Your

1    Honor.  And I apologize if I'm unclear.  Let me try again.

2         You do have to enable for the full scope of the

3    claim.  I agree with that.  The patent is required to enable

4    using 2' ribofuranosyl nucleosides, methyl up, nonhydrogen

5    down, to treat hepatitis C, to be effective in treating

6    hepatitis C.

7         What I'm saying is the fact that when the

8    skilled artisan, following the teachings of this patent,

9    sometimes makes a 2'-methyl compound that is inactive, so

10   it is a strike out, that does not mean that the claim is not

11   enabled.  You are allowed to have some amount of failure.

12   That was exactly the circumstance in *Wands*.

13        THE COURT:  Okay.  In order for the claim to be

14   enabled, does the patent have to tell us somewhere that what

15   is key or what is critical is that 2'-methyl up be used at

16   the 2' position?

17        MR. GRIFFITH:  I don't know that it has to, but

18   the evidence, the overwhelming evidence in this case is that

19   it did.  And Dr. Meier so testified to that.

20        But it wasn't just Dr. Meier.  Those Pharmasset

21   scientists pointed right to the 2'-methyl feature.  And they

22   didn't say, you know, it's the 2' in combination with OH

23   down or some other thing.  They pointed to the 2'-methyl

24   feature.  So we have that circumstance here.

25        Now, I get that they argued and their experts

1    disagreed with Dr. Meier's opinion on that point, but that

2    is a fact issue in terms of what skilled artisans, the

3    ordinary skilled artisan would understand and appreciate

4    from reading this patent.  That is part of the guidance

5    aspect of the *Wands* factors that the jury assessed, weighed,

6    and came out in favor of Idenix on.

7            They didn't have to come out in favor of Idenix

8    on every *Wands* factor, by the way.  As the Court instructed

9    the jury, they can -- no one is dispositive, and the jury's

10   duty was to weigh the *Wands* factors and size them up on

11   their own and reach their conclusion based on their weighing

12   of the evidence.  It wasn't that one trumped any of the

13   others or was controlling over the others.

14           THE COURT:  In the cases, what, if you know, is

15   the longest amount of time that courts have looked to for

16   how long the experimentation would take and still said that

17   that claim is enabled?

18           MR. GRIFFITH:  I'm trying to think about it.  I

19   mean in the *UroPep* case, they certainly said it can take a

20   lot of time without quantifying specifically how much it

21   would be.

22           Now, again, if you select one that is identified

23   in the patent or, you know, of the PDE5 inhibitors, then

24   that would be quicker than if you try to make some

25   embodiment that is not depicted but in *UroPep* they said it

1    can take a long time.

2              That it's not the guidepost.

3              THE COURT:  Dr. Sommadossi testified there is no

4    disclosure of the 2'-methyl up fluoro down nucleoside

5    disclosed; isn't that correct?

6              MR. GRIFFITH:  There is no -- right, that

7    specific species was not called out in the specification,

8    that's correct, as was discussed in claim construction.  And

9    at the time, they said that constituted a disavowal.  They

10   said that was a specific exclusion.  And the Court found

11   that that silence on that was not a specific exclusion, was

12   not a disavowal.  This is not a *Liebel-Flarsheim* situation

13   where it was a criticism of the jacketless design in

14   *Liebel-Flarsheim*.  Here, there was no criticism of using

15   fluoro at the 2' down position.  None.

16             THE COURT:  Okay.  You can move on to written

17   description, if you want to.

18             MR. GRIFFITH:  I guess, you know, I'm thinking

19   about your question, Your Honor, about, I mean I just don't

20   think there is, under the *Wands* factors or under any other

21   of the Court's cases, any hard and fast rule about what is

22   the maximum amount of time.

23             If I go back -- and it is always dangerous to

24   think out loud but I'm going back.  If you go back in time

25   to the invention of the automobile, and we're talking 1800s

1      at some point in time, no doubt for someone to take that

2      patent and construct an automobile would take some

3      substantial amount of time.  It just would.  Putting an

4      entire automobile together by hand would take time.  That

5      doesn't mean it would be undue experimentation.  That is why

6      we have these *Wands* factors that look at the particular

7      context of the art and have the experts testify about that

8      and deal with fact issues in that fashion.

9              On written description, Your Honor, I'll keep my

10     comments brief.  I promise.

11             THE COURT:  I know I have taken a lot of your

12     time with enablement.

13             MR. GRIFFITH:  And that is fine.

14             The issue has been decided here, twice actually.

15     And the Court, in denying their motion for summary judgment,

16     said the fact-finder could credit Dr. Meier's opinion and

17     analysis and find as he opines that the inventors had

18     possession of the claimed invention.

19             The record also contains Gilead documents which

20     was, for example, the grant application, but not just that,

21     from which a reasonable fact-finder might conclude that

22     Gilead and/or its predecessor Pharmasset recognized that the

23     inventors of the patents-in-suit were in possession of their

24     claimed invention.

25             The fact-finder here, the jury, did reasonably

1  credit Dr. Meier's opinion and other evidence and find that

2  the inventors had possession of the claimed invention.

3        And evidence that the Court pointed to as

4  showing a fact dispute to be resolved by the jury was the

5  disclosure that the invention of nucleosides may inhibit HCV

6  polymerase activity.  That is what is the target.

7        The patented formulas, the Court noted.  The

8  patent data was pointed out.  And we introduced evidence on

9  all of those things.

10       We introduced the Gilead documents that the

11 Court pointed to.  Dr. DeFrancesco commented on those, the

12 significance of those to a virologist.

13       The specification.  The Court pointed out the

14 spec shows the inventors were in possession of nucleosides

15 with certain structural characteristics that were effective

16 to treat HCV.  We introduced that with Dr. Meier.  They

17 haven't denied any of this testimony was submitted.

18       And the Court, in pointing out the fact dispute,

19 noted, for example, that the Gilead documents were an

20 independent reason for denying the summary judgment motion,

21 as it is here for denying JMOL.

22       This is really where their big distinction comes

23 for the written description issue.  And that is that they

24 say Dr. Meier didn't come forward, didn't come through with

25 this particular testimony.  He testified that the inventors

had possession of a definite class of compounds ... useful

in the treatment of HCV.  But they say he didn't finish

up with the naturally occurring substrate of the HCV

polymerase.

          Now, we've pointed out "sufficient to be useful

for inhibiting."

          Now, Dr. Storer did introduce, by the latter

part, did introduce testimony that is substantively the same

thing.

          And certainly Dr. Meier did testify regarding

the inventors were in possession of a definite class.  He

went through the patent, formulas, illustrations, data, and

so forth, and concluded that it was not limited to the

specific options that are described at the 2' down position

which was the issue we were looking at.  So the issue had

been decided.

          There is no failure of proof on our part.  We did

not bear the burden of proof on this, but we came forward with

lots of evidence once the jury could reasonably have concluded

that they failed to prove this written description defense by

clear and convincing evidence, as they were required to do.

          It's an intensely factual issue like enablement.

          And Dr. Meier came through with his testimony.

He specifically was asked, after having reviewed all of

those things, it was not conclusory.  He went through the

1    patent in detail.

2              And he said -- was asked:  Would a skilled

3    artisan being able to recognize the 2'-methyl up

4    ribonucleoside class of compound without having every member

5    specifically listed?

6              And the answer was:  Yes.  Definitely.

7              It's a fact issue for the jury to decide.  The

8    jury would have credited that testimony as well as all the

9    other evidence that we submitted on this and come out in

10   favor of Gilead -- I'm sorry, come out in favor of Idenix.

11   There is no matter of law circumstance here.

12             Your Honor, enablement is in the law to ensure

13   that the public has adequate teaching commensurate with the

14   right to exclude.  And Gilead's counsel referred to the

15   public policy behind this here, and he alluded to that there

16   was a detraction, detraction from the field that may have

17   occurred because of this patent.

18             And, Your Honor, we see anything but that here.

19   We see that 11 out of the 12 compounds that have made it

20   into clinical trials to treat HCV are compounds according to

21   this patent.

22             The public got the teaching that they were

23   entitled to in this patent.  There is no better testament to

24   that than the Pharmasset scientists who cited this paper for

25   the proposition of a 2'-methyl class of ribonucleosides is

1    effective to treat HCV.

2            Without the teaching of this patent, there is

3    no -- without that.  I mean, they got 2' methyl idea from

4    Idenix.  That's where it came from.

5            So this patent provided the information

6    necessary for Pharmasset to get its drug to market as well

7    as for the good many other compounds that made it into

8    clinical trials with a 2' methyl ribonucleoside structure as

9    described in the claim.

10           We submit that there is ample evidence here

11   under which the jury could reasonably have reached its

12   conclusion that Gilead did not prove that the claims in this

13   patent are not enabled or that they fail under the written

14   description test.

15               THE COURT:  Okay.

16               MR. GRIFFITH:  Thank you, Your Honor.

17               THE COURT:  Thank you very much.

18           Do you want rebuttal?

19               MR. SINGER:  Do you want to take a lunch break?

20               THE COURT:  No.  I would rather hear from you

21   first.

22               MR. SINGER:  Okay.  Your Honor, I guess I want

23   to start -- I've got a lot and I will try to organize them

24   as best I can.

25           I want to start really with something that

counsel for Idenix said in the middle that I found really

remarkable, and just to remind the Court, that I think

something to the effect of that Dr. Secrist sort of

artificially inflated the numbers that are impacted here,

and you wouldn't want to make a prodrug of an inactive

compound.  That's what's sofosbuvir was.  The jury, no

contest, no contested evidence about what sofosbuvir

actually was.  It was an inactive nucleoside, 6206, if the

Court looks at record, that was then modified by Dr. Sofia

to turn it into the great success that it is today, by

adding a phosphate moiety to it to make it have some

activity and then adding a prodrug.  So the notion that

someone wouldn't look at inactive nucleoside to then meet

the effectiveness limitation is simply both remarkable given

what was found to infringe here, what was conceived to

infringe, but it's not supported by record.

Picking up on that, in terms of the sort of the

numbers of compounds that are impacted by the claims, I

heard an assertion that it was thousands.  I don't think

record has that number in it.  Dr. Meier I believe said

varied a lot of compounds if you look at what he said, and I

will give you the cite, Your Honor.  What he was describing

was actually not a -- he was describing a theoretical

approach tied to what was actually listed in the patent, not

a theoretical approach divorced from the patent.  You know,

1    counsel showed Dr. Secrist being crossed about plutonium and

2    mercury.  Well, plutonium and mercury, they're not listed in

3    the patent as something someone of skill in the art would

4    consider, ever.  I think Dr. Secrist was saying the obvious,

5    one can put plutonium on here.

6              But what Dr. Meier said, and this is at page

7    1918, is -- he's being asked that he disagrees that there

8    are billions, and he says, you know, why is that number much

9    too large?  This is the -- of course, if you take the

10   theoretical approach to discuss all the structures that are

11   mentioned in the '597 patent, also in the '585 patent, then,

12   and that's the priority application, then there are very, a

13   lot of compounds.  So he's talking about what is disclosed,

14   that if you take those, there are a lot.  And then he

15   circumscribes it by talking about the 2' methyl and the

16   inhibition of the NS5B polymerase.  So it's either a lot or

17   billions, but it's tied to the substitution that the patent

18   recommends.

19             You asked, Your Honor, about this issue of

20   making new compounds versus, you know, going to the library,

21   if you will.  Actually, Dr. Secrist was cross-examined by

22   counsel on that very point, so the record does reflect, and

23   I will direct your attention to page 1728 of Dr. Secrist's

24   cross-examination.

25             "Question:  And, by the way, sometimes you

1    wouldn't even necessarily have to synthesize it anew.

2    Right?  Sometimes you can find compounds in an existing

3    library with it already available.  Right?

4              "Answer:  In an existing library, you mean buy

5    it from somebody?

6              "Question:  Buy it from somebody, or maybe if

7    you are a large company, you have it in your library of

8    compounds?

9              "Answer:  Any company that worked on nucleosides

10   would presumably have some.  They don't last forever, but

11   they would, and they're all different.  But it is a pretty

12   small number, very small number, I would say."

13             That's a record about what was available

14   pre-existing that you didn't have to make.  And it's ironic

15   that Merck, the Merck library was mentioned, because the

16   jury saw evidence about what Merck's views were on modifying

17   nucleosides, and this is from, Your Honor, DX-2802, page 8,

18   which is an e-mail that the jury saw about the Merck Isis

19   collaboration, about the effort required.  Along those lines

20   I think we have to be very careful and clear about what we

21   collectively chose to synthesize, since it is apparent that

22   there may be a lot of synthetic effort required even for

23   minor modification of compounds you already made.

24             So even suggesting, even stating that the

25   methods were known to make nucleosides, the record before

1    the jury was not simply that it would be, snap, you just go

2    to the library and, snap, you can make them, it took time.

3    That's why Dr. Tausek talked about it would be a lot to do

4    37 a month, and Dr. Secrist said uncontested, that a person

5    could make about two to four per month.  That's what he

6    talked about.  Dr. Meier never addressed how much time it

7    took.

