IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IDENIX PHARMACEUTICALS LLC and UNIVERSITA DEGLI STUDI di CAGLIARI, <br><br> Plaintiffs, <br><br> v. <br><br> GILEAD SCIENCES, INC., <br><br> Defendant. | C.A. No. 14-846-LPS <br> **REDACTED VERSION** |

Steven J. Balick, John G. Day, and Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE

Calvin P. Griffith, Ryan B. McCrum, Michael S. Weinstein, and Bradley W. Harrison, JONES DAY, Cleveland, OH

Anthony M. Insogna and John D. Kinton, JONES DAY, San Diego, CA

John M. Michalik and Lisa L. Furby, JONES DAY, Chicago, IL

Stephanie E. Parker, JONES DAY, Atlanta, GA

Jennifer L. Swize, JONES DAY, Washington, DC

    Attorneys for Plaintiffs

Martina Tyreus Hufnal, Douglas E. McCann, Elizabeth M. Flanagan, Joseph B. Warden, and Santosh V. Coutinho, FISH & RICHARDSON P.C., Wilmington, DE

Frank E. Scherkenbach and Jenny Shmuel, FISH & RICHARDSON P.C., Boston, MA

W. Chad Shear, FISH & RICHARDSON P.C., San Diego, CA

Jonathan E. Singer and Tasha M. Francis, FISH & RICHARDSON P.C., Minneapolis, MN

Corrin N. Drakulich, FISH & RICHARDSON P.C., Atlanta, GA

    Attorneys for Defendant

**MEMORANDUM OPINION**

September 22, 2017
Wilmington, Delaware

**STARK, U.S. District Judge:**

Pending before the Court are several requests for relief made by Plaintiffs Idenix Pharmaceuticals LLC and Universita Degli Studi di Cagliari ("Idenix") against Defendant Gilead Sciences, Inc., following Idenix's victory in a jury trial in this patent infringement action. Prior to trial, Gilead stipulated that it would not contest that, under the Court's claim constructions, its accused treatments for Hepatitis C virus ("HCV"), sofosbuvir and ledipasvir/sofosbuvir (sold under the trade names Sovaldi and Harvoni), infringe the asserted claims of Idenix's United States Patent No. 7,608,597 (the "'597 patent").[1] (*See* D.I. 452 at 8 n.2)

Following a ten-day trial, the jury returned a verdict in favor of Idenix on all issues that were tried. (D.I. 518) Specifically, the jury found that Gilead's infringement was willful, that Idenix was entitled to damages equal to a 10% running royalty on Gilead's adjusted net sales revenue from the accused products – for a total damages figure of $2.54 billion – and that Gilead had failed to prove that the asserted claims of the '597 patent were invalid due to lack of enablement, lack of written description, anticipation, or obviousness. (*Id.*)

Idenix now asks the Court to exercise its discretion to enhance damages based on the jury's finding of willful infringement.[2] Idenix further asks the Court to declare this case "exceptional," within the meaning of 35 U.S.C. § 285, and exercise its discretion to require Gilead, as the non-prevailing party, to pay Idenix's attorney fees. Finally, Idenix requests that the

---

[1] The '597 patent is entitled "Methods and Compositions for Treating Hepatitis C Virus." It was issued on October 27, 2009. (D.I. 1 Ex. B)

[2] At the August 2017 hearing on Idenix's motion – although not at any point prior to the hearing – Idenix specifically asked the Court "to at least double" the damages award. (*See* D.I. 586 ("Arg. Tr.") at 142) That is, Idenix asks the Court for at least an additional $2.54 billion, which would bring the total judgment against Gilead to at least $5.08 billion.

1

Court's award of pre-judgment interest (which Gilead does not oppose) be determined based on the prime rate, and not the T-bill rate, the latter being the lower interest rate advocated by Gilead.[3]

For the reasons set forth below, the Court will deny Idenix's motion with respect to enhancement of damages and attorney fees and grant the motion with respect to the prejudgment interest rate.[4]

## I. The Court Exercises Its Discretion to *Not* Enhance Damages Based on the Finding of Willful Infringement

When damages resulting from patent infringement are found, "the court *may* increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284 (emphasis added). In *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S. Ct. 1923, 1932 (2016), the Supreme Court explained that § 284 means "[d]istrict courts enjoy discretion in deciding whether to award enhanced damages, and in what amount." *See also id.* at 1934 ("Section 284 gives district courts discretion in meting out enhanced damages.").