8            The other point, Your Honor, is, in going

9    through, if you will, the *Wands* factors, actually the record

10   we presented on JMOL basically accepts what Idenix is saying

11   with respect to how the jury might have found those.  With

12   respect to the scope of the claimed invention, I actually

13   think the parties aren't in that big of a disagreement.

14   There are a lot of compounds impacted by the structure that

15   are then narrowed by the effectiveness limitation.  That's

16   the seventh factor.

17           And on operability, Your Honor, this is really a

18   fact-based case on that point.  Sure, there's some case law

19   that talks about inoperative embodiments, but this patent as

20   it relates to full scope has to enable the full scope,

21   everything, because there are no inoperative embodiments by

22   the nature of the claim language.  The claim language

23   requires that they be effective, that the 2' methyl

24   ribonucleoside must be effective to treat HCV.  So there are

25   no inoperative embodiments possible by the claim.  And all

1    the strikeouts that counsel is saying is permitted, that's

2    the problem.  Finding the effective ones, you strike out a

3    lot.  That's what the experts said.  You don't know until

4    you make a test, and that was record evidence before the

5    jury about the struggles of Idenix to identify effective 2'

6    methyl compounds.

7              And a couple more points, Your Honor.  Again,

8    I'm happy to address whatever the Court would like.

9              On predictability, Dr. Meier was clear that he

10   was of the same view, that this was an unpredictable art,

11   the art being the use of modified nucleoside to treat HCV.

12   That was the field we had in this case.  It's not the use of

13   nucleosides to treat viruses, it's the use of nucleosides to

14   treat HCV.

15             And I asked him, because if the Court will

16   recall, Dr. Meier actually didn't even start working in the

17   field until 2012.  And I asked him on cross-examination

18   about what he learned when he did this in 2012.  Well, I was

19   talking about 2012, and this is page 1929.  When you started

20   working on it, the "it" being the field of nucleosides for

21   treatment of HCV, you learned how unpredictable it could be,

22   didn't you?  Yes, of course.

23             The other couple points, Your Honor, there was

24   raised some case law and there was a heavy reliance on the

25   *Wands* case, and that's an instruction that faces the Court.

1    It's the seminal case with the *Wands* factors.  I actually

2    think that's not correct, the 44 percent.  That was sort of

3    the inventive process that they went through.  But the Court

4    then commented on the actual practice of the claims.  You

5    know, if you practice the claims, would you always, or would

6    you sometimes achieve inoperative results?  And what the

7    Court said at page 858 F2d. 740 is, you know, the Court is

8    talking about that the antibodies used to practice the claim

9    method are obtained by a process which entails, quote,

10    "immunizing animals, using lymphocytes from the immunized

11    animals with myeloma cells to make hybridomas and screening

12    the antibodies produced by the hybridomas for the produced

13    characteristic."

14    *Wands* carried out the entire procedure three

15    times and was successful each time in making at least one

16    antibody that satisfied all the claim limitations.  Here,

17    the evidence is that people would make things trying to

18    satisfy the claim limitation and they would fail.  And

19    the only examples in the patent are with the one substituent

20    bound do not go to the breadth of the possible substituents.

21    Just one comment on *Wyeth*.  I don't know if

22    counsel misspoke or not, but the structure in *Wyeth*

23    comparable to 2' methyl absolutely was identified.  It was

24    the macrocyclic structure.  That was the discovery, that

25    that macrocyclic ring bound in a certain way to achieve the

1   anti-restenosis effects.

2          And, Your Honor, an awful lot is being put on

3   that grant application, and if the Court reads what was

4   highlighted in slide, I think it's slide number 21, you will

5   see it says, several classes of sugar modified nucleosides

6   were recently disclosed.  And, of course, the

7   ribonucleoside, the sugar in its natural state, has 2' OH

8   down and 3' OH down.  And they can be divided.  So that's

9   what we're talking about, modifying the sugar of the natural

10  ribonucleoside, which has the 2' OH and 3' OH.  And then it

11  goes on to say, they can be divided into the following three

12  classes, and they highlighted the 2' modification of methyl,

13  where 2' methyl is the modification, and then they identify

14  the compound.  Among them, 2'-C methylcytidine is

15  representative of that class of modified nucleosides with a

16  potent anti-HCV activity.

17         2'-C methylcytidine is methyl up, OH down, so

18  all they're talking about is one of the very examples that's

19  in the patent in suit.  It's no more comment on the full

20  scope of this claim as we transfer from OH down to anything

21  else down at 2' than the patent does, which doesn't have any

22  examples of that at all.

23         Your Honor, just a couple more points and then I

24  will be done.

25         With respect to the Storer testimony, I think I

was making the point that there's a legal requirement in

enablement to link the understanding of a person of skill in

the art about this mimicry point to the disclosure of the

patent, and this is the novel aspect of the patents-in-suit.

It needs to be in there.  You can't fill it with the

testimony of a scientist talking about something else to, if

you will, gap fill for enablement.  That has to be in the

patent specification.  But I suppose even if there's some

exception to that, that has to be linked, that a person of

skill in the art would make that same conclusion after

reading the patent specification.  That would be sufficient

to support enablement.

And then, Your Honor, with respect to Mr. Clark,

again, I would just emphasize, you asked me, you know, isn't

the jury entitled to accept certain things he said and

object to other things he said?  That's certainly true.  But

they're asking for an inference is what they are asking for,

to infer that Mr. Clark was guided by the '597 patent.  He

testified that he went into the office with it, and they are

asking that there be an inference given that you have to

look at all the testimony and determine whether or not it

was a reasonable inference.

And, you know, finally, Your Honor, subject to

checking with these folks over there if I've missed

anything, again, happy to answer any questions.

1            I just want to say, what we heard at the end was

2    a plea, if you will, that this was an important and

3    groundbreaking discovery, and the Court can very well find

4    that.  You know, I'm not here to talk about the merits.  I

5    think I said that at the beginning, that regardless of what

6    the merits of the patentee might have contributed, the

7    question for this Court is whether the claims of the patent

8    go too far?  Are they too broad given what the patentee

9    actually discovered?  And it's right there in the Ariad

10   cases and all of them.  Patents are not awarded for academic

11   theories.  And here I will say it wasn't just an academic

12   theory, but the theory that any 2' methyl up would be

13   active, that is an academic theory that is not borne out by

14   the evidence, and no matter how groundbreaking or necessary

15   to the later patentable inventions.  That's from the *Ariad v*

16   *Eli Lilly* case, Your Honor, 598 F 3d. 1353.

17           The fact that other molecules utilize 2' methyl,

18   that's the point.  They had to do the work to, if you will,

19   later enable the full scope of these claims.  They are not

20   enabled by the patent specification, as I think the record

21   amply demonstrates before this jury.

22           THE COURT:  All right.

23           MR. SINGER:  Let me just check if I missed

24   anything.

25           THE COURT:  I also have a few other questions

1    for you.

2              MR. SINGER:  Okay.

3              THE COURT:  Then I will let you check.

4              MR. SINGER:  Very well.

5              THE COURT:  On the *Wands* factors, is it your

6    view that there's not a single change due to material fact

7    with respect to any of the *Wands* factors?

8              MR. SINGER:  I think there might be -- you know,

9    I don't think -- no I guess would be my answer because we

10   believe as a matter of law enablement, lack of enablement

11   has been shown.  I think there have been arguments made

12   about the quantity of experimentation that is necessary that

13   do not reflect what record actually shows, and about the

14   scope of the structure impacted by the claims that are also

15   not supported by what record shows, but in our view, the

16   undisputed facts show a lack of enablement under the *Wands*

17   factors.

18             THE COURT:  There was some reference during

19   Mr. Griffith's argument to the identification of a

20   polymerase that was being attacked essentially in order to

21   treat HCV.  Is that an element of the claim here?

22             MR. SINGER:  It is not an element of the claim.

23   I mean, I think what I said at the beginning was that we

24   dispute that that is an element of the claim.  I don't think

25   the Court needs to resolve that issue to decide Gilead's

1    motion here, but --

2                THE COURT:  Does it have any relevance to the

3    enablement question?

4                MR. SINGER:  I think it does, Your Honor, in

5    that the Court could readily find that the patent actually

6    doesn't teach explicitly that the things covered by the

7    claim have to be active with the polymerase.  The patent

8    actually says they may be active in the polymerase, but they

9    also may act in other mechanisms, and the jury heard

10   testimony about ribonucleosides, which is a nucleoside that

11   acts through a different mechanism.

12               But I actually think in terms of resolving the

13   issue, it's -- I don't believe it's necessary for the Court

14   to resolve that issue to rule on the JMOL, because even

15   accepting Dr. Meier's premise that the patent directs you to

16   the NS5B polymerase, it still requires undue

17   experimentation.

18               THE COURT:  And on whether or not the patent

19   teaches away from fluorine because it doesn't expressly

20   disclose it, given the jury finding, could I in any way

21   credit your argument about it essentially teaching away from

22   fluorine?

23               MR. SINGER:  I think, Your Honor, the jury is

24   allowed to make those findings that are supported by the

25   evidence.  And I think you could find that the failure to

1    list fluoro, while listing it in other places, that the

2    jury's conclusion that that is okay is not supported by

3    substantial evidence.  I don't see that the jury verdict is

4    an obstacle to that finding.

5              THE COURT:  Do you want to confer, see if you

6    have anything else to add?

7              (Pause while counsel conferred.)

8              MR. SINGER:  Your Honor, they are telling me I

9    did okay.

10             THE COURT:  All right.

11             MR. SINGER:  We can go to lunch.

12             THE COURT:  If you would like to add anything,

13   you certainly may.

14             MR. GRIFFITH:  Thank you.

15             First, Your Honor, on the point about Dr.

16   Storer's testimony about mimicking OH, that goes in part to

17   predictability, so this is, as I said, a tool that a skilled

18   artisan used, and used at the time to synthesize, and so

19   that was -- it was a predictive tool for them.

20             And the second point I would make about that is,

21   and I apologize if I was less than clear in my first go

22   round, is that that section of the patent that is talking

23   about acting on the HCV polymerase and preferred embodiments

24   specifically doing the HCV polymerase assay, that is honing

25   in on the mimicry aspect of the invention.

1          So Dr. Sommadossi testified about this

2     invention, that what happens is, you have to phosphorylate

3     so that the ribonucleoside will be taken up by the

4     polymerase, and then what happens is you have chain

5     termination when it does.  This is the way the HIV drug AZT

6     worked, so that was his background in getting to this.  AZT

7     was a deoxyribonucleoside, but the concept was the same.

8          So the concept of mimicking the ribonucleoside

9     is present in that disclosure in the specification talking

10    about acting on the HCV polymerase.

11         And then the point I want to make about *Wands*,

12    it was, the *Wands* -- Wands was the patent applicant in that

13    case, and Wands himself argued that his success rate was

14    four out of nine.  That was the 44 percent.

15         And I was looking for the places in the

16    specification -- in the opinion that noted that it was

17    specifically called out in Judge Newman's dissent in that

18    case, and I didn't see where it was specifically called out

19    in the majority opinion, but it was Wands's position that he

20    was successful 44 percent of the time.

21         And then elsewhere in the decision, page 738,

22    *Wands* submitted a declaration first for fusions were

23    unsuccessful and produced no hybridomas, the next six

24    all produced hybridomas, hybridomas that may have antibodies

25    specific for hepatitis B.  Wands had failure.  He had

failure.

Now, Mr. Singer pointed out that there was

another instance pointed out here where screening antibodies

all three times in the entire procedure, he got at least one

antibody, but he had a lot of strikeouts.

And then in terms of why does that matter here

is that we say that skilled artisans may experience some

amount of, I've got a ribonucleoside that is not active, but

that is not -- no evidence indicates that is happening with

an undue occurrence rate or a substantial portion of the.

And the second point on that is, so Mr. Singer

pointed to, by definition, you can't have inoperative

embodiments because this claim requires effectiveness.

I think the claim in *Wands* required the ability

to bind the hybridoma at a certain affinity level.  So it

was the same situation, and it was the same issue, and that

is do you have enough information to make compounds that

are effective, that bind the HBV surface antigen that are

effective against HCV?  Do you have enough information in

the patent for skilled artisans to practice the invention

without undue experimentation?

The Court in *Wands* said yes.  Even though more

than half the time you are going to strike out, that is

still not undue experimentation.  And these experiments were

a significant amount of time, working with animals, to do

1   fusions, to injecting animals, to develop the hybridomas.

2          So those the main thoughts that I wanted to go

3   back to.

4          This is not a plea, Your Honor.  This is simply

5   a fact that in a motion for a judgment as a matter of law,

6   Your Honor, it is a heavy burden to take away from what the

7   jury did.

8          And there was a substantial amount of evidence

9   submitted to this jury, including conflicting evidence.

10  There is some waffling on whether there was conflict between

11  the experts on does the target matter?  There absolutely

12  was conflict on that.

13         And it does matter because it is informative.

14  It doesn't matter that it is not a claim element per se.  It

15  is useful and important information to the person of skill

16  in the art that it can help guide them.  And, indeed,

17  indeed, that was information that guided Dr. Sommadossi and

18  Dr. LaColla to this invention in the first place.

19         Thank you, Your Honor.

20         THE COURT:  Thank you.  Mr. Singer, any last

21  word on this?