*Halo* further explains that "enhanced damages are generally appropriate under § 284 *only in egregious* cases. . . . [Enhanced damages are] *not* to be meted out in a *typical* patent

---

[3]Idenix also urges the Court to award a running royalty of greater than 10% for Gilead's ongoing, post-judgment infringement. (*See* D.I. 538 at 17-23) The Court will not address this portion of Idenix's motion, as the parties have agreed to stay their disputes relating to ongoing royalties. (*See* D.I. 574 at 1; *see also* D.I. 575 (granting "parties' joint request to stay"))

[4]Still pending before the Court is Gilead's motion for judgment as a matter of law, remittitur, or a new trial. (D.I. 535) In due course, the Court will issue a separate opinion resolving Gilead's motion. The instant Opinion is written based on the assumption – which should not be misunderstood as a holding or indication of the Court's forthcoming ruling – that Gilead's motion will be denied in full and, therefore, that the Court should resolve all issues presented by Idenix's motion that have not been stayed.

infringement case." *Id.* at 1932 (emphasis added). *Halo* continues: "The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or – indeed – characteristic of a pirate." *Id.* Yet

> . . . none of this is to say that enhanced damages ***must*** follow a finding of egregious misconduct. As with any exercise of discretion, courts should continue to take into account the particular circumstances of each case in deciding whether to award damages, and in what amount.

*Id.* at 1933 (emphasis added). The party seeking enhanced damages has the burden of proving by a preponderance of the evidence that they should be awarded. *See id.* at 1934.

Applying this law to the facts and circumstances presented here, and after carefully reviewing the trial record and the parties' briefing, and also having heard extensive oral argument, the Court concludes that it should not enhance damages.

\* \* \*

Before turning to the explanation as to why the Court is exercising its discretion to not award enhanced damages, the Court first addresses a preliminary matter. As detailed further below, many of the considerations that go into determining how to exercise discretion in this context are somewhat untethered from findings of fact made (explicitly or implicitly) by the jury. As explained below, the Court will principally be applying the "*Read* factors." *See Read Corp. v. Portec, Inc.*, 920 F.2d 816, 827-28 (Fed. Cir. 1992).[5] Several of the *Read* factors – such as the "closeness of the case," "behavior as a party to the litigation," and the "size and financial

---

[5] Both sides devoted extensive portions of their briefing and oral argument presentations to application of the *Read* factors.

condition" of the accused infringer – relate to matters that were not before the jury and/or which the jury would not have been in a position to assess. *See, e.g., Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1311 (Fed. Cir. 2001) (noting that "closeness of the case" is factor "that a jury is not in the best position to assess"). Therefore, it is entirely appropriate, even required, for the Court to consider – based on its extensive familiarity with the entire course of this case, as well as what it observed at trial – where, notwithstanding the jury's verdict in favor of Idenix, substantial contrary evidence was presented by Gilead.

The Court takes as true that Gilead committed willful infringement, as the Court must do, based on the jury's verdict. *See id.* at 1310 ("[C]ertainly a judge cannot substitute his or her factual determination for a jury's willfulness finding."). This does not, however, prevent the Court from observing where, as the case may be, there was also substantial evidence presented by the willful infringer, where the jury may have made findings that were not supported by the record, and where the jury heard no evidence and cannot be presumed to have made a particular finding. Thus, in the course of undertaking the particularized assessment of the totality of circumstances required by *Halo* and other precedent, the Court will, as appropriate, take such considerations into account.

\* \* \*

Idenix's request for enhancement is predicated on several grounds. First, the jury, after being properly instructed, resolved factual disputes and found that Gilead's infringement was willful. Second, Gilead – and its predecessor, Pharmasset – engaged in a pattern of egregious misconduct. Third, the "*Read* factors" support its request. As the Court explains below, none of Idenix's contentions, singly or in combination, supports a decision to enhance damages.