22         MR. SINGER:  No, Your Honor.

23         THE COURT:  All right.  Well, we will take a

24  lunch break.  I recognize we're running more behind

25  schedule.  The arguments have been very helpful to this

```
 1          point.  I had indicated we would take an hour for lunch.  If
 2     you want to come back sooner than that, that's fine by me.
 3                    Any thoughts by the Idenix side on how long you
 4     want to be given?
 5                    MS. PARKER:  We think maybe 45 minutes for us.
 6                    THE COURT:  Okay.  Any problems with 45 minutes
 7     on the defendants' side?
 8                    MR. SCHERKENBACH:  That's fine, Your Honor.
 9                    THE COURT:  Then whatever 45 minutes is from
10     now, we'll look for you.  We will be in recess.
11                    (Lunch recess taken.)
12                    *     *     *
13                    2:30 P.M. - Afternoon Session
14                    THE COURT:  Have a seat.
15                    I hope you all had some lunch.  I think we're
16     ready to move on.  Is there anything to add?
17                    All right.  Let's move on to the next issue,
18     please.
19                    MR. WARDEN:  Good afternoon, Your Honor.  Joseph
20     Warden on behalf of Gilead.  I will be addressing Gilead's
21     JMOL on damages.
22                    May I approach with some slides, Your Honor?
23                    THE COURT:  Yes.
24                    (Slides passed forward.)
25                    MR. WARDEN:  Before I get into the specifics of
```

1    my argument, Your Honor, I want to start with one high level

2    point.

3               Idenix in this case obtained a $2 and-a-half

4    billion damages award which is the largest patent damages

5    award in U.S. history and, in support of that award, was

6    given the testimony of Mr. Andrew Carter, Idenix's damages

7    expert.

8               And Mr. Carter here on this slide acknowledges

9    that Idenix did not invent the cure for HCV.  That cure came

10   from Gilead's work.

11              Even assuming Idenix's patent is valid, it

12   contributed one piece, methyl up.  And methyl up, by itself,

13   doesn't cure HCV.  And for purposes of damages, methyl up

14   does not bring any commercial success.

15              Now, we heard from Mr. Griffith talk about the

16   important of methyl up and how 11 of 12 compounds that have

17   gone through clinical trials are methyl up compounds, but

18   what Mr. Griffith didn't say is only one of those compounds

19   has ever been successful, sofosbuvir, as a result of

20   Pharmasset and Gilead's work and in particular, the

21   contribution of fluoro down and the prodrug.

22              And the other striking thing we heard this

23   morning on that point is the admission first from Dr.

24   Sommadossi that the '597 patent does not disclose fluoro

25   down, and Mr. Griffith agreed with that and essentially

1    argued it doesn't, it doesn't matter.  They don't have to

2    disclose fluoro down.

3              And while Mr. Singer explained all the reasons

4    why we disagree, even assuming that is true for purposes of

5    validity, the question for damages is different, and that

6    is what is the value of this patent?  In particular, what is

7    the value of a patent that does not disclose the only

8    embodiment that has ever had any commercial success?

9              And with that, Your Honor, I want to get into

10   the specifics of what went wrong with Idenix's damages

11   presentation.

12             And at a high level, there were two problems:

13             The first of which is that Mr. Carter failed

14   to perform the required license comparability analysis.

15             And the second I'll get to later is that he

16   failed to perform the required apportionment analysis.

17             And just to reorient the Court:

18             Mr. Carter's entire damages case was premised

19   on comparison to two past licenses:  one between Merck and

20   Roche and one between the Pharmasset and Roche, and using

21   those two licenses is where he pulled his 10 percent rate

22   from.

23             The Federal Circuit has explained that if you

24   are going to do that, you have to account for the

25   differences between your past licenses and your hypothetical

1  license.  And Mr. Carter failed to do that in a number of

2  important respects.

3        And I'm not actually going to take the time

4  today to go through every one of these four.  They're all

5  talked about in our briefs, and we still stand by all of

6  them.  I want to focus on the first and the last because

7  those are the most important here:  the impact of portfolio

8  licenses or the number of patents and the impact of the

9  nonpatent assets that were licensed.

10       First is the differences in the number of

11 licensed patents.

12       Here, Your Honor, are excerpts from both the

13 patents or, excuse me, both of the licenses that Mr. Carter

14 relied on showing that both of them gave Roche license or

15 rights to an entire portfolio of patents, not a single patent.

16       And the Federal Circuit in, and this Court, have

17 both explained that portfolio licenses are not comparable to

18 single patent licenses.

19       In *Lucent*, the Federal Circuit, said, A

20 reasonable juror could only conclude that they were vastly

21 different.

22       In *AVM Technologies*, Judge Andrews said, A

23 patentee cannot even argue they are comparable.

24       And that doesn't, Your Honor, mean that a

25 plaintiff can't ever rely on a portfolio license.  Judge

1    Andrews, in another case, *Inventio*, explains how and when

2    you can use a portfolio license as part of a comparability

3    analysis.

4              In *Inventio*, Judge Andrews allowed the use of

5    that license, the portfolio license only because the expert

6    took into account the need to make a significant downward

7    adjustment to the royalty rate.  The expert didn't just

8    extract a rate from the portfolio license.  If Mr. Carter

9    wanted to use portfolio licenses, that is what he was

10   required to do.

11             Let's look at what he actually did do.

12             Mr. Carter testified that the number of patents

13   didn't matter.  That it didn't affect his rate.

14             That is problematic for a number of reasons.

15   The main one being it contradicts the law in *Lucent*, in

16   *AVM Technologies*, and in *Inventio* which say, no, portfolio

17   licenses and single patent licenses are very different and

18   you can't compare the one to the other without making a

19   significant downward adjustment.

20             And, Your Honor, this case actually provides a

21   really good example of why portfolio licenses and single

22   patent licenses are so different and can't be treated as

23   though they're the same.

24             Roche, in its two licenses, got the right not

25   just with a single patent but protection from the future of

1    any other patents being asserted against them.  So Roche

2    would never have to face the situation where Merck came back

3    a year later and said, hey, we've got another patent we

4    think covers your product.  Now you need to take a license

5    to that one and wouldn't have to serially defend it from

6    patents from Merck or Merck's affiliates.

7            Gilead didn't get that.  Gilead is getting a

8    license to one patent.  And if Gilead were getting what

9    Roche got, Gilead wouldn't find itself in the situation of

10   having to serially defend itself against the patents of

11   Idenix and its affiliates.  It wouldn't be defending this

12   case in this court.  It wouldn't be defending against

13   Merck's patents in California.  It wouldn't be in front of

14   the Federal Circuit still fighting about the '600 patent.

15   And it wouldn't have to worry that a year from now, Idenix

16   might identify another patent that it thinks the covers

17   sofosbuvir and assert that against Gilead.

18           Simply put, Mr. Carter is charging Gilead the

19   price for a portfolio license but Gilead is not getting

20   portfolio protections.  The case law says that is not a

21   comparison Mr. Carter was even allowed to make.

22           THE COURT:  Are you saying that an expert cannot

23   opine that the number of patents being licensed does not

24   matter?

25           MR. WARDEN:  I am saying that under the case

1    we cited, he can't say it doesn't matter.  There might in

2    theory be a situation where he might offer an explanation

3    for why a single patent license could have the same rate as

4    a multiple patent license under some circumstances, but he

5    has to address it.  He has to talk about the difference.

6              And he said I can disregard the difference.  He

7    says the number of patents doesn't make a difference in the

8    rate.  That is not allowed.

9              What he needs to do, as *Inventio* says, is to,

10   well, in that case at least, make a significant downward

11   adjustment to the royalty rate but critically to account

12   for the vastly different bundle of rights conferred and not

13   simply extract a rate from the portfolio license.

14             THE COURT:  Are you saying the law requires an

15   expert to opine that the value of a license to a smaller

16   number of patents is per se less valuable than to a

17   portfolio or a license to a larger number of patents?

18             MR. WARDEN:  I think the law does require an

19   expert to opine that a value of a portfolio license is

20   not the same as the value of a single license.  I think *AVM*

21   *Technologies* says that extremely clearly:

22             "A patentee may not argue that prior licenses

23   granting rights to entire portfolios of patents are

24   comparable to a license that the parties would have

25   negotiated for a single asserted patent."

1            I think that is a clear statement of law, also

2      consistent with what the Federal Circuit said in Lucent.

3      That error, by itself, renders Mr. Carter's damages analysis

4      legally unsupportable.

5            There are several other problems with Mr.

6      Carter's license comparability analysis.  And in the

7      interest of time, Your Honor, I'm not going to go through

8      all of them.

9            The next one, the difference in timing and risk

10     as well as technological comparability.  We have covered

11     these in our brief.  We stand by what we said in our briefs.

12           But I want to again focus on the other part of

13     the comparability analysis that I think is the biggest

14     problem here, and that is Mr. Carter's failure to account

15     for nonpatent assets.  And this relates really to the

16     Pharmasset/Roche agreement.

17           And the first thing I highlight, Your Honor, is

18     this Pharmasset/Roche agreement is not a license agreement.

19     It is entitled a Collaboration Agreement.  The reason it is

20     entitled a Collaboration Agreement because it covered a lot

21     of things and an patent license was only one of many parts.

22           And, critically, one of the things that it

23     covered was the actual PSI 6130 compound.  Pharmasset didn't

24     just give Roche patent rights, Pharmasset gave Roche PSI

25     6130, gave them an exclusive license to develop PSI 6130.

1   They gave them samples.  They told them how to make it.

2   They gave them anything that was necessary or useful for the

3   manufacture, development, or commercialization of it.

4         They gave Roche everything that the '517

5   patent doesn't give:  actual directions on how to make this

6   compound, the actual physical compound.

7         And here is what Mr. Carter had to say about

8   that -- six words.

9         In talking about that patent or that license, he

10   mentions in passing it was for the 6130 drug and the related

11   patents.  And then he never talks about this point again.

12   He never tells the jury how that impacts his analysis.  He

13   never adjusts the rate for that license to account for the

14   fact Pharmasset wasn't just getting a patent but was given

15   the key compound they were working on.  That never affects

16   his analysis.

17         And under far less egregious circumstances, the

18   Federal Circuit has set aside damages award.  In ResQNet,

19   the Federal Circuit set aside a damages award that was based

20   on licenses that included non-patents, like "finished

21   products, training, maintenance, and marketing."

22         And in Trell, which was relied on by the Court

23   in ResQNet, the Federal Circuit set aside a damages award

24   that was based on a patent or on a license that actually

25   covered the patent-in-suit but also conveyed other rights

1    that were more broad than just the patent-in-suit.  And the

2    Federal Circuit said you can't just pluck a rate out of that

3    license when it covers more than just the patent-in-suit.

4    And it set aside the damages verdict.

5              Those two comparability points I think are the

6    most egregious, Your Honor.  I'm happy to address the other

7    comparability issues if the Court has questions before I

8    move on to the apportionment issue.

9              THE COURT:  The only question is when you

10   suggest that Carter failed to address things, what I'm

11   hearing you say is that while he referenced them, while

12   he was made aware of them, perhaps even on your own

13   cross-examination, you don't like the answers he gave and

14   you think that they are inadequate in some instances under

15   the law.  You don't mean to say he was, as far as the jury

16   was concerned, ignorant of factors that you are pointing to,

17   do you?

18             MR. WARDEN:  I don't mean Mr. Carter was ignorant.

19   What I mean is that Mr. Carter I think intentionally

20   disregarded factors that as a matter of law he was required

21   to take into account and make adjustments for.

22             THE COURT:  But by disregard, do you mean there

23   is nothing in the record where Mr. Carter says anything

24   about these factors?

25             MR. WARDEN:  So with respect to the 6130, the

1  fact that the Pharmasset and Roche agreement included 6130,

2  he says right here, it was for the 6130 drug.

3          THE COURT:  And the related patents.

4          MR. WARDEN:  And related patents, but then he is

5  focusing on the fact it is a patent license.  He never talks

6  to the jury at all about how the fact that it also covered

7  this drug impacted the rate in that Pharmasset/Roche license,

8  and he never adjusts the rate downwards in his hypothetical

9  license to account for the fact that Gilead was not getting a

10 complete finished compound from Idenix the way that Roche was

11 getting it from Pharmasset.

12          That is something that he was not allowed to do.

13 The Federal Circuit had said that.  You can't just take a

14 rate from a license that gives patent rights and a whole

15 bunch of other stuff and then use that same rate in your

16 hypothetical license that only gives patent rights.  That is

17 exactly what Mr. Carter has done here.  As a matter of law,

18 he was not allowed to do that.

19          THE COURT:  Okay.  You can move on if you wish.

20          MR. WARDEN:  So the second issue is Mr. Carter's

21 failure to satisfy the apportionment requirement.

22          This is the same slide that I showed at the

23 beginning, Your Honor, that Mr. Carter is acknowledging

24 Idenix is only contributing a piece of sofosbuvir, that is

25 the methyl up, whereas Gilead is contributing the other two,

1    or at least two other pieces, fluoro down and the prodrug.