4

1

Although Idenix understandably emphasizes the jury's finding of willfulness, it recognizes, as it must, that the jury's finding is a necessary but not sufficient basis for enhancing damages. "[A] finding of willful infringement does not mandate that damages be enhanced, much less mandate treble damages." *Read*, 970 F.2d at 826. As Idenix acknowledges (*see, e.g.,* Arg. Tr. at 126), the jury's finding merely "opens the door" to the Court making a discretionary decision as to whether damages should be enhanced. *See also WesternGeco L.L.C. v. Ion Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir. 2016) ("[T]he [Supreme] Court stressed throughout *Halo* that, if willfulness is established, the question of enhanced damages must be left to the district court's discretion.").

2

Idenix next contends that it proved egregious misconduct by Gilead and, for purposes of evaluating Idenix's motion, the Court accepts this contention as true. Thus, as Idenix accuses, "Gilead built its success on a pervasive course of gross misconduct." (D.I. 538 at 7) No challenge to the sufficiency of the evidence supporting the jury's finding of willfulness is before the Court.[6] Even if it were, substantial evidence supports the jury's express finding of willfulness as well as the jury's implicit agreement with Idenix that Pharmasset, and later Gilead,

---

[6]Gilead challenged the sufficiency of Idenix's evidence of willfulness at the close of all evidence. (*See* Tr. at 2029; D.I. 509) But Gilead's post-trial argument on the sufficiency of the willfulness evidence was limited to a cursory reference in a footnote in its brief supporting its renewed motion for judgment as a matter of law (*see* D.I. 536 at 24-25 & n.14), which is inadequate to put the issue before the Court. *See John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (stating that "arguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived"); *Robocast, Inc. v. Apple Inc.*, 2014 WL 2622233, at *1 (D. Del. June 11, 2014) (same).

engaged in egregious misconduct. (*See, e.g.*, D.I. 538 at 3-8) (summarizing evidence)

More particularly, the Court takes as true, among other things, that Pharmasset's founder, Dr. Raymond Schinazi, violated his confidentiality obligations to Idenix, and shared with Pharmasset scientists Idenix's proprietary discoveries relating to treatment of HCV. Specifically, Dr. Schinazi "took" from Idenix the use of "two-prime (2')-methyl up modified nucleosides" as being effective in the treatment of HCV. Whether directly or indirectly, Dr. Schinazi improperly shared this Idenix information with Pharmasset scientists, whose reactions included bemoaning that they now needed a "cold shower" as they feared their concurrent development efforts would be for naught, as there was nothing left for Pharmasset to patent. (*See* PX-470) Idenix also showed that internal Pharmasset documents – not available to Idenix until it obtained discovery in this litigation – referred to Pharmasset's compound as an "Idenix derivative[]," and showed an effort to replace similar references to the "Idenix compound" or "Idenix sugar" with references to the chemical formulation of the same compound. (*See, e.g.*, Tr. at 619; PX-678) When Pharmasset's Jeremy Clark was describing to his boss, Dr. Michael Otto, Clark's breakthrough – the synthesis of a 2'-methyl up 2'-fluoro down compound, later labeled PSI-6130 – he had Idenix's patent application in hand. (*See, e.g.*, Tr. at 1006) The jury implicitly found that Clark and others at Pharmasset copied (and were assisted by) Idenix's work.

Idenix is correct that this course of conduct, viewed alone, favors enhancement of damages. But, when considered in context, the Court concludes that Gilead's conduct does not warrant increasing the amount of money Gilead must pay Idenix.

3

Idenix contends that application of the *Read* factors, *see* 970 F.2d at 827-28, supports its

6

request for enhanced damages. The Court disagrees. In totality, these factors disfavor an award of enhanced damages here.[7]

The first *Read* factor is "whether the infringer deliberately copied the ideas or design of another." As to this factor, Idenix contends that "Gilead/Pharmasset's deliberate copying and misuse of Idenix's invention presents a quintessential basis to enhance damages." (D.I. 538 at 9) Gilead counters: "Pharmasset affirmatively reviewed Idenix's patent application, determined its compound of interest was not included in the closed list of potential compounds described by the patent, then proceeded to make and test that compound – a compound that Idenix itself was not able to make and test until after it reviewed Pharmasset's application." (D.I. 555 at 2-3) While substantial evidence was presented at trial on both sides of this dispute,[8] the jury presumably found the facts to be more consistent with Idenix's characterization than Gilead's. The Court

---

[7]Even where several of the *Read* factors favor enhancement, it remains within the Court's discretion to decline to enhance damages. *See, e.g., Sprint Communications Co. L.P. v. Time Warner Cable, Inc.*, 2017 WL 978107, at *13-14 (D. Kan. Mar. 14, 2017) (finding three *Read* factors in favor of enhancement, but concluding case did not involve "especially egregious case of infringement" and, thus, not awarding enhanced damages).