2           Here, Idenix's counsel in opening statement

3    acknowledged the same thing.  And this is just a graphic

4    sort of showing that how you can divide it up into at least

5    three key pieces, only one of which was the contribution of

6    Idenix's patent.

7           And there is a fair amount of briefing, Your

8    Honor, on the question of whether under these circumstances

9    the Entire Market Value Rule comes into play.  We stand on

10   that point by what we said in our briefing.  We think it

11   does.  We think Idenix is required to satisfy it.

12          I'm not actually going to talk about that now

13   because ultimately it doesn't really matter, and the reason

14   it doesn't matter is because in *AstraZeneca*, the Federal

15   Circuit explained that even if the Entire Market Value Rule

16   doesn't apply, there is still a related inquiry that has to

17   be done which is substantially same kind of analysis.

18          What *AstraZeneca* said is where you have a drug

19   that covers, or a patent that covers a product, a drug as a

20   whole, but where the patentee only invented one element of

21   what is claimed and the other elements were not invented by

22   the patentee, you actually have to do an apportionment,

23   where you compare the value of the element that the patentee

24   invented to the value of the elements it didn't invent.  And

25   I prepared some graphics to show how this played out in

1   *AstraZeneca*.  In *AstraZeneca*, the drug was omeprazole.  It

2   had three elements, a core, a subcoating and enteric

3   coating.  What *AstraZeneca*'s invention was, that that

4   combination, they didn't invent the actual individual

5   elements, but they figured out if you arrange these elements

6   in this particular way, it has benefits.  They invented the

7   recipe, not the ingredients.

8          And what *AstraZeneca* said is, well, what we

9   have to do is we have to compare the value of *AstraZeneca*'s

10  invention, which is the combination, to the value of the

11  other elements that they didn't invent standing alone.  And

12  in that case, the Court concluded, well, here, *AstraZeneca*'s

13  contribution, the recipe is actually what drives the value

14  for this product, and so the Court allowed use of an

15  unapportioned royalty base.

16         That same analysis needs to be done with respect

17  to sofosbuvir.  Sofosbuvir has at least three elements,

18  methyl up, fluoro down and a prodrug.  Idenix invented only

19  one of those elements, the methyl up piece, and under

20  *AstraZeneca*'s analysis, the other pieces, fluoro down and

21  the prodrug, are other elements.

22         Under *AstraZeneca*'s analysis, Mr. Carter was

23  required to do an apportionment analysis between the value

24  of Idenix's invention, methyl up, and the value of the other

25  elements that Idenix didn't invent, including fluoro down

1  and the prodrug.  He didn't do it.  And I just want to make

2  clear in case we hear from Idenix that, you know, he did do

3  it somehow in his apportionment of the royalty rate, which

4  is not true, but, more importantly, as a matter of law, it

5  has to be done on the royalty base.  Both *Laser Dynamics* and

6  *Uniloc* talk about the fact how this kind of apportionment

7  has to be done on a base, not a rate, because the use of an

8  unapportioned royalty base can unfairly skew the damages

9  award high when the jury sees it.

10          So Mr. Carter was required to apportion the

11  base.  He didn't.  This is a second independent reason why

12  Mr. Carter's damages analysis is insufficient, and why there

13  is no legally sufficient evidentiary basis for Idenix's

14  damages award.

15          The last point I conclude on, Your Honor, is

16  the remedy, so to speak.  We've asked the Court to grant

17  judgment as a matter of law as well as a remittitur.  In

18  this case, while Idenix did not present a legally sufficient

19  evidentiary basis for its damages award, there was a

20  sufficient evidentiary basis put in by Dr. Putnam for

21  damages of no more than $380 million, and what this Court

22  and the Federal Circuit have explained is that where there's

23  no support for a jury's award, this Court can remit it down

24  to the maximum amount that is supported by the evidence.

25  In this case, that's $380 million, and that's what we would

1  ask the Court to order as the appropriate damages in this

2  case.

3            THE COURT:  If I do think that there was a

4  legally admissible basis for Dr. Carter's analysis, is there

5  any other basis on which you are entitled to relief with

6  respect to damages?

7            MR. WARDEN:  The only thing we've moved on is

8  Mr. Carter's analysis, which was the entire basis for

9  Idenix's damages award.

10            THE COURT:  Okay.  Thank you.

11            Ms. Swize?

12            MS. SWIZE:  Good afternoon, Your Honor.

13            THE COURT:  Good afternoon.

14            MS. SWIZE:  May it please the Court, I do have

15  some slides that I'm not going to go through in its

16  entirety, but if I may hand them up?

17            THE COURT:  You may, sure.

18            (Ms. Swize handed slides to the Court.)

19            MS. SWIZE:  Your Honor, a jury had substantial

20  evidence to adopt Mr. Carter's royalty analysis, which it

21  adopted in its entirety, and I'm just going to jump right

22  into the complaints that Gilead has raised, starting with

23  its license comparability challenge.

24            I'm going to go by very quickly the basis of

25  Mr. Carter's analysis, which was a license comparability

analysis.  He analyzed the parties.  He compared them to

Idenix and Gilead and he looked at the royalty rates.  He

also supplemented his opinion with Georgia-Pacific factors.

He did address Gilead's complaint, which I will get to, and

he opined on the ten percent on net sales.

So let's go to the first of Gilead's challenges

on the number of patents that were covered in the comparable

licenses.

So the first point is that these are issues that

the jury could weigh.  The Federal Circuit has been very

clear that on the complaints that Gilead is raising, those

are issues about weight for the jury to decide, the degree

of comparability, and whether and how the expert has

controlled for different variables, because obviously we're

talking about not an apples-to-apples comparison, but an

apples-to-oranges comparability.  The Federal Circuit does

not require identity.

Then we go to the first point on the number of

patents in the licenses.  This goes to weight.  It was the

jury's decision to decide how much weight to give this.  I

heard a suggestion, this was maybe something in theory where

an expert could rely on a license with a different number of

patents than the patents in the hypothetical negotiations.

We don't have just something theoretical here.  We have a

reasoned analysis, because this issue was presented to the

1    jury.

2             And Mr. Carter didn't just disregard it because

3    he ignored it.  He said, the parties' comparable licenses do

4    disregard the number of patents.  They have the same royalty

5    rate regardless of the number of patents that issued or

6    expire, come in or out.  So he acknowledged it and said it

7    wouldn't matter in this kind of negotiation in this industry

8    where Idenix and Gilead would be coming to the table as

9    well.

10            On the other assets, this was also presented to

11   the jury.  Mr. Warden suggested that it wasn't, and he said

12   in his testimony or his presentation that Mr. Carter said

13   about six words on this.  That's not true.  That's not

14   accurate.  Mr. Carter was cross-examined extensively by

15   Gilead.  It was exactly what the Federal Circuit said in

16   Active Video.  That's the best way to assess comparability,

17   have the expert examined on it and cross-examined on it.

18   And Gilead's counsel I don't think mentioned the other

19   license that Mr. Carter relied on, which is the Merck-Roche

20   license.  And on there, in terms of the other assets that

21   were covered by other agreements in that package, there was

22   evidence in the record, and Dr. Putnam, Gilead's expert, was

23   asked about this, where the rates would have been higher if

24   those other assets had not been included.  In other words,

25   those were accounted for, and for both of the licenses that

1   Mr. Carter used, they used a range, but Mr. Carter did

2   adjust, and he adopted at the low end of both of those

3   accounting differences.

4           I will turn to Gilead's argument on the royalty

5   base and whether it was appropriate to use sofosbuvir.  It

6   was.  Your Honor may remember, this was an issue that was

7   before the Court on the *Daubert* motion that Gilead brought,

8   and Your Honor said that our expert, with respect to damages

9   and the entire market value rule, gives a reasonable,

10  reliable opinion, and that the patented feature may not

11  under the circumstances be segregated out, and the patented

12  feature may be found to drive demand, a reasonable

13  valuation.  The jury doesn't have to agree.  They could

14  challenge it and the jury could accept it, and they did

15  accept it here.

16          And I have five points on this, and I will be

17  brief.

18          First, with respect to *AstraZeneca*, I think that

19  answers our case entirely, because while the Federal Circuit

20  did not say it's a per se rule in the pharmaceutical

21  context, there is something about this context that really

22  does not fit.  You can't really divide it up like electronic

23  components where this rule usually arises.

24          And with respect to our case, we are like

25  *AstraZeneca*.  Our claims do not cover methyl up.  That's not

1    our invention.  Our invention are ribonucleoside, a class of

2    ribonucleosides that include a prodrug at the '5 position,

3    the fluoro at the 2' down position.  That's all part of our

4    claim so we're exactly like *AstraZeneca* in that respect.

5    But in our case we have even more than *AstraZeneca*.  We have

6    the record in this case, where the entire trial the jury

7    heard about the entire molecule being an appropriate base.

8    The two licenses that Mr. Carter used did the same thing.

9    And we did not have any dispute from Gilead's expert.  There

10   was no offer by Dr. Putnam to divide sofosbuvir up the way

11   the diagram presented today did because somehow it separated

12   out.  Dr. Putnam did not dispute this.  He offered no

13   alternative view.  In fact, he essentially endorsed it when

14   he converted one of the licenses into a lump sum using net

15   sales of the royalty base.

16          And my final point here is that this really is

17   different than the electronics context, which is where

18   Gilead's cases arise.  So in short, the jury was entitled to

19   adopt our damages theory and award a reasonable royalty to

20   compensate for the infringement of ten percent on net sales.

21          If the Court has no questions?

22          THE COURT:  No.  Thank you.

23          MS. SWIZE:  Thank you.

24          MR. WARDEN:  I will just touch on a few

25   additional points, Your Honor.

First, I just want to make clear that we are not

arguing that the licenses that Mr. Carter relied on were

inadmissible.  Counsel for Idenix made some suggestion that

the issues we talked about go to weight and not

admissibility and we're not disputing that.  What we're

saying is even if they were admissible, the Federal Circuit

makes clear you can't just pluck the rate out of those

licenses.  You have to adjust that rate to account for

differences.  And that is where Mr. Carter failed, was to

adjust the rate to account for differences.

So one of the things that counsel said is that

he did give testimony about how licenses to single patents,

it is appropriate to use the same rate of a license to

portfolio.  That's not actually what he said.  Here's the

testimony she's referring to, which I don't believe was

shown during Idenix's presentation.

What Mr. Carter says is that when you've already

got a rate in a license, once that rate has been agreed to,

you don't adjust that rate every time a new patent expires

or a new patent in the portfolio issues.  That rate within

the patent stays the same.  We're not disputing that.

The question is:  How do you set that rate in

the first place?  And is the rate the same for single

patent licenses as for portfolios?  And the Federal Circuit

has clearly answered that question.  A patentee can't

1    even argue that they're the same.  That's what Judge Andrews

2    said in *AVM Technologies*.  In *Lucent*, the Federal Circuit

3    said, a reasonable juror could only conclude that they're

4    vastly different.  And, again, Judge Andrews said, if you

5    want to use them, this is how you do it.  You can't just

6    extract the rate out.  You have to adjust it downwards.

7    That's where Mr. Carter failed, was to make the necessary

8    adjustments.

9               I want to just now go to the apportionment and

10   *AstraZeneca* point.  What I did not hear counsel for Idenix

11   address was this other inquiry.  We understand there's a

12   disagreement between the parties about whether the EMVR

13   comes into play in *AstraZeneca*, but we're setting that

14   aside, maintain what we said in our papers about that.

15   *AstraZeneca* still says that you have to do this related

16   inquiry, and especially when the patent covers the

17   infringing product as a whole.  Idenix is arguing our patent

18   covers sofosbuvir has a whole.  Therefore, we don't have to

19   apportion, except that's exactly when *AstraZeneca* says this

20   related inquiry comes into play.  And what you have to do is

21   you have to examine the value of the elements that they

22   contributed to that whole, in this case, that's methyl up,

23   and you have to compare that to the value of the elements

24   that they didn't contribute.

25               And we heard concession from Mr. Griffith this

1    morning that Idenix didn't contribute fluoro down.  Dr.

2    Sommadossi said the same thing.  Under *AstraZeneca*'s related

3    inquiry, they were required to do an apportionment analysis

4    here.

5            And I want to point out what was said during the

6    Daubert hearing on our motion for the entire market value.

7    What the Court said was that it's possible that Mr. Carter

8    at trial will be able to show that the patented features are

9    the basis of customer demand.  Maybe the jury won't accept

10   it, but it's possible heal be able to show it and he's going

11   to be allowed to go forward with that.

12           But Mr. Carter didn't even try to show that at

13   trial.  Instead, at trial, Mr. Carter changed tacts.  He

14   said, I don't even need to deal with apportionment.  I'm

15   using licenses instead.  And he readily acknowledged that

16   elements other than what Idenix invented contributed to the

17   value and demand for sofosbuvir.  He said, Idenix is

18   bringing its patent to the table, but Gilead is bringing

19   everything else.  Gilead has to provide the drug that cures

20   you.  Gilead is the prodrug that gets the curative drug into

21   the body.  Mr. Carter did not try to show that the patented

22   feature, methyl up, was the basis for customer demand.