[8]For example, Idenix relies heavily on the statements of Pharmasset's Dr. Lieven Stuyver, including that he felt he needed a "cold shower" after learning of Idenix's patent application, as "NOTHING is left of our inventions," due to Idenix getting there first. (Tr. at 651-52; PX-470) It is undisputed that Stuyver made these comments in November 2001 and that Pharmasset's Jeremy Clark's work – on compound PSI-6130 – was performed in 2002-03. (*See* Tr. at 969) It follows that Stuyver could not have been stating that Clark's work – which led directly to Dr. Sofia's creation of sofosbuvir a few years later – amounted to "nothing" and was within the scope of Idenix's patent.

Also, if the only thing Pharmasset/Gilead did was to "deliberately copy" Idenix's discovery that a 2'-methyl up modified nucleoside could be effective in treating HCV, that was not nearly enough to arrive at sofosbuvir. It is undisputed that many 2'-methyl up compounds are inactive against HCV, and only sofosbuvir has proven to be suitable for use in humans. Pharmasset and Gilead engaged in a massive effort to arrive at the ultimate cure.

concludes that this "deliberate copying" factor must, based on the jury verdict, be deemed to favor enhancement.

Turning to the second *Read* factor – "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed" – the record shows that Gilead had a "good-faith belief" that the '597 patent was invalid or not infringed. Dr. Otto testified that, after being made aware of the Idenix patent application in 2001, he instructed Pharmasset chemists in the fall of 2002 to "look for the holes ... areas that you don't believe are being worked on by others that we might work on and still be able to get an invention." (Tr. at 693) Around this time, Jeremy Clark conceived of the idea of a 2'-methyl up 2'-fluoro down nucleoside. (*See, e.g.,* Tr. at 967) Dr. Otto further testified that he and Clark believed that the fluorine compound was "a novel idea that clearly wasn't being described in [Idenix's] patent application." (Tr. at 1011; *see also id.* at 1005-12) Dr. Otto explained that Clark approached him with the idea for PSI-6130 with Idenix's patent application in hand, and that Clark "thought his idea was novel." (Tr. at 1005-07) This was important to Dr. Otto because Pharmasset "had limited resources" and he did not want his researchers "wasting ... time on working on something that wasn't a novel idea." (Tr. at 1007)

The jury was not instructed on good faith – the Court had stricken, as untimely, Gilead's non-infringement defense of good faith[9] – and the jury presumably found that at some point in

---

[9]Idenix is correct that the Court struck Gilead's "good faith belief of non-infringement defense" when it was raised, for the first time, in Gilead's summary judgment briefing. (*See* D.I. 367; D.I. 368 at 136-38) The Court struck the good-faith defense in July 2016, noting that Gilead had yet to disclose "who, if anyone, at Gilead subjectively believed Gilead does not infringe, how they formed that belief, and when they formed that belief." (D.I. 368 at 137) Idenix is incorrect, however, in asserting that "Gilead has no evidence that it had a good-faith belief that it would not be liable for infringement." (D.I. 538 at 11) While the Court made the

8

time Pharmasset or Gilead acted in bad faith. (*See* D.I. 516 at 25) (jury instruction 5 on "Willful Infringement") Even so, there is evidence of Gilead – in the persons of at least Clark and Otto – having had a good-faith belief after reviewing Idenix's patent application that a 2'-fluoro down compound would be outside the scope of Idenix's claims and, therefore, non-infringing. This factor, then, does not support enhancing damages.

Gilead's "behavior as a party to the litigation," the next *Read* factor, disfavors enhancement. Idenix contends that Gilead "took unreasonable positions" by waiting until just before trial to concede infringement, by requesting bifurcation despite previously opposing it, and through its handling of its "Merck work" obviousness defense. (D.I. 538 at 13-14) The Court strongly disagrees with Idenix's portrayal of this litigation.