23           I don't have any other issues that I want to

24   address unless the Court has additional questions.

25           THE COURT:  Yes.  For damages purposes, I have

1    to assume that the patent is valid.  Correct?

2              MR. WARDEN:  Yes.

3              THE COURT:  So I have to assume that the patent

4    is enabled.  Correct?

5              MR. WARDEN:  Yes.

6              THE COURT:  And so if it's enabled, their view

7    is that it enabled the embodiment, including the accused

8    ones, of course.  Right?

9              MR. WARDEN:  I'm not actually sure that is their

10   view.  What I heard Mr. Griffith saying during his argument

11   is we don't need to enable the infringing product.  I wrote

12   that down verbatim.  I think their view is they don't have

13   to enable sofosbuvir.  And more critically, even if it's

14   enabled from a legal standpoint, the question on damages, is

15   what is the value it contributes?  How much of sofosbuvir

16   does it get you?  And there, no one is disputing it gets you

17   one piece.  It gets you methyl.  That the work of getting

18   fluoro, the work of getting the prodrug came from Mr. Clark

19   and it came from Mr. Sofia, and Idenix doesn't get credit

20   for that for purposes of damages, when we're trying to

21   divide up how to give credit for the commercial success of

22   sofosbuvir.

23             THE COURT:  Okay.  Anything else?

24             MR. WARDEN:  Nothing else, Your Honor.

25             THE COURT:  All right.  What's next?

1        MS. PARKER:  Good afternoon, Your Honor.

2        THE COURT:  Good afternoon.

3        MS. PARKER:  If I may have just one moment, and

4   I have a hand-up, if I may?

5        THE COURT:  Sure.

6        (Ms. Parker handed slides to the Court.)

7        MS. PARKER:  Your Honor, my motion that I'm

8   going to argue is our motion for enhanced damages, and I

9   know Your Honor is very familiar with the case law and the

10  *Read* factors and all of that, so I'm going to focus more on

11  the facts and circumstances here that support enhancement,

12  and we start, of course of course, with the jury verdict.

13       As your Honor knows, the jury checked "yes" to

14  that first question on the verdict form.  There's more than

15  just that.  Under *Halo*, one of the primary factors is all

16  of this bad conduct warranting enhanced damages, which is

17  described specifically as characteristics of a pirate, and

18  believe it or not, in this case, the testimony from one of

19  the Pharmasset scientists actually used that word.  His

20  trial testimony that was played to the jury was that this

21  was a piracy that would go on in Pharmasset at that point in

22  time.

23       Your Honor is familiar with the *Read* factors.

24  The biggest issue here in any case where there's an

25  enhancement of damages is to look at the facts and

1    circumstances of the particular case.  The one thing that

2    Your Honor should respectfully consider is this pre-patent

3    misconduct.  That's an argument that they make in their

4    brief.  There are a number of cases, including *Read* itself,

5    that says you need to look at the pre-patent conduct as

6    well.  And Your Honor has addressed this issue before trial

7    when Your Honor allowed this testimony in.

8              So what was all of that?  Well, let's start with

9    Dr. Schinazi.  Dr. Schinazi was an insider at Idenix.  He

10   admitted he had a large amount of confidential information

11   from Idenix.  He knew he was supposed to keep that

12   information confidential within Idenix and not to be shared

13   outside of that company.  He had a position of trust.  He

14   had a duty of loyalty.  He signed documents, including this,

15   as one example, this confidentiality agreement here on the

16   screen.  He admitted in his sworn deposition testimony that

17   was played to the jury that he had this confidential

18   information that Idenix was developing compounds.  He also

19   testified at his deposition that he obtained the information

20   about 2' methyl and its importance from Idenix.  And he

21   admitted that when he got that information, he knew it was

22   not public knowledge.  He knew that Idenix had filed a

23   patent, and he knew that that information was covered by the

24   patent.

25              THE COURT:  Let me stop you there.  The jury

1    found willfulness, as you pointed out.  Let's assume for the

2    sake of argument that I agree there's substantial evidence

3    to support that.  What if I subjectively don't believe that

4    that is what happened?  In making the enhancement decision,

5    do I have to defer to the jury's finding or can I rely on my

6    own views?

7                    MS. PARKER:  Your Honor, I would respectfully

8    submit that Your Honor is bound by the jury finding of

9    willfulness here.

10                   Now --

11                   THE COURT:  Bound to believe that there was

12   willfulness, but then the enhancement decision is

13   discretionary.

14                   MS. PARKER:  Exactly.  Exactly.  It's just the

15   first step.  It's a big part of it.  It's a big first step.

16   But just because the jury found willfulness does not mean

17   automatically enhancement.  Enhancement is in your Honor's

18   discretion based on a number of factors.

19                   THE COURT:  In enhancing my discretion, is there

20   no role for the judge to have his or her own views based on

21   reviewing the evidence?

22                   MS. PARKER:  Is your question, respectfully --

23   is your question only about the willfulness part or all of

24   the factors?

25                   THE COURT:  Not the willfulness.  We're really

1    focused on enhancement for the moment.  I mean, another way

2    to put it is, of course, the jury was entitled to make no

3    credibility determination.  We can infer what they were

4    based on their verdict.  What if I, having looked at the

5    witnesses, had a different view of somebody's credibility?

6    Can I consider that in making the discretionary enhancement

7    decision or is that off the table?

8              MS. PARKER:  Are you asking about a different

9    view of credibility on the issue of willfulness or other

10   issues that are relevant to enhancement?

11             THE COURT:  Let's assume that it's an issue

12   relevant to enhancement.

13             MS. PARKER:  If it's an issue relevant to

14   enhancement other than the willfulness, I think that's

15   entirely within your Honor's discretion.  I do respectfully

16   believe that once the jury found willfulness, once the jury

17   made that determination, I believe that does bind, so to

18   speak, the Court as to that aspect of the entire analysis

19   that goes into enhancement.  And the jury found it.  The

20   jury has spoken, and the fact that the jury found

21   willfulness is such an important factor in a number of these

22   cases.  The deference to the jury of, okay, the jury has

23   already found willfulness is like the first major step.

24             I honestly don't think that I've seen any case

25   where a Court has gone back and said, well, I'm not

1    going to accept that jury's finding.  I think all the cases,

2    to my memory, I think all the cases that I've looked at,

3    and we've looked at a lot of them, accept the jury's finding

4    as the first step and then go on and look at all the

5    different, all the other facts and circumstances that are to

6    be considered as far as the discretion in determining

7    enhancement overall.

8             May I -- should I continue?

9             THE COURT:  Sure.

10            MS. PARKER:  Okay.  So the next step is Dr.

11   Schinazi gets this information that he learned from Idenix,

12   and he admitted, and here's just an e-mail from him.  He

13   admitted that he violated his confidentiality agreement and

14   provided that information to his own scientist.  He breached

15   his duty of loyalty.  He breached that trust that he had

16   with Idenix and gave that information to, to begin with, Dr.

17   Watanabe.  He admitted that.  He said Dr. Watanabe must have

18   turned around and given it to other scientists and that's

19   how all of this started.

20            Dr. Schinazi also admitted in his deposition

21   that he knew that this work that Dr. Hassan was doing, he

22   specifically references Dr. Hassan, he knew those particular

23   compounds belonged to Idenix.

24            And that is what led up to this e-mail that

25   Dr. Stuyver, who was a top scientist at the time, sent to

1    Dr. Schinazi.  This is the one, Your Honor will recall, from

2    trial where he said I had to take a cold shower.  He said

3    when I found out about this, when I found out about this

4    Idenix patent, I knew there was nothing left of the work we

5    had done.  He said we're just going to have to take a

6    license.  He says to Dr. Schinazi:  What do you think about

7    the fact that all this work we have been doing may

8    eventually might end up belonging to Idenix?

9              Then, of course, we talked about several times

10   today Jeremy Clark goes in and talks to Dr. Otto about the

11   work he is doing and he takes the patent with him.

12             Again, knowledge that they knew about the

13   patent.

14             And then that brings us to some of the internal

15   meeting minutes that we obtained during discovery in the case.

16             There are a number of them, here is just one

17   example, where they are talking internally about the work

18   they're doing.  This is not for any reason other than their

19   own recordings of the work that the chemistry department is

20   doing.  And they say, over and over and over, they're

21   working on Idenix.

22             Here is another example.  All of this is in

23   evidence, of course.

24             THE COURT:  Right, it is.  So I don't think you

25   need to go over it again.

1            But here is another I guess way of asking the

2    question.  You had your spin on all of this evidence.  They

3    had their spin on it.  It seems pretty clear which side the

4    jury agreed with.  But, again, if I don't buy that story,

5    the one that the jury bought, are you saying for purposes

6    of deciding whether to exercise my discretion to enhance

7    damages, I have to buy the story?

8            MS. PARKER:  No, Your Honor.  Let me see if I

9    can try this again.

10            What I'm saying is I think Your Honor cannot

11    reject the jury's finding of willfulness.  The jury has

12    decided willfulness.

13            THE COURT:  Okay.

14            MS. PARKER:  But there is more.

15            THE COURT:  That "at least" means I need to ask

16    the enhancement question; right?

17            MS. PARKER:  Right.

18            THE COURT:  If I reject willfulness, then I

19    don't even have to get there.

20            MS. PARKER:  Exactly.

21            THE COURT:  But does it mean more that I have to

22    ask the question of enhancement?

23            MS. PARKER:  Again, I believe it does.  Because

24    I have not -- it doesn't mean automatically that we get

25    enhancement, though.  It means, though, it is one factor

1    that I believe Your Honor must consider in looking at all of

2    the facts and circumstances under *Read*.

3                And, again, I haven't seen a single case where a

4    Judge has not accepted that finding of willfulness and not

5    discussed that finding of willfulness in reviewing the *Read*

6    factors.

7                THE COURT:  So one factor that I want to

8    understand your view of is the size of the damages verdict.

9                I think your position is it really doesn't

10   matter, but is that how I should view it?  That even though

11   we're talking about very large numbers here and increasing

12   them would by definition be very large, that is not a

13   consideration that should get any weight in this case?

14               MS. PARKER:  Your Honor, that is exactly what

15   the law is.  There is no aspect -- and actually Your Honor

16   wrote this I think in the Power Integrations case.  There is

17   no aspect of punitive damages to the jury's award.  The

18   jury's award is entirely compensatory and no aspect of

19   that -- it was not Your Honor's case, it was *Pall Corporation*.

20               The compensatory verdict is not to punish,

21   it is entirely to make Idenix whole.  So there has been no

22   punishment at all of Gilead so far.

23               So it's kind of apples and oranges.  What

24   happened so far is an entirely different issue than what is

25   before the Court in the motion for enhancement.

1          THE COURT:  All right.  So then when we talk

2   about punishment, why is it not very relevant that here, the

3   combined efforts, whether they were intentionally combined

4   or not, led to a cure of a very serious disease here?  Why

5   should the Court want to punish that?

6          MS. PARKER:  Your Honor, I think that has been

7   addressed very well in the *Johns Hopkins* case in the

8   District Court decision there.  That was a case involving a

9   cure treatment for leukemia which is again a very serious

10  illness that can cause death in patients.

11          And, same situation, the defendant there said,

12  well, this is a treatment that's used to help people and

13  cure people and save lives.  And the Court there had a very

14  good couple of paragraphs saying, well, yes, we're not

15  disputing that.  You know, that is part of it.  But you also

16  have to take into account the rest of the situation.  You

17  have to take into account the bad conduct, the misconduct

18  that happened along with it.

19          So there is no exception to the statute for

20  treatment that is successful here.  And I think that Johns

21  Hopkins decision, which was from 1997 from this Court, I

22  think it's instructive in terms of how Your Honor should

23  consider that.  It's just it's not, it doesn't cure the

24  problem.

25          THE COURT:  But you're not arguing that I

1    shouldn't be cognizant of the fact that end result of

2    whatever the defendant did, good or bad, turned out to be

3    a cure for a very serious disease?

4              MS. PARKER:   I think that is one of the facts

5    and circumstances of the case.  And I think it is entirely

6    appropriate for Your Honor to rely on it as well as others.

7              What I am saying, though, is that does not

8    negate, that does not prevent enhancement when there are

9    other factors that are in our favor for enhancement here.

10              THE COURT:   So a key theme of the case that you

11   argued was that they took your invention, essentially the

12   2'-methyl up, and they improved it.  They made it better.

13   They indisputably did things that you hadn't done to it.

14              If I accept that theme, how do I square that

15   with now turning around and punishing them?

16              MS. PARKER:   Well, that was factored into the

17   damages here.  That was factored into the compensatory

18   damages.  That was factored into the discussion about the

19   damages that we just had with the motion that related to

20   that.  That was part of what the jury considered when the

21   jury came back with an award.  That is why we asked for

22   10 percent.  We didn't ask for 100 percent.