As the Court has previously observed, Gilead has not "conceded infringement;" instead, Gilead decided that it could not prevail on an infringement dispute based on a claim construction with which it disagreed. (*See* D.I. 477 at 141) The Court encourages – and expects – litigants to narrow their cases as trial approaches, focusing on the strongest, and most important, of the manifold contentions they have considered at earlier stages of the case. Moreover, just as Gilead refined its case while preparing for trial, so, too, did Idenix, including by dropping a previously-asserted patent (U.S. Patent No. 6,914,054) in its entirety and several previously-asserted claims of the '597 patent. (*See* D.I. 452 at 4) *See generally Sprint*, 2017 WL 978107, at *14 ("[A]lthough Sprint complains that Time Warner Cable significantly narrowed its defenses at trial, such a decision to focus on the strongest arguments (like Sprint's own narrowing of claims

---

correct case-management decision, given the inadequacies – in terms of timing and substance – of Gilead's disclosures, this is not the same thing as saying that, as a factual matter, there is no evidence of Gilead having had, at the pertinent time, a good-faith belief of non-infringement.

for trial) is not improper, and the Court is not persuaded that Time Warner Cable otherwise over-litigated the case."). While the Court rejected Gilead's eventual request for bifurcation, it was not improper for Gilead to have reevaluated its position on bifurcation in light of case developments, including its decision not to contest infringement. And the Court permitted (despite Idenix's objections) Gilead's presentation of its Merck-work defenses. In sum, the litigation conduct factor does not favor enhancement.

Gilead's "size and financial condition" are large and healthy, respectively, which as a general matter could support enhancement. Under the circumstances here, however, these considerations do not merit any weight. This factor is often given weight *against* enhancement in situations where, for instance, the other Read factors strongly support enhancement but the infringer is in such perilous financial condition that an award of enhanced damages might put it out of business. *See, e.g., Virginia Panel Corp. v. Mac Panel Co.*, 887 F. Supp. 880, 885 (W.D. Va. 1995), *aff'd*, 133 F.3d 860 (Fed. Cir. 1997) ("[Defendant's] financial condition is such that a large enhancement of damages could drive it out of business. Although an enhancement of damages is partly motivated by punishment, this court does not consider it appropriate to levy a punishment which under these circumstances perhaps could be equivalent to an organizational death sentence."); *see also Krippelz v. Ford Motor Co.*, 670 F. Supp. 2d 815, 822 (N.D. Ill. 2009) ("Defendant's size and financial condition should be viewed both relative to the Plaintiff and also individually to ensure that enhanced damages would not unduly prejudice the defendant's non-infringing business.") (internal quotation marks omitted). Furthermore, as Gilead explains, although it has "undoubtedly profited from sofosbuvir, Gilead also took a major risk in acquiring Pharmasset for $11 billion, before it knew whether sofosbuvir would succeed in Phase III FDA

10

clinical trials or that Idenix's lead compound would fail." (D.I. 555 at 12-13)

The next *Read* factor, "closeness of the case," strongly disfavors enhancement. Notwithstanding the jury verdict, and the speed with which it was returned (in approximately two hours) (*see* D.I. 566 at 5), nearly every aspect of this case was "close" in the sense that it easily could have gone the other way. It is true, as Idenix observes, "The Court construed the claims twice, adopting Idenix's proposals in full each time; twice denied Gilead's motions for summary judgment; and denied all of Gilead's *Daubert* motions seeking to exclude part or all of the opinions of six Idenix experts." (D.I. 538 at 2) But what is omitted from this recitation of some of the litigation events is that almost all of these decisions were difficult, and the Court seriously considered ruling against Idenix on most of these disputes, particularly on claim construction. (*See, e.g.*, D.I. 237 at 8 (stating in claim construction opinion: "The patent's failure to expressly disclose fluorine at the 2' down position does give the Court pause . . . ."); D.I. 446 at 17 (describing Gilead's written description defense as "reasonable interpretation of the record"); D.I. 477 at 141 (recognizing that Court's claim construction "may ultimately be shown to be wrong" on appeal))