23              You have to remember I think another factor that

24   is very important for the Court to consider.  Even after

25   the compensatory damages award here, and even if Your Honor

1    were to treble the damages here, Gilead is still left with

2    billions and billions and billions and billions of dollars

3    from taking our ideas that were covered by this patent and

4    wrongfully using them.  So there is more to it than just,

5    oh, well, they did something to help get this to the market.

6              THE COURT:  Isn't the taking what you invented

7    and looking at the application and the patent and citing the

8    scientific articles and coming up with a way to improve it,

9    as you yourself argued, isn't that exactly what the patent

10   system is supposed to be encouraging the parties to do?

11             MS. PARKER:  The patent system does not

12   encourage anyone to use a position of trust that they have

13   with the company to get inside confidential information,

14   take it outside of the company in violation of their

15   agreements and their duties to that company, turn around,

16   wrongfully give it to their own scientists, for their own

17   scientists to then copy and use and then cover it up.

18             That is a big part of this that we haven't

19   talked about yet.  They had a guilty mind.  They knew what

20   they were doing was wrong.  That is why we had all those

21   documents at trial where they said delete this data and

22   avoid using the word "Idenix."  Because they knew what they

23   were doing was wrong.

24             That is misconduct.  That is not the kind of

25   corporate citizenship that this Court should sanction.  That

is exactly the type of corporate misconduct that should be

covered by this enhancement motion.  That is something that

this Court should not sanction.  Instead, this Court should

punish it, and the Court should award enhanced damages as a

deterrent to Gilead and to other companies so that this

won't ever happen again, so nobody else will go out there

and do this.

THE COURT:  One of the arguments I think you make

in the papers is that there is no actual contemporaneous

evidence of a subjective belief that they didn't infringe.  I

thought that there was some testimony at least from Dr. Otto

to that effect when he and Mr. Clark were looking at the

application or whatever it was at the time.  Is that not

evidence of a contemporaneous belief?

MS. PARKER:  Your Honor, let me ...

If we could go to the slide right before that, I

believe.

So, Your Honor, to answer that question, let me

first start:  So during discovery, we sent discovery asking

if they had any witness, if there was any human being who

had a good faith belief.  And they did not identify

Dr. Otto, they didn't identify anybody.  And that is why

Your Honor had that hearing last summer, and Your Honor

granted our motion to strike the good faith -- their defense

of good faith belief of noninfringement.  So they didn't

1      even list him before trial.

2             At trial -- if you could go to the next slide,

3      please -- the jury's finding here shows that they rejected

4      that testimony.  His testimony, Your Honor, I would

5      respectfully submit is just not credible.

6             Remember he said I'm not even, I'm not even

7      considering all of this about Dr. Schinazi, because Dr.

8      Schinazi was not officially an employee of Pharmasset at

9      the time.  While all the other witnesses said he founded the

10     company, it was his baby, he was telling them what to do, he

11     was running the company.

12            But part of Dr. Otto's -- but Dr. Otto admitted

13     he was not even considering any of that when he was giving

14     the testimony about what he thought at the time.

15            And then also remember Jeremy Clark just flat

16     contradicted what he said.  Jeremy Clark said, Well, I'm

17     the one working on it.  I'm the one that is making this

18     compound.  I think back at that time, whether it was in

19     somebody's patent or not was not my concern.

20            So the whole story that Dr. Otto told, first of

21     all, it is not even identified before trial.  Your Honor

22     struck that.  Then he comes in and says, well, here is my

23     view, but it is not based on Dr. Schinazi at all and

24     intentionally excluding that for that technical reason that

25     maybe he is not an employee.

1              Jeremy Clark says that is not true.  I'm the one

2    doing it, and I didn't consider what was in the patent or

3    not.

4              So I respectfully submit that his testimony just

5    is insufficient to form a good faith belief.

6              THE COURT:  It did come into evidence, though.

7              MS. PARKER:  It is in evidence.

8              THE COURT:  And I take it, this is an example

9    of something you would say I think I can't find Dr. Otto

10   credible.

11             MS. PARKER:  Your Honor, I would -- that's

12   correct.  Your Honor, I would again say for all these

13   different reasons that he wasn't even listed before.  He

14   said I'm excluding Schinazi.  He said what he testified to

15   is directly contrary to what Jeremy Clark said.  I just

16   don't think there is a basis for Your Honor to consider that

17   to be credible within light of the jury's finding.

18             THE COURT:  Another argument that was made, I

19   think this one was made against your side, is that no one

20   associated with Idenix ever even alleged that Gilead had

21   basically stolen or acted like a pirate and taken your

22   invention until this lawsuit, which was roughly 2013, I

23   believe, even though Pharmasset had gotten a patent and done

24   a presentation.  Isn't that correct on this record?

25             MS. PARKER:  Well, a couple of things.

1    One is before this lawsuit, we did not have any

2    of this internal information, these internal documents that

3    we now have.  So, no, we did not have the same information

4    back then that we have now.

5    But we did, as soon as we found out that there

6    was actually an infringing product, we filed the lawsuit.

7    Before then, there was no infringing product, so there was

8    nothing to file a lawsuit about.

9    THE COURT:  Right.  Well, the story at trial was

10   that back in I think 2001, it turns out they were stealing

11   your property.  You would have known about that by at least

12   2005 when they got their patent?

13   MS. PARKER:  We didn't know the whole story.  We

14   didn't know the extent of it.  That is the information.

15   That additional part is what came out at trial, came out

16   during discovery.  So before the trial, no, we did not know

17   that whole story.

18   Now, I would also like to mention that in looking

19   at all the cases and all, I bet if you went back to all the

20   cases that have been reported where there is enhancement,

21   whether it is from the District Court level or on appeal, I

22   bet you that there are -- you could go back and find out this

23   information.  I bet you there are a number of those as well

24   where the plaintiff had information beforehand, and maybe not

25   everything like here but didn't file a lawsuit before when the

1    infringing product came out.

2              That is just not a factor.  That is just not

3    relevant here.  That just doesn't have anything to do with the

4    situation.

5              When there were infringing products, when we

6    knew they were going to hit the market, we filed a lawsuit.

7    Before that, we didn't know this whole story.  So I don't

8    see how that -- I mean I understand, I think I understand

9    Your Honor's question, but I don't see how that that can be

10   a fact that would weigh in against enhancement.

11             THE COURT:  Well, I think if I'm permitted to

12   consider whether or not the real world facts are what you

13   maybe persuaded the jury what you think they were, if I'm

14   permitted to evaluate that for myself, if I weigh into my

15   thinking that you would or should have known at least as

16   early as 2005 that some of what you now say is what

17   happened, all that bad stuff about Schinazi and others, that

18   you would or should have known about it in 2005 and yet

19   nobody hears anything about that until 2013.

20             MS. PARKER:  There was testimony at trial that

21   a couple of people there knew that they were using the

22   information.  Okay?  That is in the record.  I'm not

23   disputing that.

24             What I am saying, though, they didn't know the

25   whole story.  They didn't know the whole story and once they

1    found out, once the infringing products were about to hit

2    the market we filed the lawsuit.  And because of those

3    circumstances, I just respectfully submit I don't think that

4    that is information that would be appropriate for Your

5    Honor, respectfully, to use in analyzing the enhancement.

6              THE COURT:  We're near the end of your time.

7    Just one other question.  It was technically I think raised

8    by their motion.  It relates to willfulness, so maybe you

9    will know the answer to it.  It has to do with waiver and

10   really whether I should be evaluating if there was

11   sufficient evidence of willfulness.

12             I think this doesn't get argued but gets

13   mentioned towards, in a footnote maybe in their brief, and

14   you all argue at least footnote arguments or things that are

15   just listed and efforts to revive them from a 50(a) motion

16   are waived.

17             Is that something you could address?

18             MS. PARKER:  I'm not sure what the argument is

19   in the footnote.  What is the ...

20             THE COURT:  Basically, it is they are trying to

21   reserve their right to have me decide, for instance, whether

22   there is substantial evidence of willfulness.  Your position

23   I think is they have waived their chance to do that.

24             MS. PARKER:  Yes, Your Honor.  And besides that,

25   we think it would be inappropriate under *Read* and the other

1    cases that have interpreted *Read*.

2              Your Honor, may I add one more thing?  I know my

3    time is about up.

4              THE COURT:  Sure.

5              MS. PARKER:  If I could add one more thing.

6              It is totally up to Your Honor's discretion

7    in terms of whether or not to enhance, and the amount is

8    totally up to Your Honor's discretion as well.

9              But if you step back and just think about what

10   happened here, regardless of when somebody found out or put

11   all that aside, this is a situation where an individual is

12   in a position of trust with a corporation.  There is just no

13   question about that.  He was in a position of trust and he

14   abused that.  He abused it by taking information that he

15   shouldn't have shared.  He shared it.  He knew what he did

16   was wrong.  That is what led to the cover up.

17             That is not behavior that is appropriate for our

18   corporations.  It is the exact type of behavior that should

19   be punished.  And I respectfully submit Your Honor should

20   send a message of deterrence for Gilead and for other

21   corporations as well.  And because of that -- and again, it

22   was totally in Your Honor's discretion.  And because of

23   that, we didn't even put this in our brief, because, again,

24   it is up to you.

25             But given all these factors, in case it would be

1    helpful to the Court to hear our position on this, looking

2    at all the cases out there, all the cases that have decided

3    that have awarded enhanced damages, this fits within the

4    cases where it is appropriate to at least double.  And this

5    is really bad corporate behavior here.  This is something

6    that we should send a message, it should not be allowed.

7    You shouldn't let this happen.  We don't want it to happen

8    again.  They knew what they were doing.  They knew what they

9    were doing and they covered it up.

10            So thank you, Your Honor, for your time.  And if

11   you have any other questions, I'm happy to answer them.

12   Otherwise, I'll sit down.

13            THE COURT:  Not at this point.  You are out of

14   time, but I will give you a couple of times for rebuttal, if

15   you want.

16            MS. PARKER:  Thank you, Your Honor.

17            MR. McCANN:  May I approach, Your Honor?

18            THE COURT:  You may.

19            (Slides passed forward.)

20            MR. McCANN:  Good afternoon, Your Honor.  I

21   think I'm the last batter today.

22            THE COURT:  Good afternoon.

23            MR. McCANN:  Doug McCann from Fish & Richardson.

24   I'm going to address the issue of enhancement.

25            Just very briefly on the law, Your Honor.  This

1    goes toward some of the questions you were asking about

2    willfulness.  I think you understand that there is a

3    willfulness finding here but as the Supreme Court and other

4    courts have told us, willfulness, a finding of willfulness

5    is the entrée into whether the Court will enhance or not.

6    It does not require enhancement.  That is within the Court's

7    discretion.

8              As the Federal Circuit said in the remand on *Halo*,

9    willfulness, the finding of willfulness is a factor for you to

10   consider.  It is not the factor for you to consider.

11             Your Honor also understands, the cases tell us,

12   that this is about punishment.  This is about deterrence.

13   And I was interested to see that counsel sort of ended with

14   a request for doubling, and that's the first we had heard as

15   to what they thought the appropriate punishment here was,

16   and I think that's kind of telling.

17             You know, this was obviously a very significant

18   patent case.  You know and you've heard the statements of

19   the attorneys that it's the largest verdict I guess in U.S.

20   history.  And I thought it surprising that when the Court is

21   going to punish, the Court is acting at the height of its

22   power when it's going to punish somebody.  And I certainly

23   have been as a lawyer in court many times where some party

24   was about to be punished and I never had a situation where

25   you didn't go into it explaining what the appropriate

1    punishment was with detailed reasons as to why that was

2    appropriate in this particular case, and I don't think you

3    have really gotten much guidance from counsel on that point

4    alone.

5            I also think, and this is related to some of the

6    questions that the Court was asking counsel, if you are

7    going to deter and punish, does that make sense here,

8    and who are you punishing?  So what I have is a timeline

9    from 2000 to 2013.  Your Honor is familiar with a lot of

10   facts, but I've put in a red box.  I have on the left side

11   outside the red box Dr. Schinazi and Dr. Watanabe, and then

12   I have in the red box Mr. Clark and Dr. Sofia and Dr.

13   McHutchison.

14           And I think one of the questions the Court

15   should be asking itself when trying to determine whether it

16   should impose any kind of punishment here, is the path of

17   sofosbuvir something that should be deterred?  If you think of

18   the evidence in the case, Dr. Otto was the chief scientific

19   officer of the company, and he tells the chemists, I want

20   you to go and look for ideas.

21           And when I'm making my presentation, Your Honor,

22   I don't intend to say things contrary to our JMOL argument.

23   It's really sort of, even crediting a lot of the arguments

24   that Idenix has made, Dr. Otto said, go look for ideas, go

25   find the holes, things that other people are not doing.

Jeremy Clark was walking into his office with a Novirio patent.  The testimony was, he said, I thought of making a methyl up and fluoro down with all of the four natural bases, and I looked and I don't see that anybody else is doing that.  And he specifically has, I believe he testified, and he said Merck patent application and Idenix patent application.  He said look here.  I don't see that here.