Idenix has admitted that Gilead would not literally infringe under Gilead's proposed constructions (*see* D.I. 553 at 27) – so, had the Court not been persuaded (after two rounds of claim construction briefing and two claim construction hearings), and with "some pause," to agree with Idenix, this case almost certainly would have been resolved in Gilead's favor. Moreover, during the post-trial motions hearing earlier this month, the Court heard more than two hours of oral argument on Gilead's invalidity defenses, a reflection of (at minimum) the reasonableness of those defenses and the challenging issues involved. (*See, e.g.*, Arg. Tr. at 5-

100) Idenix is simply wrong when it asserts that "this case was not close." (D.I. 566 at 5)[10]

The next two factors – the "duration" of the infringer's "misconduct" and "[r]emedial action" it has taken – do not favor enhancement. Even accepting Idenix's position that Gilead's misconduct began in 2001, when Dr. Schinazi violated his confidentiality agreement with Idenix (*see* Tr. at 584-85), the record cannot reasonably be understood to show an uninterrupted 16-year saga of unremediated wrongs. Pharmasset ousted Dr. Schinazi in 2005. (*See* Arg. Tr. at 147)[11] Further, it is undisputed that Idenix's patent did not issue until October 2009, Gilead did not launch an accused product until December 2013, and Gilead did not know until December 2015 – when this Court issued its claim construction order – that the claims cover 2'-methyl up 2'-fluoro down compounds. **REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

Similarly, there is no evidence of a "motivation for harm" that would support enhancement. The record can only reasonably be understood as showing that Gilead's "motivation" – in addition to a healthy profit motive, which Idenix (quite rightly) shares – was to

---

[10]While "[p]roof of an objectively reasonable litigation-inspired defense to infringement is no longer a defense to willful infringement," *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016), the Court can consider such a defense as part of its discretionary enhancement decision, *see WesternGeco*, 837 F.3d at 1363 ("After *Halo*, the objective reasonableness of the accused infringer's positions can still be relevant for the district court to consider when exercising its discretion.").

[11]While the jury did not hear evidence of this, the parties agree the Court may consider "materials outside the trial record." (D.I. 538 at 8 (citing *nCUBE Corp. v. SeaChange Int'l, Inc.*, 313 F. Supp. 2d 361, 388-89 (D. Del. 2004), *aff'd*, 436 F.3d 1317 (Fed. Cir. 2006)); *see also* Arg. Tr. at 147)

develop a cure to a devastating, life-threatening disease. "[T]he fact that the infringer acted pursuant to a financial motive does not distinguish this case from the garden-variety infringement case." *Sprint*, 2017 WL 978107, at *14.[12]

Turning to the next factor, the jury may have found that Gilead "attempt[ed] to conceal its misconduct." The jury heard that internal Pharmasset documents were modified to remove references to Idenix (*i.e.*, chemistry meeting minutes that originally read "Idenix compound" were changed to read "2'-C-methyl-Cytidine"). (*Compare* PX-782 *with* PX-789) But even Idenix presented evidence that Pharmasett did not entirely conceal its work. It was undisputed at trial that Pharmasset, and its scientists, pursued a patent on PSI-6130, the application for which was made public in January 2005. (*See* DX-7 (U.S. Patent No. 7,429,572); *see also* Tr. at 1190-91) Even before that, Dr. Schinazi himself had apparently informed Idenix's Dr. Sommadossi of

---

[12]Idenix (D.I. 538 at 15; Arg. Tr. at 132-33) analogizes this case to *Johns Hopkins University v. CellPro*, 978 F. Supp. 184, 196 (D. Del. 1997), where Judge McKelvie trebled damages for willful patent infringement notwithstanding the infringer's contributions to "sav[ing] lives, to fight[ing] cancer, and improv[ing] the human condition." However, other factors entirely missing here supported Judge McKelvie's decision. He wrote of the defendant, CellPro:

> Behind the science, the medicine, and the potential for treating cancer patients are investors who have demonstrated that their primary motivation is not humanitarianism, nor even responsible capitalism. The record in this case demonstrates that CellPro's motivation, as expressed by the words, conduct, and testimony of it[s] founders, is greed. They are prepared to stretch the boundaries of marketplace competition to maximize their returns. They will deliberately take what is not theirs, pad their files and financial disclosures with weak and misleading opinions of counsel, and litigate to delay and frustrate.

*Id.* There is simply no way to contort the record before this Court and reach the same conclusions about the motivations of Pharmasset or Gilead.