And so the question, Your Honor, as you try to decide am I going to impose punishment here, do you want Dr. Otto to say to Mr. Clark or Dr. Otto of the future, well, although I don't see -- you know, I see the halogens, but I don't see fluorine anywhere in the specification.  It's possible that a couple years from now, Idenix will get new claims.  It's possible about six years after that, a patent. It's possible another nine years after that, a District Court reviewing the record might conclude there wasn't a clear and unmistakable disavowal of fluorine.  So it's possible that some day we'd be subject to treble damages, so actually, you'd better go do something else.  That is not something that should be deterred.

If you consider the issue of enhancement to be this issue of piracy, there are no pirates in that red box. In fact, if they are anything, they are heroes.  Dr. Sofia, in fact, received an award, Hero of Chemistry, because of

1    that wonderful thing he did in taking the start that Clark

2    had and turning it into what became sofosbuvir.

3            THE COURT:  All right.  So, of course, from

4    other punishment contexts you've dealt with, you're familiar

5    with the fruit of the poisonous tree doctrine.  Why

6    shouldn't I apply something like that?

7            Assume for the moment that Dr. Schinazi did

8    all the bad things that he was alleged to have done.  Why

9    shouldn't I punish and send a message that all the heroes

10   afterwards, good for them, but too late for at least

11   Gilead?

12           MR. McCANN:  Well, let's consider Dr. Schinazi

13   to be the pirate in our scenario here.  You're not punishing

14   him and you're not punishing the Schinazi of the future.

15   The facts of this case are Dr. Schinazi did what he did.

16   He was a founder of Pharmasset and he owned a lot of

17   Pharmasset stock, and Gilead paid the $11 billion for

18   Pharmasset and he made a lot of money.  I think there's some

19   evidence it is something like $400 million.

20           No one is going to be, this Court is not going

21   to be, if it sanctions Gilead or enhances Gilead, he's not

22   giving any money back.  There's no disincentive to the next

23   Schinazi.  All the Court would be doing would is punishing

24   Gilead, taking money away from Gilead that could be used for

25   the next great improvement or the next effort anyway to

1    improve drugs.

2              So I actually don't think a deterrent here would

3    actually have an effect on Schinazi because he's out of the

4    picture.  He actually -- it's not in the trial record, Your

5    Honor, but it is in the record before the Court.  He was

6    forced out of the company in 2005 because Pharmasset had

7    concerns about him.  And Dr. Sofia, you know, said, I

8    wouldn't even have joined Pharmasset if he was there.

9              I guess my point on that is, Pharmasset took

10   corrective action already, and any punishment here only

11   punishes the good work that Pharmasset did and not whatever

12   Dr. Schinazi did in the days when he was involved.

13             THE COURT:  Well, I think part of the whole

14   theory of this is, as you said yourself even, the Dr. Ottos

15   of the future, what would we want him to do?  If one were to

16   apply something like a fruit of the poisonous tree doctrine,

17   why wouldn't that put Gilead on notice that if you are going

18   to spend $11 billion?  Let's say you'd better be super

19   diligent and make sure that what you are buying isn't itself

20   somehow the fruit of the poisonous tree or be prepared to

21   pay double or triple damages.

22             MR. McCANN:  If I was advising Gilead of the

23   future, I would say this drug is a public good and you need

24   to bring it to the market whatever what the risks are on

25   that.  I don't know of any -- you know, I just don't see

1    what is the connection to what Dr. Schinazi did and how does

2    that lead to the development of sofosbuvir itself?  And let

3    me explain what I mean by that, Your Honor.  It's not a

4    theft of trade secrets case.  It's not.

5              Dr. Schinazi, according to Idenix, Dr. Schinazi

6    learns that Idenix thinks that 2' methyl up is significant

7    and has activity.  That's the gist of what he supposedly

8    tells Dr. Watanabe and that's in 2000 and 2001.  It's not

9    the case that Idenix kept that close to the vest for all

10   time.  They published it in a patent application.  So

11   everything that Schinazi supposedly learned and gave to

12   Pharmasset by November of 2001, that's out there for all of

13   the public to learn from.  And again that is exactly why we

14   have patent applications that are published, because we want

15   the public to learn from that.

16             The Supreme Court in *Halo* said something along

17   the lines of, you want, when you are trying to determine

18   whether to enhance or not, you want a balance on the one

19   hand protecting the interests of the patentee, but on the

20   other hand, not discouraging, and the words they used were,

21   imitation, or imitation through refinement that is, in fact,

22   often the heart of the next invention.  That's what the

23   Supreme Court said.  Again, that's what we have here.

24             If you have Jeremy Clark look at their patent

25   application and say, I see methyl up, fine.  I don't see a

1    methyl up and a fluoro down.  Let's try that.  You want that

2    to happen, Your Honor.  You don't want to discourage it.

3    Even if it ultimately proves down the road that they're

4    wrong and they're going to infringe a patent claim and they

5    have to pay compensation, you still want that R&D, that

6    effort to go forward.

7              Now, just very briefly on Dr. Schinazi, a little

8    bit more on him.  It was just this allegation that the 2'

9    methyl up is the bedrock of Sovaldi and Harvoni.  You

10   already heard some of this, Your Honor, in the earlier

11   presentations.

12             Again, when you are looking at whether to

13   exercise your discretion to enhance, what is the importance

14   of this 2' methyl up information that's published in

15   Idenix's patent application and is out there for the world

16   to benefit from?

17             You heard Mr. Griffith talk about the 12

18   companies that were pursuing compounds, all that had the 2'

19   methyl up.  I guess under the Idenix view of the world,

20   they're all pirates.  We have a whole fleet here.  Only

21   one of those compounds succeed, sofosbuvir, the others all

22   failed, notwithstanding the fact that they had the 2' methyl

23   up.  And I think that is also important in considering

24   whether to exercise your discretion to punish.

25             The idea of the 2' methyl up is not the entrée

1  into the cure for hepatitis C.  It's the work that Michael

2  Sofia did and Jeremy Clark before him, and why would you

3  want to punish that?

4           Now, I do want to go to the *Read* factors

5  briefly, Your Honor, and I want to emphasize at most number

6  five, the closeness of the case.

7           First, when we're talking about the closeness of

8  the case, it is still true.  We used to have that objective

9  test under Seagate, it's now gone, but the Federal Circuit

10  has made clear that even after *Halo*, you can still look at

11  the objective reasonableness of the accused infringer's

12  positions in determining whether to exercise your

13  discretion, and that's *WesternGeo*.

14           I want to point to really, I guess, two areas on

15  the closeness of the case.  The first is the claim

16  construction and the second are the 112 arguments.

17           If Your Honor thinks about why was the claim

18  construction a close question and why are the 112 issues

19  close questions, it really has to do with that patent

20  specification and the fact that there's no F there.  You

21  really go back into the room with Clark and Otto, looking at

22  that and, you know, do you see possession of the invention?

23  Do you see them teaching how to make this?

24           Those are the reasons why the 112 arguments,

25  however you ultimately come out, I think at least it's

1    certainly our position that these are very close calls.  And

2    the same thing with the claim construction.  I was looking

3    at the Court's claim construction opinion, and you

4    specifically mentioned that the failure to disclose fluorine

5    at the 2' down position gives the Court pause.  It could

6    have been the case, Your Honor, that you could have stopped

7    at that pause and said, you know what, there's no fluorine

8    here.  I'm not going to construe the claim to cover

9    fluorine.  There would be no infringement.  There would be

10   no willful infringement.  We would not be talking about

11   enhancement.  It was a complete defense.

12               The same could also be true with enablement.

13   You might determine ultimately that the patent is not

14   enabled, the full scope of the claim.  And, again, then

15   there's no valid claim and no infringement, no willful

16   infringement and no enhancement.  And so I think that that

17   is something that the Court should consider I think as one

18   of the most important issues in determining whether to

19   enhance here or not.

20               I've talked a bunch about Watanabe, Your Honor.

21   And I did want to just sort of touch briefly on -- this is

22   the point I failed to mention earlier.  I wanted to make the

23   point.  You heard a lot about Dr. Schinazi and what he did,

24   and Your Honor sees there's sort of a gap in the story.

25   Schinazi tells Watanabe, hey, they're looking at 2' methyl

1    up at Idenix, and then around this time Dr. Hassan is making

2    2' methyl up.  And there's an actual fight within the

3    company, within Pharmasset, where did Hassan get the idea?

4    And Schinazi says, well, I told Watanabe.  He must have told

5    Hassan.  And Dr. Otto is saying, well, I thought Hassan, you

6    know, came here from his last employer knowing this

7    information.  That's actually what Dr. Hassan had to say.

8    So this sort of fight, but even Idenix doesn't say that

9    Clark had anything to do with that.  He's sort of separated

10   in time by a year from whatever Dr. Schinazi is doing to

11   what his effort is with the methyl fluoro compound.  I mean,

12   there's a big disconnect between the bulk of the evidence

13   that they say is the piracy and the effort that led

14   ultimately to 6130.

15            Your Honor knows it's not improper to look at a

16   published patent application.  In fact, that's often what

17   happens in research and development.  We know from this very

18   case that certainly Pharmasset was looking at what Idenix

19   was doing, but Idenix was looking at what Pharmasset was

20   doing.  And so here on slide 3019, we have an internal

21   Idenix communication where JP, that's John Pierre

22   Sommadossi, is still keen that we try to make a 2', fluoro

23   2' methyl analogue because he heard from Schinazi that was

24   good.  There's nothing necessarily improper looking at your

25   competitor's work.

On this issue of copy, again, I've already touched on this, so I will be very brief, Your Honor.  But I did want to pick up a little bit on what Mr. Singer was talking about, about how counsel had said that, you know, a person of skill in the art would not make a prodrug with an inactive compound.  He said that's exactly what Dr. Michael Sofia did.

This slide was presented at trial.  This is how Dr. Sofia described how you arrive at sofosbuvir.  He was studying 6130, and he noticed there was an inactive metabolite that was being generated, this 6206, which has a methyl up and fluoro down.  It has a different base.  It was inactive and there was a lot of it being thrown off.  He was trying to figure out why that was.  And he figured that, he learned through his work that if he made the triphosphate of that, it was really active.  But he had a lot of trouble, or he had a big task in figuring out, how do I actually get that into your body, and that's what led him to do that prodrug work.  Again, very far removed from anything Dr. Schinazi did and certainly not something that the Court should be discouraging or punishing.

So this is the *Halo* quote I was referring to before, Your Honor, just for record.  It's at page 1932 of the opinion.  Imitation and refinement imitation, these are the things necessary to the invention itself and the very

1    lifeblood of a competitive economy.  It's not wrong to say I

2    think that they're not doing this.  I will go ahead and some

3    day be proved to be incorrect because of a claim

4    construction ruling that goes against you.  That's not

5    something that is an act of piracy.

6              Most of the rest of this, Your Honor, we've

7    already talked about.  I think maybe the last thing I will

8    focus on is concealment.  Your Honor touched on it before.

9    I think Pharmasset was very open about what it was doing.

10   It was publishing its work as many small companies do, and I

11   think Idenix was very well aware, record shows, of what was

12   happening.  They did not complain at the time.  And I think

13   Your Honor has in the record in front of you the D.I. 556,

14   where Lorie Ann Morgan from Gilead makes the point in her

15   declaration that not only was Pharmasset not concealing at

16   the time it was doing its work, but later on when Gilead

17   acquired sofosbuvir and it got into sort of this worldwide

18   dispute with Idenix, that was all about that '600 patent,

19   which is their methyl fluoro patent, and its overseas

20   counterparts.

21             At no time did Idenix ever say in any of the

22   settlement discussions they had during the couple years of

23   litigation, you need to take a license to this '597 patent.

24   The first we knew of it, it was a bolt from the blue, is

25   when they sued us in this case, which really began in

Boston.  So not only no concealment, but not even an

allegation until the case began.  That was the first notice

that Idenix actually considered Gilead to be infringing the

'597 patent.

So that's all I have, Your Honor, unless you

have any specific questions.

THE COURT:  Yes, I do.  First, what about this

point about any credibility assessments that I may have made

sitting here through the trial?  Is it fair for me to factor

that in or not?

MR. McCANN:  It is, Your Honor.  It is within

your discretion to make, to weigh the evidence and to make

determinations, including credibility, in assessing whether

you should or should not enhance.

So I do think that, although we have a JMOL on

willfulness and we have our arguments about whether there's

substantial evidence for that, but if you decide, yes, there

was and there is a willfulness finding, yes, then that is a

factor you should consider, that there is willfulness, but

then you, yourself, in exercising discretion can look at the

evidence, weigh the evidence, and ask yourself, do I think,

some of the cases talk about did the defendant have evidence

of its own invention separate from learning it from the

other side.  In other words, do you credit Dr. Hassan and

Raji Kahn as they had the methyl up idea separate from

1    whenever Schinazi learned from Idenix.  You can weigh that

2    evidence and decide based on that evidence in part, I'm

3    not going to enhance.  You can look at the, what Clark and

4    Otto's discussion was and say, yes, it was legitimate, or I

5    credit that testimony where Dr. Otto says -- I mean, he

6    can't be making this up.  There is no F in that

7    specification.  There's no F there.  Go ahead and make it.