13

Pharmasset's work. (*See* DX-202) Sofosbuvir's inventor, Dr. Sofia, cited Idenix and an Idenix scientist, Dr. Paulo LaColla, in publicly-available research papers. (*See* Tr. at 2136) And in 2009, Dr. Sofia made a public presentation of the structure of sofosbuvir. (*See* DX-2749; Tr. at 1076) The "concealment" factor, in sum, only weakly favors enhancement.[13]

Having assessed each of the *Read* factors, and giving each appropriate weight under the particular circumstances presented here, the Court concludes that an award of enhanced damages is not at all warranted. Only two factors favor enhancement: deliberate copying by Gilead and attempts by Gilead to conceal its misconduct. Most of the other factors – a good faith belief in non-infringement, behavior in the litigation, the closeness of the case, the duration of misconduct and remedial actions taken by Gilead, and the lack of a motivation to harm Idenix – disfavor enhancement. The remaining factor, Gilead's size and financial condition, is essentially neutral. In sum, then, the *Read* factors demonstrate that the Court should exercise its discretion to deny Idenix's request for enhanced damages.

\* \* \*

Additional considerations further support the Court's conclusion. As Idenix correctly observes, "enhanced damages are designed as a punitive or vindictive sanction for egregious infringement behavior." (D.I. 538 at 3) (internal quotation marks omitted) Here, however, Gilead's conduct does not warrant either a "punitive" or "vindictive" response from the judicial

---

[13]When considering the evidence of "concealment," it is difficult to overlook that *Idenix* concealed its view that Gilead had unlawfully taken Idenix's invention. It was not until Idenix filed this lawsuit, in December 2013, that anyone at Idenix told anyone at Pharmasset or Gilead of Idenix's copying allegations. This was despite Idenix having long known of Pharmasset and Gilead's work on 2'-methyl up compounds. (*See, e.g.*, Tr. at 1070; DX-1274.0002, DX-1289.0008, DX-399.0117 (internal Idenix documents, from 2006 and 2009, which describe PSI-6130 as the "Pharmasset compound"))

14

system. While the Court does not, of course, "bless" the type of underhanded corporate piracy the jury implicitly found Gilead committed, given that the result of that misconduct is a *cure* for a potentially-fatal disease afflicting millions of people around the world, and given that the jury's damages award is already the *largest damages verdict ever returned in a patent trial* (compensating Idenix for what it lost), additional sanction is just not warranted.[14]

Another consideration in deciding whether to enhance damages for willful patent infringement is deterrence of undesirable conduct. *See generally Halo*, 136 S. Ct. at 1929. The Court cannot confidently state that it should wish to deter the conduct the jury implicitly found Gilead committed. Even fully accepting Idenix's view of the evidence as it pertains to Dr. Schinazi, Jeremy Clark, Dr. Otto, and the rest, the fact is that Idenix did not synthesize (or at minimum did not recognize that it had synthesized) the key 2'-methyl up 2'-fluoro down compound that led to a cure for HCV until well after Pharmasset did so. (*See, e.g.*, Tr. at 1183; DX-202) Throughout trial, Idenix emphasized that this compound, now known as sofosbuvir, constituted an improvement *by Pharmasset and Gilead* on Idenix's invention. (*See, e.g.*, Tr. at 2104 (Plaintiff's counsel arguing in closing that "they took the great invention that [Idenix] came up with, and they made it better")) In finding willful infringement, the jury may well have agreed with Idenix's characterization of the parties' respective roles – and may have found that the cure for HCV was discovered due only to the combination of Idenix's groundbreaking discovery of

---

[14]Idenix has not contested Gilead's contention that sofosbuvir has saved more than 1 million lives. (*See, e.g.*, D.I. 555 at 1; *see also* Tr. at 1071) It is further undisputed that experts estimate that approximately 2% of the entire world population – about 170 million people, including 3.2 million in the United States – have HCV. (*See* Tr. at 1233) Also undisputed is that the latest variant of the treatment, sofosbuvir combined with velpatasvir, has been shown to cure 95% or more of HCV cases regardless of genotype. (*See* D.I. 563 at 4)

15

potent 2'-methyl up nucleoside activity against HCV with Gilead's revolutionary refinement of that invention (by putting fluorine at the 2'-down position and developing a prodrug that could be delivered effectively).