8    You can credit that separate and apart from the fact that

9    you've determined that there should be a willfulness verdict

10   upheld.

11              THE COURT:  There seems to be a tension there,

12   because if I uphold the willfulness verdict at least based

13   on a finding of substantial evidence, then you have to infer

14   that the jury made certain credibility determinations that

15   led it to that conclusion, it would seem, and that was

16   completely, and I don't think you are arguing to the

17   contrary, but that was their province to do.  It is not my

18   job to make a credibility determination.  So it would seem

19   odd that I could question that for purposes of enhancement,

20   but your position is that I can.

21              MR. McCANN:  I guess first, just for the record,

22   Your Honor, we did preserve the argument that willfulness

23   ultimately is something, it should be something for the

24   Court and not the jury.  I understand that the Federal

25   Circuit still has its cases that say it's still a jury

issue.  That is something that is winding its way through

the courts.  So it was, in this trial, it was given to the

jury to make that decision.

         I don't think there is anything at all though

inconsistent with you analyzing the same evidence and

asking yourself whether or not you should enhance in making

determinations as to what would credit or not credit in

doing that.  I mean they found willfulness but there is no

special interrogatory, so I guess nobody exactly knows why

they found willfulness.  And it could be that they found

certain testimony credible and others incredible.  We don't

really know that.

         We're not in a JMOL context when we're talking

about enhancement where you must consider all the evidence

and weigh it in a light most favorable to Idenix in

determining whether to uphold willfulness or not.  We're

talking about whether you should use your discretion in how

you view the evidence you heard in determining whether there

was piracy here by Gilead.

         THE COURT:  You mentioned you do say that there

is not substantial evidence for willfulness, but if I'm not

mistaken, it's in a footnote or you have various arguments

you are trying to incorporate by reference to briefs that

would well exceed the page limits that we set on the JMOL

motions.

1              Is it really Gilead's contention that all those

2      issues are ripe for me to decide and they didn't waive them?

3              MR. McCANN:  I'm happy to say, Your Honor, that

4      Mr. Scherkenbach told me that he would address that if Your

5      Honor posed that question.

6              THE COURT:  All right.

7              MR. McCANN:  Before I turn it over to him, do

8      you have any other questions?

9              THE COURT:  I do.

10             MR. McCANN:  Do you want to cover those first,

11     Your Honor?

12             THE COURT:  I think they even use this phrase in

13     their briefing, but the sort of heads I win/tails you lose

14     scenario.  They point out, and incorrectly, that while it is

15     a large number that has already been awarded against your

16     client, it is all, strictly speaking, compensatory.  And if

17     you don't enhance, in this case or let's say more generally

18     a case where there is willfulness, then what is to stop an

19     accused infringer from saying, look, worst case scenario, I

20     lose this case and I just pay what I fairly owe.  I don't

21     have to worry about anything beyond that.

22             MR. McCANN:  First, Your Honor, I don't think

23     that one must follow from the other.  Plenty of courts have

24     willfulness findings from their juries and don't enhance.

25     And so presumably they think, under those circumstances, no

1    further punishment was required.  And that is what I'm

2    saying is the case here.

3              This is a very substantial verdict, and that

4    does have I think a deterrent effect on a company who is

5    pursuing a drug.  I think it acts as a very negative effect

6    on companies who might be pursuing an acquisition, what are

7    we buying here?  Because even as a company that is as large

8    and successful as Gilead, $2.54 billion is devastating.  It

9    is a huge verdict that will have, and does have, a great

10   impact on that company.

11             I don't think that, you know, counsel asked

12   for double that.  Under these facts, to me, that makes

13   absolutely no sense.  If the issue is you had an employee

14   or not even an employee but a person associated with your

15   company who did some things he should not have done but

16   all of that in a way was mooted by the fact that Idenix

17   published that very same information, you have other persons

18   associated with your company that you someday are going to

19   acquire, you look at it and think, well, this is probably

20   going to be clear and go ahead and then prove to be wrong.

21   The $2.54 billion Gilead has to pay here would give I think

22   a lot of companies pause:  Do we want to take this on?  This

23   is huge.

24             I don't think that it is necessary to add money

25   to a judgment, if that is the only way you can have

1      deterrence.  The mere size of the verdict is a huge impact

2      on this industry, and that is enough, if we even get to the

3      point of thinking some deterrence is required, which, again,

4      Your Honor, I believe under the facts of this case are not

5      supported.

6                  THE COURT:  And you mentioned Schinazi was

7      forced out of the company in 2005 but noted I think that is

8      not in the trial record.

9                  MR. McCANN:  It is not.

10                  THE COURT:  Is it your view I could consider

11      things that are not in the trial record for this enhancement

12      decision?

13                  MR. McCANN:  It is my view, and also it is

14      Idenix's view, as they made clear in their opening brief.

15                  THE COURT: All right.  If Mr. Scherkenbach

16      wants to address the waiver et cetera question, we'll hear

17      that before we turn back to Ms. Parker.

18                  MR. SCHERKENBACH:  Thank you, Your Honor.  Just

19      briefly on that.

20                  I think it is useful to go back and look at what

21      actually happened on the JMOL on willfulness.  I'll just

22      focus on willfulness because that was your question.

23                  So during trial, Gilead made oral motions for

24      judgment as a matter of law that included willfulness.  Then

25      in the next day or so, we filed a Rule 50(a) written motion

1    for judgment as a matter of law that included willfulness.

2              And the Court then, subsequently on the record

3    at trial, reserved judgment on JMOLs actually on both

4    sides.  So the Court never actually addressed the JMOLs on

5    the willfulness, and some other issues too but let me stay

6    focused on willfulness.

7              And so when it came time to do our post-trial

8    JMOL motion, what we thought we did and what we intended to

9    do was to say essentially on those other issues, we renew

10   the JMOLs that had been made at trial because as to those,

11   the Court had not definitively ruled one way or the other.

12             On this page limit issue, there isn't, certainly

13   there was no attempt to end run on that.  If you go back

14   and look at each side's Rule 50(a) motions as filed during

15   trial, each side addressed willfulness and some of these

16   other issues, the Merck issue and the priority issue, in

17   writing in roughly the same number of pages, so it's not

18   like Gilead got a bunch of pages and Idenix never had a

19   challenge to response.  The record is really the same on

20   both side for those issues.

21             THE COURT:  Well, I can at least say,

22   subjectively, I did not understand that when you all said

23   you were going to raise issues in post-trial motions, and I

24   think you came up with a 25 page limit, but I don't recall

25   exactly.

1          MR. SCHERKENBACH:  We did.

2          THE COURT:  I didn't understand that I was then

3     going to be asked to revisit issues that had been briefed

4     during trial and which I had reserved judgment.  I certainly

5     would have given you more pages if I thought that was what

6     was going to happen.

7          MR. SCHERKENBACH:  Well, and --

8          THE COURT:  Let's, just for the moment, if that

9     was my subjective experience, why should I not say too late

10    for these issues?

11         MR. SCHERKENBACH:  Well, I think our real

12    concern is with any sort of a finding -- and it is a little

13    hard to tell what Idenix is arguing here because they used

14    the word "waiver," sort of the magic word, and we certainly

15    don't want to have any finding or suggestion that that these

16    issues were waived for purposes of appeal.  That really is

17    the primary driver for Gilead having renewed these motions.

18         I think if we can get past that or get some

19    comfort on that?  You know, we're not expecting the Court

20    to revisit in detail the Merck issue or the priority issue

21    and, frankly, even the willfulness issue.  That isn't

22    fundamentally what is driving us.  It is really some sort of

23    waiver suggestion or suggestion that would say not only,

24    Judge Stark, should you not, do you not have to reconsider

25    it, but it is lost for appeal as well.  Because we think we

1    clearly preserved it for appeal.

2                    THE COURT:  Okay.

3                    MR. SCHERKENBACH:  Thank you.

4                    THE COURT:  Thank you very much.

5                    Ms. Parker, come back and address whatever you

6    would like.

7                    MS. PARKER:  Thank you.  Your Honor, I think

8    four points cover.

9                    First of all, I think I know the answer to

10   Your Honor's question.  And I think I know why there are no

11   cases out there on enhancement that talk about the Court

12   considering credibility of witnesses and reexamining the

13   willfulness finding.  It's because of the Seventh Amendment.

14   And so I believe that the Court cannot reexamine facts that

15   are found by the jury either found expressly or implicitly.

16   So I believe that is the answer to Your Honor's question.

17                   Next point.  Counsel asked, well, who are you

18   punishing, and tried to say it is not Gilead, tried to

19   distance themselves.

20                   If we can pull up slide 25.  25, please.

21                   There is a lot of evidence in the record as to

22   what Gilead did, not just Pharmasset.  So when it purchased

23   it, it has access to all of these documents.  They knew

24   about Dr. Schinazi.  These same key Pharmasset employees

25   went over to Gilead, and Gilead continued to work on the

1    product.  So it's not just Pharmasset.  They can't divorce

2    themselves from it.

3              They also talked a lot about the compensatory

4    damages verdict was something that was important, affected

5    the company.  And I just want to point out -- if we can pull

6    up slide 45.  For the record, the record evidence is that

7    Gilead has $32.4 billion in cash and cash equivalents, and

8    that from its misconduct here.

9              Let's go to slide 45.

10             That is the *Arctic Cat* case where the Court said

11   enhancement is "particularly warranted" where the defendant

12   "is a multibillion dollar enterprise and the market leader

13   -- due in significant part to sales of products found to

14   willfully infringe."

15             The next point I want cover is argument from

16   counsel on closeness of the case.  Your Honor knows that is

17   only one factor, so even if the Court were to believe that

18   there was some issue that was close, I just bring to Your

19   Honor's attention the *Dominion* case that was from the

20   Eastern District of Pennsylvania last year.  That is a case

21   where the Court found enhancement in doubling but also found

22   that there was the closeness of the case factor went against

23   the plaintiff but nevertheless that other factors were

24   strong.

25             And then, finally, counsel said, well, what

1    message are you sending?  What message would you be sending?

2              Well, Congress says because of enhancement,

3    because of the statutory structure that is set up, Your

4    Honor need to consider the message to the inventors, to Dr.

5    Sommadossi and Dr. LaColla.  They're the ones that came up

6    with this idea to begin with, and they're the ones who are

7    protected.  They are the ones that are covered by this

8    enhancement provision.  They're the ones that started off as

9    the heroes here.  So we shouldn't forget them and their role.

10             Unless Your Honor has any questions?

11             THE COURT:  The only other one, it was

12   mentioned, as you heard, Dr. Schinazi was sort of taken care

13   of in the defendants' view in 2005 when he was evidently

14   pushed out of Pharmasset.

15             Do you disagree with that?  And more so, do you

16   disagree that I can consider things like that or am I

17   limited to only what was the jury verdict?

18             MS. PARKER:  You are the not limited to what was

19   the jury verdict.  You are limited to what is in the record.

20   And frankly I don't know.  This is the first I have heard of

21   this.  I don't know whether it is in the record or not.  If

22   counsel says it is, I'm sure it probably is, but I just, I

23   can't speak to that.

24             But I think the point is there is all that

25   happened separate from him.  It's not just him.  Gilead

1    bought that company knowing what they were buying.  They

2    knew they were buying Dr. Schinazi.  They knew that they

3    were buying the company.  They knew about all the -- they

4    acquired all those documents.  They inherited all that.

5    They knew about all that.  And then, remember, Dr. Schinazi

6    was still being paid by Gilead at trial here.  Remember the

7    testimony on his videotape deposition that was shown to the

8    jury is that he was being paid $800 an hour for the trial,

9    for his work at the trial.  So it's not that he was gone and

10   done for forever back then.

11                Thank you, Your Honor.

12                THE COURT:  Thank you.

13                Mr. McCann, anything further?

14                MR. McCANN:  Just briefly, Your Honor.  A couple

15   of things.

16                Counsel said that Gilead has made something like

17   $32.4 billion and that it is all from wrongful conduct.

18                Really, that is unsupportable.  That drug has

19   succeeded in a way it has or exists because of Sofia, not

20   because of Ray Schinazi.

21                Your Honor asked some questions about whether

22   you can weigh the evidence.  You asked a couple of times at

23   least while I was sitting here.

24                I think in the briefing, if you look at the case

25   *Enplas Display Device v Seoul Semiconductor* or the case

1    *Sprintcom v Time Warner*, those are at least two examples

2    where the Court determined enhancement is going sort of back

3    to the record and assessing it separate and apart from what

4    the jury had to say.

5               I think that is really it, Your Honor, unless

6    you have any further questions.

7               THE COURT:  No, I don't have anything further.

8               Ms. Parker.

9               MS. PARKER:  No.  Thank you, Your Honor.

10              THE COURT:  All right.  Well, our time is up.

11   The arguments have been very helpful on all issues.  I

12   appreciate it very much.  We will take the motions under

13   advisement; and we will be in recess.

14              (Oral argument hearing ends at 4:00 p.m.)

15

16        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

17

18                        /s/ Brian P. Gaffigan
                         Official Court Reporter
19                        U.S. District Court

20

21

22

23

24

25