The Court – and, more generally, the patent system – wants to encourage, and not deter, innovation on existing ideas, and exploration and investment (including in the form of massive expenditures) in related inventions that may reasonably appear to be outside the scope of another patentee's claims. As the Supreme Court reiterated in *Halo*, "patent law reflects a careful balance between the need to promote innovation through patent protection, and the importance of facilitating the imitation and refinement through imitation that are necessary to invention itself and the very lifeblood of a competitive economy." 136 S. Ct. at 1935 (internal quotation marks omitted); *see also State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) (noting that patent system is intended to encourage innovators to develop alternatives to "competitor's products, even when they are patented, thus bringing a steady flow of innovations to the marketplace"). Here, without both parties' contributions, humanity may well have been deprived of a cure for HCV. Under the totality of circumstances, society's interest in deterrence of willful patent infringement does not justify enhancing damages here.

For all of the foregoing reasons, Idenix's request for enhanced damages will be denied.

## II. The Court Finds that this Case is *Not* "Exceptional" within the Meaning of the Patent Statute

In patent cases that are deemed "exceptional," a Court may award "reasonable attorney fees" to the "prevailing party." 35 U.S.C. § 285. The Supreme Court has held that an "exceptional" case is "one that stands out from others with respect to the substantive strength of a

party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). Ultimately, the Court must make a discretionary decision based on the totality of circumstances. *See id.* A party moving for attorney fees must demonstrate, by a preponderance of the evidence, that a case is "exceptional." *Id.* at 1758.

This case was not "exceptional" within the meaning of § 285. For reasons that have already been described in connection with the Court's decision on enhancement of damages, this case does not "stand out from others" with respect to the "substantive strength" of Idenix's position, nor the substantive weakness of Gilead's position. Instead, both sides' positions had substantial merit and this was a case that, quite understandably, went to trial – a trial at which either side could have prevailed. Nor does this case "stand out from others" with respect to "the unreasonable manner" in which it was litigated. The Court does not believe that this case was "unreasonably" litigated by either party. While the case has been hotly contested, and has been marked by a tremendous number of disputes, these are typical realities of high-stakes patent litigation between competitors in a market presenting an opportunity for enormous profits.

Hence, the Court will deny Idenix's request for attorney fees.

### III. The Court Will Use the Prime Rate to Calculate Prejudgment Interest

"As a general matter, prejudgment interest should ordinarily be awarded in patent cases to provide patent owners with complete compensation." *LG Display Co. v. AU Optronics Corp.*, 722 F. Supp. 2d 466, 475 (D. Del. 2010). The Court has broad discretion to determine the appropriate interest rate to apply. *See Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991).

17

Here, the parties agree that the Court should award Idenix prejudgment interest. (*See* D.I. 538 at 25; D.I. 555 at 25) Their dispute is only whether the Court should apply the prime rate, compounded quarterly, as Idenix proposes (D.I. 538 at 24-25), which ranged from 3.25-3.75% during the relevant period (*see* D.I. 538 at 24), or should instead apply the T-bill rate, which was at times as low as 0.10-0.14% (*see* D.I. 566 at 12).[15]

As requested by Idenix, the Court will apply the prime rate. This is by far the most common practice in the District of Delaware. (*See* D.I. 538 at 24 n.4) (collecting cases) Further, for reasons set out in Idenix's brief **REDACTED**

**REDACTED** . (*See id.* at 24-25)

To Gilead, given the absence of evidence that Idenix (or Merck) had to borrow money because it was deprived of the money Gilead should have paid it, the only risk to be alleviated by pre-judgment interest is the "very low risk" of non-payment by Gilead. (D.I. 555 at 25) While the Court plainly has discretion to view the situation as Gilead suggests, decisions of this District have used the prime rate even when there was no evidence that the patentee was borrowing money or experiencing a risk of non-payment. *See XpertUniverse, Inc. v. Cisco Sys., Inc.*, 2013 WL 6118447, at *11 (D. Del. Nov. 20, 2013). Thus, the Court will grant Idenix's request with respect to prejudgment interest.

## IV. Conclusion

Idenix's motion will be denied in all respects except with respect to Idenix's request for prejudgment interest to be calculated using the prime interest rate. An appropriate Order follows.

---

[15]The parties agree also Idenix is entitled to supplemental damages. (D.I. 538 at 25)